**US** Exhibit **11**

```
         IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ALABAMA
                 NORTHEASTERN DIVISION

UNITED STATES OF AMERICA,)
                         )
     Plaintiff,           )
                          )
-vs-                      ) CIVIL ACTION NO.
                          ) 5:18-cv-01055-CLS
RANDY HAMES and HAMES,    )
MARINA, d/b/a HAMES       )
MARINA AND MOBILE HOME    )
PARK,                     )
                          )
     Defendants.          )
_____

TOMEKA BARTLETT and KAYLA )
CARREKER,                 )
                          )
     Plaintiffs,          )
                          )
                          )
v.                        )
                          )CASE NO.
RANDY ALLAN HAMES, et,    )2:18-cv-0109-CLS
al.                       )
                          )
     Defendants.          )
```

## CAPTION

THE DISCOVERY DEPOSITION OF MIRANDA ███, taken pursuant to Notice before R. Keith Kennedy, a Notary Public for the State of Alabama at Large, on the 22nd day of December 2020, beginning at approximately 9:40 a.m., at the law offices of Wiggins, Childs, Pantazis, Fisher and Goldfarb, The Kress Building, 301 19th Street, Birmingham, Alabama; said deposition taken pursuant to the Federal Rules of Civil Procedure.

- - - - - - - - - - - - - - - - -

## APPEARANCES

ELISE SANDRA SHORE AND ERIN MEEHAN RICHMON, Trial Attorneys, Housing and Civil Enforcement, Civil Rights Division, U.S. Department of Justice, 4 Constitution Square, 150 M Street, NE/Room 8.1104, Washington, D.C.; appearing remotely as counsel for the United States.

CARLA B. WARD, Assistant United States Attorney for the Northern District of Alabama, 1801 4th Avenue North, Birmingham, Alabama 35203; appearing remotely as counsel for the United States,

CANDIS A. MCGOWAN AND LACEY DANLEY, Attorney-at-Law, of the law firm of WIGGINS, CHILDS, PANTAZIS, FISHER AND GOLDFARB, 301 19th Street North, Birmingham, Alabama 35203; appearing as counsel for the Private Plaintiffs.

R. CHAMP CROCKER, Attorney-at-Law, of the law firm of R. CHAMP CROCKER, LLC., 207 2nd Avenue S.E., Cullman, Alabama 35055; appearing as counsel for the Private Plaintiffs.

KILE T. TURNER, Attorney-at-Law, of the law firm of NORMAN, WOOD, KENDRICK AND TURNER, 1130 22nd Street South, Birmingham, Alabama 35205; appearing as counsel for the Defendant, Hames Marina.

GREGORY F. YAGHMAI, Attorney-at-Law, of the law firm of YAGHMAI LAW, LLC, 2801 Old Columbiana Road, Birmingham, Alabama 35216; appearing remotely as counsel for Marina Management and Miranda Self.

ALSO PRESENT:

MARY ███, Defendant, appearing remotely via W███

JESSICA ███, Defendant, appearing remotely ███ ebEx.

CHRISTI ███, Defendant, appearing remotely ███ bEx.

ANGELA ███, Defendant, appearing remotel███

CHIQUITA ROBERTSON, Paralegal, U.S. Department of Justice, appearing remotely via WebEx.

LACEY MCCALEB, paralegal, Champ Crocker, LLC, appearing remotely via WebEx.

## INDEX

| Witness: | | Page |
|---|---|---|
| MIRANDA ███ | | |
| Examination by Ms. McGowan | | 6 |

## EXHIBITS

Private Plaintiff's

| Exhibit No. | Description | Page |
|---|---|---|
| 1 | Private Plaintiffs' Fourth Notice of the 30(B)(6) Deposition of Hames Marina, L.L.C. (8 pages).' | 80 |
| 2 | Photograph (1 page). | 84 |
| 3 | Statement of Claim (4 pages). | 170 |
| 4 | Kayla Carreker handwritten document (1 page). | 174 |
| 5 | Statement of Claim (4 pages). | 179 |
| 6 | Order 1-19-2018 (1 page). | 184 |
| 7 | Response to Defendant's Answer to Unlawful Detention/Eviction Complaint (1 page). | 187 |
| 8 | Chart of Cases (5 pages). | 198 |
| 9 | Application and Affidavit for entry for Default Judgment (4 pages). | 207 |
| 10 | Verified Complaint (5 pages). | 214 |
| 11 | Letter to Judge Wells Turner, III from Miranda ███ (1 page). | 220 |
| 12 | Rules of Hames Mobile Home Park (1 page). | 266 |
| 13 | Notice of New/Owner Manager (1 page). | 269 |
| 14 | Check register of Hames Law Firm (28 pages). | 255 |

**Page 6**

```
 1        THE VIDEOGRAPHER:  This begins
 2   day two of the continued deposition of
 3   Miranda ▮.
 4        We are on the record at
 5   12-22-2020 -- the date is 12-22-2020.
 6        The time is 9:40 a.m.
 7        Would the court reporter remind
 8   the witness that she is still under oath.
 9             MIRANDA ▮,
10   a witness of lawful age, having sworn to
11   tell the truth, the whole truth, and
12   nothing but the truth, was examined and
13   testified as follows:
14   EXAMINATION BY MS. MCGOWAN:
15   Q    Miranda, as you know, I'm Candis
16   McGowan.  And I represent the -- along with
17   Champ Crocker and Lacey Danley, we
18   represent the Private Plaintiffs in this
19   case.
20        And I'm going to ask you some
21   additional questions from the questions you
22   were asked yesterday.
23        And then I'm going to ask you
```

**Page 7**

```
 1   some follow-up questions throughout the day
 2   also based on your testimony yesterday.
 3        But let me just back up just a
 4   little bit and say if at any point you do
 5   understand my question or hear me because I
 6   tend talk softly sometimes and look down,
 7   please ask me to repeat or rephrase the
 8   question.  Okay?
 9   A    Okay.
10   Q    Can we have the agreement that if
11   you don't ask me to repeat or rephrase the
12   questions, that you've heard my question,
13   you understand the question and you're
14   giving me the best possible answer to that
15   question?
16   A    Yes.
17   Q    Did you do anything, in addition
18   from yesterday to today, to prepare for
19   this deposition?
20   A    No.
21        MR. TURNER:  Candis -- I'm sorry,
22   Candis, Greg just said that you're fading
23   in and out.
```

**Page 8**

```
 1        MR. YAGHMAI:  Yeah.  Hey, Candis,
 2   at times you can hear your voice and part
 3   of the question and then it kind of fades
 4   back out.
 5        MS. MCGOWAN:  I don't know what
 6   to do about that.
 7        MR. TURNER:  Do you have a
 8   microphone?
 9        MS. DANLEY:  But that microphone
10   isn't going to --
11        MS. MCGOWAN:  No, I'm using the
12   microphone from the -- make it closer
13   maybe.
14        Is that better?
15        THE VIDEOGRAPHER:  Beautiful.
16        MR. YAGHMAI:  Yes.
17        MS. MCGOWAN:  All right.  You can
18   hear?
19        MR. YAGHMAI:  Yes, ma'am.
20        MS. MCGOWAN:  All right.
21   Q    (By Ms. McGowan)  So I was asking
22   you, had you done anything between when you
23   left here yesterday and today to prepare
```

**Page 9**

```
 1   for this deposition?
 2   A    No.
 3   Q    Did you go back and look at any
 4   additional documents?
 5   A    No.
 6   Q    Did you discuss your deposition
 7   testimony with anyone?
 8   A    No.
 9   Q    Did you send any text messages to
10   anyone about the testimony?
11   A    I texted with my attorney and had
12   a phone call this morning with Greg about
13   him attending remotely.
14   Q    Did you talk to any of your
15   sisters about the deposition?
16   A    No.
17   Q    Did you talk to your dad about
18   it?
19   A    No.
20   Q    No one at all asked you how it
21   went?
22   A    Well, my husband asked me how it
23   went.  I told him it went fine.  I told him
```

10

```
1    I can't talk about it.
2    Q       Yesterday you said you looked at
3    some documents to prepare.
4            And I think you said
5    interrogatories?
6    A       Yes.
7    Q       And anything else?
8    A       Yes.
9    Q       What?
10   A       Some financial records from
11   ▮▮▮▮▮ and some text messages.
12   Q       What interrogatories did you look
13   at?
14   A       The ones provided identify by my
15   attorney.
16   Q       But were they interrogatories
17   that you gave responses to or were they
18   interrogatories that the Plaintiffs gave
19   responses to or that Randy Hames gave
20   responses to or that Hames Marina?
21           Who -- who was responding in
22   these interrogatories?
23   A       Hames Marina.
```

11

```
1    Q       Anyone else?
2    A       I suppose Randy Hames was
3    responding in an interrogatory as Hames
4    Marina.
5    Q       Because Randy Hames until, I
6    think you said sometimes in 2018 you
7    started managing -- well, prior to, say
8    from 2014 until you took over in --
9    sometimes in 2018 Randy Hames, was Hames
10   Marina; correct?
11           MR. TURNER:  Object to the form.
12           THE WITNESS:  Randy Hames was the
13   sole manager.
14   Q       (By Ms. McGowan)  And sole owner?
15   A       Yes.
16   Q       And he made all the decisions
17   from 2014 until you -- 2018 regarding the
18   marina; correct?
19   A       Yes.
20   Q       When exactly did you start
21   managing Hames Marina?
22   A       Late February 2018.
23   Q       It wasn't March?
```

12

```
1    Q       Could it have been March of '18?
2    A       It was late February when I first
3    started managing it.  It was early March
4    when I first started making visits to the
5    marina.
6    Q       What did you start doing when you
7    started managing?
8    A       Collecting the launch fees from
9    the box.
10   Q       What else?
11   A       Checking on the place each day or
12   each day that I could.
13   Q       When you say, "Checking on the
14   place," what do you mean?
15   A       Driving through it.
16           Checking the main water meter to
17   make sure it's not spinning indicating a
18   leak.
19           Make sure nothing is out of
20   place.
21   Q       Anything else?
22   A       Collecting rent from tenants.
23   Q       Were you given an actual job
```

13

```
1    title when you started managing?
2    A       No.
3    Q       Who made the decision that you
4    would start managing?
5    A       My father and I.
6    Q       What was Randy Hames' role once
7    you started managing?
8    A       He provided assistance if I
9    asked.  If I had a question, he could
10   answer it.
11           He did not have an active role in
12   the marina after that point.
13   Q       He was still the sole owner;
14   correct?
15   A       Of Hames Marina, LLC.
16   Q       Correct.
17           That's what I talking about,
18   Hames Marina, LLC?
19   A       Yes.
20   Q       And he was -- he was still the
21   individual, as the sole owner, with the
22   ultimate decisionmaker for Hames Marina,
23   LLC; correct?
```

**Page 14**

1  A     He -- I was making decisions
2  after that point.
3  Q     Were you making the financial
4  decisions?
5  A     Some.
6  Q     What financial decisions did you
7  make?
8  A     I paid utility bills.
9        I paid repairmen.
10 Q     More bookkeeping type decisions;
11 correct?
12 A     I didn't consider it bookkeeping.
13 Q     Well, you were paying the bills;
14 correct?
15 A     Yes.
16 Q     And if work was done you paid the
17 repairmen?
18 A     Yes.
19 Q     And, at some point, you couldn't
20 even write a check for Hames Marina, could
21 you?
22 A     Yes.
23 Q     Am I correct in that?

**Page 15**

1  A     Yes.
2  Q     And it wasn't until later that
3  you were placed on the checking account for
4  Hames Marina; correct?
5  A     Yes.
6  Q     And that was much later after you
7  started doing the day-to-day management;
8  correct?
9  A     Yes.
10 Q     Exactly what date did you get on
11 the checking account?
12 A     I don't recall that date.
13 Q     And when you were placed on the
14 checking account Randy Hames was still on
15 the account; correct?
16 A     Yes.
17 Q     After you were placed on the
18 checking account, could Randy Hames still
19 write checks?
20 A     Yes.
21 Q     Did you have to discuss any
22 checks you were writing out of the checking
23 account with Randy Hames before you wrote

**Page 16**

1  them?
2  A     No.
3  Q     Who recorded the checks so that
4  the books could be balanced?
5  A     The bank provides a monthly bank
6  statement.
7  Q     Who got the monthly bank
8  statement?
9  A     It was sent to Randy.  We didn't
10 change that address.
11 Q     Is that checking account still
12 open?
13 A     No.
14 Q     When was it closed?
15 A     I don't recall exactly.  I think
16 it may have been in September of 2018.
17 Q     Was it -- it was closed after it
18 paid for the corporate documents for Marina
19 Management; correct?
20 A     It was some time after that, yes.
21 Q     And so in September 2018 am I
22 not --
23       MS. MCGOWAN:  Hello?

**Page 17**

1        Are you there?
2        Who is it?
3        Can y'all tell who's --
4        MR. TURNER:  I can't tell.
5        MS. DANLEY:  It will record it on
6  the video.  So go ahead.
7        MS. MCGOWAN:  Okay.
8  Q     (By Ms. McGowan)  So Marina
9  Management was formed and incorporated in
10 September of 2018?
11 A     July.
12 Q     July.  Okay.
13       Who made the decision to close
14 the Hames Marina, LLC account?
15 A     Randy Hames.
16 Q     Did you have any input in it, in
17 that decision?
18 A     No.
19 Q     Did you have -- from -- when you
20 took over in February of 2018 until you
21 took over -- until the account was closed
22 in September of 2018, did you have any
23 input in decisions on how the money was

                                    18

```
 1  spent out of that account?
 2  A        Be more specific in your
 3  question.
 4  Q        Did you have any input at all
 5  about any checks that were written out of
 6  that account or any money withdrawn from
 7  the account of Hames Marina?
 8  A        I could write checks out of that
 9  account as needed for business purposes.
10  Q        But only for business purposes?
11  A        I only did for business purposes.
12  Q        Did you have tell to Randy Hames
13  when you wrote a check for business purpose
14  and how much it was?
15  A        No.
16  Q        Could you write a check to give a
17  gift to someone out of it?
18  A        It never occurred to me.
19  Q        No, that's not my question.
20           Did you have the authority to
21  write a check to give a gift to someone out
22  of the Hames Marina account?
23  A        It was not my personal money.
```

                                    19

```
 1  Q        It was Randy Hames'; correct?
 2  A        Yes.
 3  Q        So you did not have that
 4  authority; am I correct?
 5  A        Correct.
 6  Q        Going back up to the
 7  interrogatories you reviewed.
 8           You said it was the Hames Marina
 9  responses?
10  A        I reviewed the Hames Marina
11  responses.
12  Q        Have you ever reviewed the
13  responses to the interrogatories provided
14  by any of the Plaintiffs in this matter?
15  A        You mean the -- oh, I don't
16  remember.
17  Q        Have you read the deposition
18  testimony of any of the Plaintiffs in this
19  matter?
20  A        I watched some of their
21  deposition testimony via Zoom.
22  Q        You were live during the
23  deposition watching?
```

                                    20

```
 1  A        For parts of it, yes.
 2  Q        Have you watched any video
 3  recordings of any of their deposition
 4  testimony?
 5  A        No.
 6  Q        Have you reviewed any of the
 7  deposition responses of any of your sisters
 8  in this matter, any of the other
 9  Defendants?
10  A        My sisters haven't gave
11  depositions.
12  Q        No, I'm sorry.
13           Have you reviewed any of the
14  interrogatory responses of any of your
15  sisters in this matter?
16           MR. TURNER:  That the sisters
17  gave as Defendants?
18           MS. MCGOWAN:  As Defendants, yes.
19           MR. TURNER:  Have you read -- do
20  you understand what she's asking?
21           THE WITNESS:  Not -- not really.
22  I --
23  Q        (By Ms. McGowan)  Okay.  Your
```

                                    21

```
 1  sisters and you are all Defendants
 2  individually in this matter; correct?
 3  A        Yeah, yes.
 4  Q        And as individual Defendants you
 5  each got a set of discovery requests for
 6  you to respond to?
 7  A        Yes.
 8  Q        Have you reviewed those responses
 9  that your sisters filed?
10  A        No.
11  Q        Or any of them?
12  A        No.
13  Q        Have you talked about any of
14  these responses with your sisters?
15  A        Yes, in -- in regards to a couple
16  of them.
17  Q        What did you -- with whom did you
18  have a conversation?
19  A        I've had conversations with all
20  of them.
21  Q        Let's start with the first one
22  you recall having a conversation with about
23  the interrogatory responses.
```

### Page 22

```
 1         Was this a verbal conversation or
 2  a text message?
 3         MR. YAGHMAI:  Can I just pose a
 4  quick objection.
 5         Do you mean her as the Hames
 6  Marina representative.
 7         Because if you're asking Miranda
 8  ▆ then I'm going to object to that.
 9         MS. MCGOWAN:  I'm asking as her
10  role running Hames Marina.
11         THE WITNESS:  Oh, as Hames
12  Marina, no.
13  Q     (By Ms. McGowan)  Do you know if
14  anyone on behalf of Hames Marina has had
15  any discussion with you, individually, or
16  any of the other individual Defendants --
17         MR. TURNER:  Outside the presence
18  of an attorney.
19  Q     (By Ms. McGowan)  -- about their
20  interrogatory responses.
21  A     I don't believe so.
22  Q     Who would know if anyone else had
23  had any conversations on behalf of Hames
```

### Page 23

```
 1  Marina with any of the individual
 2  Defendants?
 3  A     Randy Hames would know.
 4         The other daughters would know if
 5  they've had a conversation.
 6  Q     Any other interrogatories or
 7  discovery responses that you can recall
 8  that you reviewed to prepare for this
 9  deposition?
10  A     Not at this time.
11  Q     You said you reviewed some
12  financial records from ▆?
13  A     Yes.
14  Q     What financial records?
15  A     Some bank statements.
16  Q     And these were bank statements of
17  what company or who?
18  A     Hames Marina.
19  Q     What years?
20  A     Well, I didn't review them all.
21  There was a lot.  I think I reviewed a
22  statement or two from several different
23  years.
```

### Page 24

```
 1  Q     And what did you see on these
 2  statements?
 3  A     I saw deposits and checks
 4  written.
 5  Q     To who?
 6  A     I don't recall to whom all checks
 7  were written and every statement I've seen.
 8         Could you please be more
 9  specific?
10  Q     Well, you said you reviewed a few
11  statements, you didn't review them all?
12  A     Correct.
13  Q     And the ones that you do -- did
14  review, do you recall -- were you looking
15  to see if a specific check was written to
16  anyone?
17  A     No.
18  Q     How did you choose which
19  statements to review?
20  A     My attorney provided.
21  Q     And on those statements that were
22  provided to you to review, do you recall
23  any check that was written to anyone?
```

### Page 25

```
 1  A     Checks to Lowe's.
 2  Q     Checks to who?
 3  A     Lowe's, L-O-W-E-S.  It's a home
 4  improvement supply store.
 5         MS. DANLEY:  Everyone is asking
 6  if both of y'all can speak up.
 7         MS. MCGOWAN:  All right.
 8         THE WITNESS:  Well, it's so far
 9  away is the problem.
10  Q     (By Ms. McGowan)  You reviewed
11  some checks written to Lowe's?
12         MR. YAGHMAI:  Yes, I'm still
13  having a hard time hearing Candis.  The
14  beginning of the question you can kind of
15  hear until it tails off.
16         MS. MCGOWAN:  I'm sorry, I've got
17  my mic up.
18         MR. YAGHMAI:  You can't -- it's
19  just -- you know, I don't know if they can
20  fix it because it literally -- I'm not
21  blaming you.  I'm just saying it starts and
22  then it kind of dies off.
23         MS. MCGOWAN:  I have a mic on and
```

26

```
 1  have a microphone beside me.  So I don't
 2  know what else to do.  I'm sorry.  You'll
 3  have the transcript.
 4          MR. YAGHMAI:  Well, that doesn't
 5  do me any good if I'm trying to object in
 6  the middle of it.  I appreciate that,
 7  though.
 8          MS. MCGOWAN:  Well, Kile will
 9  take care of you.  He can object.
10          MR. TURNER:  I object to that.
11  Q       (By Ms. McGowan)  The bank
12  statements that -- you said you looked at a
13  check to Lowe's.
14          How many checks to Lowe's?
15  A       I don't recall.
16  Q       More than one?
17  A       Yes.
18  Q       More than 10?
19  A       I don't recall.
20  Q       Who wrote these checks to Lowe's?
21  A       Mostly Randy Hames.
22  Q       Do you know what they were for?
23  A       Supplies.
```

27

```
 1  Q       Do you know what year?
 2  A       I think there was 2018, 2017,
 3  maybe 2014.  I don't recall.
 4  Q       Do you recall any other checks
 5  you saw?
 6  A       Yes.  Baughman Heating and Air.
 7  Q       Baughman, B-O --
 8  A       Baughman, B-A-U-G-H-M-A-N.
 9          Baughman Heating and Air.
10  Q       Do you know what year that check?
11  A       I don't recall exactly which bank
12  statements those were on.
13  Q       Was there more than one?
14  A       There's more than one payment to
15  Baughman Heating and Air.
16  Q       What -- do you know what the
17  payments were for?
18  A       For repairing heating or air
19  conditioning units.
20  Q       Do you recall any other checks?
21  A       I think -- there may have been
22  some checks to Emitt Freeman.
23  Q       Who is Emitt Freeman?
```

28

```
 1  A       He's an electrician.
 2  Q       Does he -- is he a tenant?
 3  A       No.
 4  Q       Do you how many checks there were
 5  to Emitt?
 6  A       I don't recall.
 7  Q       Do you recall what years they
 8  were?
 9  A       I don't.
10  Q       Do you know why Emitt Freeman was
11  getting a check?
12  A       For electrical repair work.
13  Q       Was this electrical repair work
14  on the trailers or do you know where it
15  was?
16          Was it on a building or do you
17  know?
18  A       He's -- he's done repair on
19  trailers.
20          And I think he repaired a
21  security light.
22          I really can't remember what all
23  repairs Emitt Freeman was hired to do.
```

29

```
 1  Q       Did you ever hire him to do
 2  things?
 3  A       I have.
 4  Q       And do you know who actually
 5  wrote the checks to Emitt Freeman?
 6  A       I believe they were all from
 7  Randy.  I can't remember right now if I
 8  wrote any checks to Emitt Freeman from
 9  Marina Management account or not.
10  Q       Do you recall any other checks?
11  A       Yes.
12  Q       Tell me about the other ones?
13  A       There were gift checks to all of
14  his son-in-laws.
15  Q       When were those written?
16  A       March 2018.
17  Q       Who are his son-in-laws?
18  A       Barry Dolbeer, Emilio Sahurie.
19  Q       Spell that?
20  A       S-A-H-U-R-I-E.
21  Q       What -- spell his first name.
22  A       Emilio, E-M-I-L-I-O.
23  Q       Who else?
```

### Page 30

```
 1  A       Shannon Self, Glenn Penner,
 2  Richard Postma.
 3  Q       Spell that last name?
 4  A       P-O-S-T-M-A.
 5  Q       Anyone else?
 6  A       Those are the five son-in-laws.
 7  Q       Were those the five $15,000
 8  checks that were marked into evidence
 9  yesterday?
10  A       Yes.
11  Q       Had you reviewed those prior to
12  yesterday's testimony?
13  A       Yes.
14  Q       Did you have any involvement in
15  the decision to write those checks?
16  A       No.
17          Wait.  Me personally, Miranda
18  ▇, or Hames Marina?
19  Q       First, you personally?
20  A       No.
21  Q       Second, you, Hames Marina?
22  A       I, as Hames Marina, had no
23  involvement in that.
```

### Page 31

```
 1  Q       That was made -- a decision made
 2  by Randy?
 3  A       Yes.
 4  Q       Did you have any discussions with
 5  Randy about these checks?
 6  A       No.
 7  Q       How did you learn that Randy had
 8  written these checks?
 9  A       He told each of his daughters.
10  Q       What did he tell?
11  A       That he was giving a gift to each
12  son-in-law.
13  Q       Did he say why?
14  A       Yes.  It was part of his estate
15  planning.
16          He gave property to his daughters
17  and he gave a gift of money to his
18  sons-in-law.
19  Q       When did this conversation take
20  place?
21  A       Which conversation?
22  Q       With Randy when -- in which he
23  informed you he was doing this for estate
```

### Page 32

```
 1  planning.
 2  A       Oh, we had many conversations
 3  about estate planning spanning over years.
 4  Q       When did the one take place where
 5  he told you he was giving the 15,000 out of
 6  Hames Marina, LLC account?
 7  A       He informed us after the checks
 8  were written that the checks had been
 9  written.
10  Q       You don't recall the date?
11  A       No.
12  Q       Do you know if it was the day the
13  checks are dated, a week after they were
14  dated?
15  A       I don't recall the day.
16  Q       As Hames Marina, LLC manager, did
17  you have any objection to him writing these
18  checks out of the marina account?
19  A       No.
20  Q       At the time these checks were
21  written you were aware that there were
22  civil lawsuits being filed against Hames
23  Marina and Randy Hames, were you not?
```

### Page 33

```
 1          MR. TURNER:  Object to the form.
 2          Which -- are you talking about
 3  the date of the check?
 4          MS. MCGOWAN:  Uh-huh, the $15,000
 5  checks, yes.
 6          MR. TURNER:  Okay.  Now, I think
 7  those were written -- what day was it?
 8          MS. DANLEY:  The 14th.
 9          MS. MCGOWAN:  The 14th of March.
10          THE WITNESS:  Hames Marina -- I'm
11  sorry, say the question again.
12  Q       (By Ms. McGowan)  Hames Marina
13  became aware that there was potential
14  litigation involving the allegations in
15  this case in February of 2018; is that
16  correct?
17  A       Litigation in February?
18  Q       That there was potential for
19  litigation in February; correct?
20  A       He was arrested.
21  Q       Correct.
22          Randy Hames was arrested in
23  February.
```

34

1  And Randy Hames also filed an
2  eviction suit. And one of the answers to
3  the eviction suit alleged sexual
4  harassment.
5  Were you aware of that against
6  Hames Marina back in January?
7  A    Yes.
8  Q    So then he was re-arrested in
9  March again; correct?
10 A    He was re-arrested twice in
11 March.
12 Q    And one of the times he was
13 arrested in March was prior to writing this
14 $15,000 check; correct?
15 A    Yes.
16 Q    So at the time that Randy Hames
17 wrote these $15,000 checks out of the Hames
18 Marina account, you were aware there was
19 potential litigation; correct, Hames
20 Marina?
21 A    Litigation had not been filed.
22 Q    Were you aware that Randy Hames
23 was and Hames Marina were served on March

35

1  13th, 2018, with two lawsuits?
2  A    Yes.
3  Q    And these checks were written on
4  March 14th; correct?
5  A    Yes.
6  Q    What happened to the money out of
7  Hames Marina, LLC when it was closed, the
8  account was closed?
9  A    Randy withdrew the remaining
10 funds.
11 Q    Do you know where they went?
12 A    No.
13 Q    Did you have any decision on what
14 would be done with the funds?
15 A    No.
16 Q    Do you know how much funds were
17 left at the time he withdrew, the account
18 was closed?
19 A    I don't recall.
20 Q    At the time they were recalled
21 you were the manager of Hames Marina, LLC;
22 correct?
23 A    During that transitionary time

36

1  period, yes.
2  Q    Was part of your roles as manager
3  to know the financial status of the
4  corporation?
5  A    No.
6  Q    Well, define for me what your
7  exact roles were as manager with regards to
8  the financial aspects?
9  A    I kept the business running until
10 we could transition it because he was done
11 running that business. And I was starting
12 running that business and there was a
13 transitionary time period.
14 Q    When you say, "You kept the
15 business," you were collecting rent?
16 A    Yes.
17 Q    And depositing rent?
18 A    Yes.
19 Q    And if repairs had to be made you
20 hired somebody to make the repairs?
21 A    Yes.
22 Q    And you paid for those repairs?
23 A    Yes.

37

1  Q    Did you have any other role in
2  the financial aspect of the business other
3  than that?
4  A    No.
5  Q    Did you have a written agreement
6  with --
7  A    Wait --
8  Q    I'm sorry.
9  A    -- let me interject one thing.
10 Q    Okay.
11 A    When it was tax filing season
12 Randy Hames and Hames Marina used the same
13 tax attorney that I use. And I had
14 inquired if the taxes had been filed. And
15 the tax attorney replied that they had not.
16 And so I contacted the secretary
17 to send over the QuickBook information so
18 that taxes could be filed.
19 Q    So you just asked that they get
20 it done?
21 A    Yes.
22 Q    But you didn't sign off on the
23 taxes?

### Page 38

```
 1   A        No.
 2   Q        And you didn't review them to
 3   make sure they were accurate?
 4   A        No.
 5   Q        And you didn't review them to
 6   make that income was accurately reported,
 7   did you?
 8   A        No.
 9   Q        Do you know who did review to
10   make sure income was reported correctly?
11   A        No.
12   Q        Did Randy Hames sign the taxes
13   for Hames Marina?
14   A        I don't know.  I would assume so.
15   Q        What tax year?
16   A        Pardon?
17   Q        Which tax year was this for that
18   you asked that they be done?
19   A        2017.
20   Q        What about the year 2018?
21   A        I don't remember asking about
22   that.
23   Q        Who is the tax attorney you used?
```

### Page 39

```
 1   A        Gloria Winton.
 2   Q        Gloria who?
 3            MR. TURNER:  I think she's a CPA.
 4            THE WITNESS:  She's a CPA.
 5   Gloria Winton.
 6   Q        (By Ms. McGowan)  Where is she?
 7   A        Cullman, Alabama.
 8   Q        Spell her last name for the
 9   record.
10   A        W-I-N-T-O-N.
11   Q        Do you know if taxes were filed
12   for 2018 on the corporate entity, Hames
13   Marina?
14   A        I don't know.  I would assume so.
15   Q        Did you have any written
16   agreement with Hames Marina to take it over
17   in transition?
18   A        No.
19   Q        Did you have any verbal
20   agreement?
21   A        Yes.
22   Q        What was your verbal agreement?
23   A        That I would start my new
```

### Page 40

```
 1   business as soon as I could so that he
 2   could close out his.
 3   Q        Who's decision was it to start a
 4   new business?
 5   A        Mine.
 6   Q        And why?
 7   A        Because I just wanted to do it
 8   that way.
 9   Q        Did you have any reasons for
10   wanting to do it that way?
11   A        I thought it was best.
12   Q        Why did you think it was best?
13   A        I probably didn't have any good
14   reasons for it.
15   Q        Give me --
16   A        It was just a decision.
17   Q        Did you weigh any pros and cons
18   changing the name?
19   A        I've considered changing the
20   name.
21   Q        Have you changed the name?
22            MR. TURNER:  From Hames Marina?
23            THE WITNESS:  From Hames Marina,
```

### Page 41

```
 1   LLC?
 2   Q        (By Ms. McGowan)  Uh-huh.
 3   A        It's Marina Management, LLC.
 4   Q        That's your business, Marina
 5   Management?
 6   A        Yes.
 7   Q        But are you still holding out the
 8   property and the trailers as Hames Marina,
 9   LLC -- as Hames Marina and RV Park?
10   A        Well, they're separate now.
11   Q        How are they separate?
12   A        The trailer park belongs to me.
13            The RV park belongs to Angela.
14            The wet boat slips belong to
15   Angela.
16            There's a few trailer lots that
17   are on Angela's land.
18   Q        So when you started your own
19   business, Marina Management, did you go get
20   any advice from anyone on starting a new
21   company?
22   A        I did Internet searches.
23   Q        And what kind of Internet
```

```
                                          42
 1  searches?
 2  A      Like a Goggle search.
 3  Q      What did you Google?
 4  A      Oh, I can't remember every search
 5  query I -- I typed into Google about how to
 6  run a business.
 7  Q      What was your concern about why
 8  it should be a different name or a
 9  different entity from Hames Marina, LLC?
10  A      I wanted it to be my own.
11  Q      At the time you were wanting it
12  to be your own, you were still the manager
13  for Hames Marina, LLC; correct?
14  A      Yes.
15  Q      Did you discuss with anyone at
16  Hames Marina, LLC your desire to dissolve
17  it and start a new company?
18  A      Yes.
19  Q      And what was Hames Marina, LLC's
20  position on that?
21  A      That that's a great idea.  I
22  should do that.
23  Q      Who told you that?
```

```
                                          43
 1  A      Randy Hames.
 2  Q      Did he say why he thought it was
 3  a good idea?
 4  A      Because he encourages me in the
 5  things I want to do.
 6  Q      Did Hames Marina, LLC have any
 7  discussions with anyone with regard to it
 8  would be a good idea, as a result of these
 9  lawsuits, to get this property and money
10  into a different name?
11  A      Not because of lawsuits, no.
12  Q      Was there any discussion with
13  Hames Marina, LLC, and anyone, that the
14  property needed to be distributed and taken
15  out of Randy's name?
16  A      We were encouraging him to move
17  forward with his plans that had been in
18  place for years.
19         And there were concerns about his
20  health, which were not good.
21  Q      Was there any discussion about
22  this lawsuit or the lawsuits, potential
23  lawsuits and the claims?
```

```
                                          44
 1  A      There was discussion about the
 2  anxiety and stress he was under.
 3  Q      Was there any discussion about
 4  potential judgments and money --
 5  A      No.
 6  Q      -- being awarded?
 7  A      No.
 8  Q      We were talking about what
 9  Exhibits -- I mean, documents you reviewed
10  and bank statements.  And we got off on
11  another subject because you were talking
12  about you had seen the gift checks.
13         Any other checks you recall
14  seeing?
15  A      Not at this time.
16         MR. TURNER:  And that also
17  includes the ones to Lowe's and the --
18         MS. MCGOWAN:  I'm sorry?
19         MR. TURNER:  You're talking
20  about --
21         MS. MCGOWAN:  She said she
22  reviewed checks.
23         MR. TURNER:  -- she doesn't
```

```
                                          45
 1  recall any --
 2         MS. MCGOWAN:  And I'm just
 3  asking --
 4         MR. TURNER:  -- other than the
 5  ones she's talked about?
 6         MS. MCGOWAN:  Right.  I'm saying
 7  are there any others you recall seeing?
 8         MR. TURNER:  Right, right, yeah,
 9  besides the one that she saw?
10         MS. MCGOWAN:  Right.
11         MR. TURNER:  I just wanted to
12  make sure that's the one.
13  Q      (By Ms. McGowan)  I'm just
14  saying, do you recall any others that you
15  looked at that were written to anyone else?
16  A      There were other checks.  I can't
17  remember who all checks were written to.
18  Q      You said that you looked at the
19  ███████ account.
20         Any other accounts you looked at?
21  A      No.
22  Q      At the time that Randy Hames had
23  the Hames Marina, LLC account, checking
```

```
                                46
 1  account at [    ], did he have another
 2  personal checking account?
 3  A       Yes.
 4  Q       Did he use the Hames Marina, LLC
 5  as kind of his main checking account?
 6  A       No.
 7  Q       Where was his personal checking
 8  account if you know?
 9  A       I believe it was at [    ].
10  Q       Then you said you looked at some
11  text messages?
12  A       Yes.
13  Q       What text messages?
14  A       I looked at some text messages
15  between Randy Hames and Tomeka Bartlett.
16  Q       Any others?
17  A       Not that I recall.
18  Q       Do you recall which text messages
19  you read between Randy and Tomeka?
20  A       Oh, I -- I would have to see them
21  again.  There was a string of messages.  It
22  was a conversation.
23  Q       Do you remember what month, year?
```

```
                                47
 1  A       I think it was January 2018, I
 2  believe.
 3  Q       Do you recall what they were
 4  discussing?
 5  A       Yes.  It was to make a refusal to
 6  pay rent.
 7  Q       Anything else discussed that you
 8  recall?
 9  A       I would have to review the text
10  to answer you what's in the text.
11  Q       Any other text messages you
12  reviewed?
13  A       Not that I can recall at this
14  time.
15  Q       When you were preparing for your
16  deposition, did you watch any videos or
17  YouTube videos or anything on how to give a
18  deposition?
19  A       Yes, I did.
20  Q       What did you watch?
21  A       Oh, I probably watched a half a
22  dozen YouTube videos on how to give a good
23  deposition.  I do not remember the names of
```

```
                                48
 1  the channels that put out the videos.
 2  Q       Did you watch those with anyone
 3  else besides yourself?
 4  A       No.
 5  Q       Did anyone direct you to watch
 6  those?
 7  A       No.
 8  Q       Why did you watch them?
 9  A       I was nervous about giving a
10  deposition.  I had never done it before and
11  didn't really know what to expect.
12  Q       Did you discuss watching the
13  videos with anyone other than the attorneys
14  representing you?
15  A       Yes.  I told my sisters that I
16  watched some YouTube videos on how to give
17  a good deposition and recommended that they
18  do the same if they have to give
19  depositions.
20  Q       Did you discuss it with Randy
21  Hames?
22  A       No.
23  Q       Have you now told me all the
```

```
                                49
 1  documents that you can recall sitting here
 2  today that you reviewed to prepare?
 3  A       That I can recall at this time.
 4  Q       Yesterday we briefly went through
 5  your educational background, what -- but we
 6  didn't get years.
 7          What year did you graduate from
 8  high school?
 9  A       1993.
10  Q       And you went to Judson?
11  A       Yes.
12  Q       What years did you attend Judson?
13  A       1993.  And I finished December of
14  1996 and I graduated in June of 1997.
15  Q       After you did your student
16  teaching?
17  A       In the fall of '96.
18  Q       Had you completed -- did you do
19  anything from January to June school
20  related?
21  A       Yes.  I was a substitute teacher
22  in Cullman County and Cullman City.
23  Q       So you had already completed all
```

Page 50

```
 1   of your course work and your student
 2   teaching in '96, in December?
 3   A      Yes.
 4   Q      And you just walked in January --
 5   in June?
 6   A      Right.  They only had one
 7   graduation a year.
 8   Q      Have you worked for any employer
 9   besides the Cullman City Schools?
10   A      Cullman County Schools.
11   Q      And you worked for Cullman
12   County?
13   A      Yes.
14   Q      Since you began teaching?
15   A      I worked briefly for Cullman City
16   Schools as a substitute teacher.
17   Q      You started with Cullman County
18   when?
19   A      1997.
20   Q      And you're still there now?
21   A      Yes.
22   Q      Have you had any other jobs
23   outside of Cullman County Schools, Cullman
```

Page 51

```
 1   City Schools?
 2   A      Helping at the marina.
 3   Q      Were you paid to help at the
 4   marina?
 5   A      Yes.
 6   Q      Did you receive a salary or how
 7   did they pay you?
 8   A      No.
 9   Q      Well, when I was younger they
10   would pay me per hour for work I did at the
11   marina.
12          And then after I was older and I
13   was married I would help out just to help
14   out.
15   Q      Did you receive any pay?
16   A      Not usually.
17   Q      If you did receive pay, did you
18   get a 1099?
19   A      It was never enough.
20   Q      Any other jobs?
21   A      You mean before I got my college
22   degree?
23   Q      No, after.
```

Page 52

```
 1   A      No.
 2   Q      Do you pay yourself now a salary
 3   through Marina Management or do -- well,
 4   let me back up.
 5          Did Hames Marina, LLC pay you
 6   anything when you were managing it during
 7   that transition period?
 8   A      No.
 9   Q      Have you ever had any courses or
10   training on sexual harassment?
11   A      Yes.
12   Q      Where?
13   A      Through the school system.
14   Q      How many?
15   A      I don't recall.
16   Q      When did you receive these?
17   A      Sometime over the last 23 years
18   as required training.
19   Q      But there is a required training
20   in the school system for sexual harassment?
21   A      Yes.
22   Q      And you're required to know what
23   it is if it involves students too; correct?
```

Page 53

```
 1   A      Correct.
 2   Q      Do you know whether there's ever
 3   been any training for employees of Hames
 4   Marina regarding sexual harassment?
 5   A      No.
 6   Q      You don't know or there -- no,
 7   there's never been any?
 8   A      I don't know.
 9   Q      Who would know?
10   A      Randy would know.
11   Q      Did -- does Hames Marina have a
12   sexual harassment policy?
13   A      No.
14   Q      Do you know why?
15   A      Hames Marina doesn't have written
16   policies.
17   Q      Do you know why?
18   A      Because it's not a big
19   corporation or company that requires
20   employee manuals and written policies.
21   Q      Does Hames Marina have any
22   written policies for -- or any policies,
23   whether written, for the business, for the
```

```
                                    54
 1  tenants?
 2  A       Hames Marina has a rules list for
 3  tenants.
 4  Q       Does Hames Marina have a policy
 5  for tenants with regards to sexual
 6  harassment or discrimination?
 7  A       Hames Marina follows all laws and
 8  common decency.
 9  Q       That's not my question.
10          Do they have a policy?
11  A       There is no written policy.
12  Q       Is there an oral policy?
13  A       No.
14  Q       So -- when tenants come in, did
15  Hames Marina say -- tell them, advise them
16  of their rights or anything with regards to
17  their rights with regards to sexual
18  harassment or the Fair Housing Act?
19  A       No.
20  Q       When employees -- when a tenant
21  came in and rented from Hames Marina, were
22  they given any rules or told any
23  information?
```

```
                                    55
 1  A       They were given the rule sheet.
 2  Q       Who gave them the rule sheet?
 3  A       Well, Carolyn Hames did; Randy
 4  Hames did; I did.
 5  Q       In 2017, do you know whether or
 6  not the tenants were actually given the
 7  rule sheet when they started?
 8  A       I don't recall.
 9  Q       Who would know?
10  A       Randy Hames.
11  Q       In 2017, you were not personally
12  involved in renting any trailers for Hames
13  Marina, were you?
14  A       No.
15  Q       In 2017, did Randy Hames make all
16  the decisions with regards to renting
17  trailers to tenants?
18  A       Yes.
19  Q       In 2017, were there any
20  background checks done on tenants?
21  A       Yes.
22  Q       What background checks?
23  A       I don't recall.
```

```
                                    56
 1  Q       Who would know?
 2  A       Randy Hames.
 3  Q       When you say, "You don't recall,"
 4  is it because you just don't know or -- and
 5  you've never been told?
 6  A       Sounded like you were asking
 7  about all the background checks ever done.
 8  I can't remember all that.
 9          MR. TURNER:  I think she's
10  asking --
11  Q       (By Ms. McGowan)  I'm asking in
12  2017.
13          MR. TURNER:  -- if they were done
14  generally; right?
15          MS. MCGOWAN:  Right.
16          MR. TURNER:  You're not asking
17  about specific ones?
18          THE WITNESS:  In general,
19  background searches were conducted on new
20  tenants.
21  Q       (By Ms. McGowan)  And in 2017 you
22  said Randy Hames did those?
23  A       Yes.
```

```
                                    57
 1  Q       Did -- are there records
 2  maintained with regards to the background
 3  checks conducted in 2017?
 4  A       Not to my knowledge.
 5  Q       Are there records maintained on
 6  background checks conducted in 2016?
 7  A       Not to my knowledge.
 8  Q       Are there records maintained for
 9  background checks conducted in 2018?
10  A       Not to my knowledge.
11  Q       Did Hames Marina, LLC do any
12  background checks in 2019?
13  A       Hames Marina, LLC did not operate
14  in 2019.
15  Q       So the answer would be no?
16  A       No.
17  Q       Other than a rules sheet, were
18  there any other written policies for
19  tenants of Hames Marina, LLC?
20  A       No.
21  Q       Were there written leases?
22  A       No.
23  Q       Were there written documents
```

## Page 58

```
 1  reflecting the rent structure, how much
 2  would be charged for rent?
 3  A       It was written in the three-ring
 4  binder notes.
 5  Q       That was after a decision was
 6  made and they were paying the rent;
 7  correct?
 8  A       The sheet for each trailer would
 9  continue on to the next tenant.  The rent
10  wasn't changed just because a new tenant
11  came in.
12  Q       Who made the decision on what to
13  charge for the rent in 2016?
14  A       Randy Hames.
15  Q       Who made the decision on what to
16  charge for rent in 2017?
17  A       Randy Hames.
18  Q       Who made the decision on what to
19  charge for rent in 2018?
20  A       Randy Hames.
21  Q       Who made the decision on what
22  would be the amount for a deposit in 2016?
23  A       Randy Hames.
```

## Page 59

```
 1  Q       Who made the decision on what to
 2  charge for a deposit in 2017?
 3  A       Randy Hames.
 4  Q       Who made the decision on what to
 5  charge for a deposit in 2018?
 6  A       Randy Hames.
 7  Q       Have you had any training on the
 8  Fair Housing Act?
 9  A       I've read it.
10  Q       When did you read it?
11  A       I've read it multiple times.  The
12  first time I read it would have been in the
13  spring of 2018.
14  Q       Why did you read it in the spring
15  of 2018?
16  A       To know what was in it.
17  Q       Was it because of the lawsuit
18  filed?
19  A       Yes.
20  Q       Prior to the lawsuit being filed,
21  had you had any training or read anything
22  about the Fair Housing Act?
23  A       No.
```

## Page 60

```
 1  Q       And where did you --
 2  A       Were you asking me personally or
 3  Hames Marina?
 4  Q       Hames Marina.
 5  A       Hames Marina, yes.  Hames Marina
 6  knew about the Fair Housing Act and had
 7  read it multiple times.  Hames Marina was
 8  familiar with the Fair Housing Act.
 9  Q       How do you know that?
10  A       I know it.
11  Q       Tell me how you know.
12          Were there written documents?
13          Were there training courses,
14  training, or how do you know that Hames
15  Marina knew about the Fair Housing?
16  A       I asked Randy and he affirmed.
17  Q       When did you ask Randy?
18  A       In 2018.
19  Q       What did you ask -- who was
20  present?
21  A       He and I.
22  Q       Where were you?
23  A       I don't recall.
```

## Page 61

```
 1  Q       Was it in-person or by phone?
 2  A       I don't recall.
 3  Q       What did you ask Randy?
 4  A       In reference to the Fair Housing
 5  Act.
 6  Q       What did you say?
 7  A       I don't recall my exact words.
 8  Q       Or what were your general words?
 9  A       In general, I asked him about the
10  Fair Housing Act.
11  Q       What did he say?
12  A       He affirmed that he was familiar
13  with it.
14  Q       Did he say how?
15  A       I didn't ask.
16  Q       Did you just say did you know
17  about it or what -- when you said he
18  affirmed --
19  A       I don't recall the exact
20  conversation.
21  Q       Was it in connection to this
22  lawsuit?
23  A       Yes.
```

62

```
1  Q       Prior to you being the manager of
2  Hames Marina, LLC, do you know if any other
3  individual, managing or operating Hames
4  Marina, LLC, had ever attended any seminars
5  or courses on the Fair Housing Act?
6  A       I don't know.
7  Q       So that I'm clear for the record.
8          In 2016, until you took over in
9  2018 as managing, the organizational
10 structure of Hames Marina was just Randy
11 Hames.
12         He was the owner, manager,
13 operator, everything; correct?
14 A       Correct.
15 Q       And then sometimes in 2018,
16 March, I think, you took over as the
17 day-to-day operation manager?
18 A       Correct.
19 Q       But Randy Hames maintained
20 ownership and maintains full ownership of
21 Randy -- of Hames Marina, LLC?
22 A       Hames Marina, LLC, yes.
23 Q       And after you took over managing
```

63

```
1  the day-to-day operations of Hames Marina,
2  LLC, did Randy Hames maintain the ultimate
3  decisionmaking authority with regards to
4  the corporation?
5  A       Yes.
6  Q       And in 2015 Randy Hames was the
7  ultimate decisionmaker, owner-operator of
8  Hames Marina?
9  A       Yes.
10         MR. TURNER:  We've been going
11 about an hour.
12         Can we take a quick break or are
13 you --
14         MS. MCGOWAN:  Hang on one second.
15         MR. TURNER:  You want to mark
16 something?
17         MS. MCGOWAN:  Yeah.
18         MR. TURNER:  Just when you get to
19 that point.  I've had a bunch of coffee
20 this morning.
21 Q       (By Ms. McGowan)  Going back to
22 the area of testimony where we talked about
23 Hames Marina knew about the Fair Housing
```

64

```
1  Act.
2          Did Hames Marina know what was or
3  was not a violation of the Fair Housing
4  Act?
5  A       Yes.
6  Q       And did Hames Marina know that it
7  was a violation of the Fair Housing Act to
8  sexually harass tenants?
9  A       Yes.
10 Q       At Hames Marina, where did
11 employees go to if they wanted -- for Hames
12 Marina, LLC, if a tenant wanted to rent
13 somewhere, was there an office on site or
14 where did they go?
15 A       There was no office on site.
16 Q       If they wanted to pay their rent
17 and get a receipt and didn't see Randy,
18 where would they go?
19 A       They could mail it in.
20 Q       Right.
21 A       They could go give it to the
22 secretary.
23 Q       So the -- when you say, "The
```

65

```
1  secretary," you're talking about the
2  secretary at Hames' law office?
3  A       Yes.
4  Q       Did Hames Marina, LLC ever pay a
5  secretary?
6  A       I don't know.
7  Q       Do you know if Hames Marina, LLC
8  ever hired a secretary?
9  A       I don't know.
10 Q       Do you know if Hames Marina, LLC
11 ever had any posters up anywhere about the
12 Fair Housing Act or numbers to call if you
13 have rights under the Fair Housing Act?
14 A       No.
15 Q       Did you know if Hames Marina --
16 no, you don't know, or, no, they didn't?
17 A       I don't know.
18 Q       Who would know?
19 A       Randy.
20         I don't recall seeing posters.
21 Q       In the work -- in your -- the
22 rules for the tenants or -- is there any
23 mention about the Fair Housing Act?
```