122

1  Q    Do you know what date you put
2  that sign up?
3  A    I don't recall the date.
4  Q    After you took over management of
5  Hames Marina, how long was it before you
6  put the sign up?
7  A    I don't recall.
8  Q    Was it a month, two months?
9  A    I'm sorry, I don't recall.
10 Q    Were employees -- I mean, were
11 tenants allowed to continue making payments
12 at Randy Hames's law office for their rent
13 up until the date that Hames Marina ceased
14 doing business?
15 A    Yes.
16 Q    Are tenants still allowed to make
17 payments at Randy Hames' law office?
18 A    No.
19 Q    When did that stop?
20 A    When Hames Marina ceased
21 operating.
22 Q    Why did you put up a new sign --
23 a sign that said, Under new management?

123

1  A    To inform.
2  Q    Whose decision was it to put the
3  sign up?
4  A    Miranda ▮.
5  Q    Did you -- did you discuss that
6  with anyone, you, Miranda ▮?
7  A    No.
8  Q    Did you discuss it with Randy
9  Hames?
10 A    No.
11 Q    When you put up the sign under
12 new management, did you provide any new
13 rules or policies to anyone?
14 A    Not at that time.
15 Q    Did you ever provide any new
16 rules or policies to the tenants?
17 A    Not as Hames Marina.
18 Q    So if you provided policies to
19 the tenants it would have been after Hames
20 Marina dissolved?
21 A    Yes.
22 Q    When you were managing the
23 property as Hames Marina, LLC, were you --

124

1  did you have authority to direct the
2  secretaries at Hames Law Firm on what they
3  to do and not do with regards to Hames
4  Marina or was -- did Randy handle that?
5  A    I could do that as well.
6  Q    What did you -- did you direct
7  any of them to do any task?
8  A    Yes.
9  Q    Who did you direct and what did
10 you have them do?
11 A    Allison Grace.  And I directed
12 her to -- let's see.
13      What did I ask her to do?
14 A    I've asked -- I had, at times,
15 asked her to make bank deposits.  Other
16 times I made bank deposits.
17      I asked her to provide me
18 information on the tenants.
19 Q    What kind of info on the tenants?
20 A    Like name, phone number, what lot
21 they were renting.
22 Q    Why did you ask for that?
23 A    Address.

125

1       I needed to be able to contact
2  tenants.  I needed to know who was renting
3  what lot or what trailer.
4  Q    Anything else?
5  A    I think I had had her -- I think
6  I had her give me a template before for
7  some forms.
8  Q    How did she give you the
9  template?
10 A    A paper copy.
11 Q    How did you get that copy?
12 A    She handed it to me.
13 Q    Were you at the office?
14 A    Yes.
15 Q    What else?
16      It didn't admit.
17 Q    I'm sorry, what?
18 A    It still says admit.
19      Christi Dolbeer.
20      There we go.
21 Q    Anything else you directed her to
22 do?
23 A    Not that I can remember at this

126

```
 1  time.
 2  Q       Any other secretaries at the --
 3  at Randy Hames' law firm that you directed
 4  to do any?
 5  A       I believe she was the only one
 6  working there at that time.
 7  Q       Is she still working there?
 8  A       No, not to my knowledge.
 9  Q       But Hames Marina, LLC didn't pay
10  these secretaries for any work they did,
11  did it?
12  A       I don't know.
13  Q       And Randy would know that?
14  A       Randy would know that.
15  Q       Did you maintain all of the
16  documents and records of Hames Marina, LLC
17  after it dissolved?
18  A       No.
19  Q       Who has those documents?
20  A       Well, Randy had them.  He
21  probably -- I believe he provided them to
22  his attorney.
23  Q       But you didn't, as the manager,
```

127

```
 1  keep them?
 2  A       No.
 3  Q       Does Hames -- does Hames Marina,
 4  LLC have any role in Marina Management?
 5  A       None whatsoever.
 6  Q       Do any of the officers of Hames
 7  Marina, LLC have any role in Marina
 8  Management?
 9  A       No.
10  Q       Do any of the owners of Hames
11  Marina, LLC have any role in Marina
12  Management?
13  A       No.
14  Q       With regards to background checks
15  of potential tenants, is there a written
16  policy?
17  A       No.
18  Q       Once you became the manager of
19  Hames Marina, LLC, were there any meetings
20  of management to discuss what to do with
21  the business going forward?
22  A       No.
23  Q       Or any meetings of the officers
```

128

```
 1  and owners to discuss what to do with Hames
 2  Marina, LLC going forward?
 3          MR. TURNER:  Candis, are you
 4  talking about in March of 2018?
 5          MS. MCGOWAN:  Yeah, once she took
 6  over, uh-huh.
 7          THE WITNESS:  There was not an
 8  official meeting, no.
 9  Q       (By Ms. McGowan)  An unofficial
10  meeting?
11  A       Randy Hames decided to dissolve
12  Hames Marina, LLC since he was no longer in
13  that business.
14  Q       And did he tell you that, is that
15  how you know that, or was there a meeting
16  where you discussed it?
17  A       He told me.
18  Q       Was this in-person, do you know?
19  A       I don't recall.
20  Q       Do you know if anyone else was
21  present?
22  A       I don't recall.
23  Q       Do you know who prepared the
```

129

```
 1  paperwork to dissolve Hames Marina, LLC?
 2  A       I believe Randy Hames.
 3  Q       Did you have any involvement in
 4  preparing this paperwork?
 5  A       No.
 6  Q       And do you recall reviewing that
 7  paperwork, Exhibit No. 32, yesterday?
 8  A       Yes.
 9  Q       Had you seen that paperwork prior
10  to yesterday?
11  A       I don't think so.
12          I'm sorry, Miranda ▓▓▓ had not.
13  Obviously Hames Marina saw the paperwork.
14  Q       Did you have the tenants sign any
15  new documents once you started taking over?
16  A       As Hames Marina?
17  Q       Yes.
18  A       No.
19  Q       In this electric co-op form that
20  you have the employees -- have the tenants
21  sign to get the power in their name --
22  A       Yes.
23  Q       -- that's not a Hames Marina
```

130

```
 1  document, that's an electric co-op
 2  document, is it not?
 3  A       Correct.
 4  Q       So it's not a policy of Hames
 5  Marina, LLC?
 6  A       No.
 7  Q       And the electric cooperative sets
 8  whatever costs it is for the tenants to
 9  have to pay to have power put in their
10  name; correct?
11  A       Correct.
12  Q       And Hames Marina has no input
13  into that decision?
14  A       Correct.
15  Q       So that form is not a lease
16  between Hames Marina and the tenant?
17  A       Correct.
18  Q       Other than the electricity, are
19  there any other utility services that the
20  employees -- I mean, the tenants had to put
21  in their name?
22  A       Water.
23  Q       Water.
```

131

```
 1          Did Hames Marina provide water
 2  for think any tenants?
 3  A       Yes.
 4  Q       Which ones?
 5  A       4A and 4B.  Both of those lots
 6  were on one water meter.  And rather than
 7  try to decide how much of the water bill
 8  belonged to each tenant, Hames Marina paid
 9  that water bill.
10          And then in the lower part, 16B
11  through 49, most of those are on one water
12  meter that is the -- the marina water
13  meter.
14          There are a few who have put in a
15  separate water meter over the years, but
16  not many.
17  Q       So Hames Marina, LLC paid for the
18  water for 4A and 4B and for most of the
19  ones -- 16B through 49?
20  A       Yes.
21  Q       Did Hames Marina pay for the
22  water at Randy Hames' mobile home?
23  A       Yes.
```

132

```
 1  Q       What about sewer, is there a
 2  sewage bill?
 3  A       They're on septic tanks.
 4  Q       Who owns the septic tanks?
 5  A       The septic tanks are part of the
 6  real property.
 7  Q       Did Hames Marina, LLC have any
 8  duty to maintain and keep up the septic
 9  tanks?
10  A       Maintenance, yes.
11  Q       Now, with regards to payment of
12  rent, did Hames Marina have a process of
13  keeping up with that payment?
14  A       Yes.
15  Q       Did they provide receipts if it
16  was a cash payment?
17  A       Yes.
18  Q       Did they provide receipts if
19  someone requested it?
20  A       Yes.
21  Q       And that would be a good practice
22  to have a -- provide a receipt?
23  A       Yes.
```

133

```
 1  Q       Who was responsible in 2017 for
 2  providing the receipts?
 3  A       Randy Hames.
 4  Q       2016?
 5  A       Some -- sometimes he would
 6  designate his secretary to write receipts.
 7  Q       Anyone else?
 8  A       Just Randy Hames or his
 9  secretary.
10  Q       In 2016, would it be the same?
11  A       Yes.
12  Q       2015?
13  A       Yes.
14  Q       In 2018, who would have been --
15  A       It would be Randy Hames, his
16  secretary and then Miranda ███.
17  Q       When you were managing, did you
18  keep records of payments in a computer
19  program, or how did you do it?
20  A       On loose sheets of paper in a
21  three-ring notebook.
22  Q       Was this the same three-ring
23  notebook that Randy Hames had used for
```

134

```
 1  Marina Management?
 2  A      No.
 3  Q      You created a new --
 4  A      I created my own notebook.
 5  Q      Do you know if at the same time
 6  you had the three-ring notebook whether or
 7  not Randy Hames was still keeping one also?
 8  A      Well, I made notations in his
 9  notebook until I created my own notebook.
10         Hames Marina does not know if
11  Randy Hames continued to make notations in
12  his notebook after such time that Miranda
13  ▓       created a notebook or not.
14  Q      Do you know if -- how were you --
15  -- how was Hames Marina made aware if
16  someone paid at Randy Hames' office, would
17  they contact you so you could note it in
18  your notebook or --
19  A      Yes, the secretary would contact
20  me.
21         MS. MCGOWAN:  We're about to
22  start getting into a bunch of documents.
23         So do y'all want to go ahead and
```

135

```
 1  take a lunch break because it's 12:20
 2  something.
 3         MR. TURNER:  Yeah.
 4         THE WITNESS:  Yeah, let's do
 5  that.
 6         MS. MCGOWAN:  Before we start
 7  getting into a bunch of documents.
 8         MR. TURNER:  Okay.
 9         MS. MCGOWAN:  All right.
10         THE VIDEOGRAPHER:  This ends MPEG
11  2 in the continued deposition of Miranda
12  ▓ .
13         We're off the record at 12:22.
14         (Whereupon, the taking of the
15         deposition was recessed from
16         approximately 12:22 p.m. to
17         approximately 1:32 p.m., after
18         which the following proceedings
19         were had and done:)
20         THE VIDEOGRAPHER:  This begins
21  MPEG 3 in the continued deposition of
22  Miranda ▓ .
23         We're on the record at 1:32.
```

136

```
 1  Q      (By Ms. McGowan)  Ms. Self, when
 2  we took a lunch break, did you do anything
 3  or review any documents to further prepare
 4  for your testimony?
 5  A      No.
 6  Q      Did you discuss your testimony
 7  with anyone?
 8  A      With my attorney.
 9  Q      Did you discuss the facts of your
10  testimony with your attorney?
11  A      No.
12  Q      Is there any testimony you need
13  to correct?
14  A      No.
15  Q      Did you text anyone about your
16  testimony?
17  A      No.
18  Q      Did you email anyone about your
19  testimony?
20  A      No.
21  Q      When you say, "Your attorney,"
22  which attorney?
23  A      Kile Turner.
```

137

```
 1  Q      After you took over management of
 2  Hames Marina, LLC, I think you said you did
 3  not make any changes to any of the rules or
 4  policies for the tenants?
 5  A      Correct.
 6  Q      And when you -- when -- in the
 7  transition from Hames Management to Marina
 8  Management, did you make any changes to the
 9  rules or policies?
10  A      Not that I recall.
11  Q      After you took over as management
12  for Hames Marina, did you remove Randy from
13  doing any work on behalf of the Hames
14  Marina -- Hames Marina, LLC?
15  A      Hames Marina did no work on
16  behalf of Marina Management.
17  Q      No, no, no, maybe that wasn't
18  clear.  I apologize, that was a bad
19  question?
20         Once -- in 2018 you said you
21  started taking over the management in, I
22  think you said February --
23  A      Yes.
```

138

```
 1  Q        -- of Hames Marina, LLC?
 2           At that point, did you take away
 3  all of Randy Hames' roles and
 4  responsibilities or did he still have some?
 5           Do you want me to go by one by
 6  one?
 7  A        Yes, please go one by one.
 8  Q        Okay.  After you took over
 9  management of Hames Marina, LLC, was Randy
10  Hames still able to interact with the
11  tenants and collect their rent?
12  A        Was he able to?
13  Q        Yes, was he still -- did he still
14  have the ability to do so on behalf of
15  Hames Marina?
16  A        Yes.
17  Q        And did Randy Hames still have
18  the ability on behalf of Hames Marina to
19  take complaints from tenants and interact
20  with them about issues relating to their
21  rental units?
22  A        When you say, "Have the ability
23  to," like I didn't band him from the
```

139

```
 1  premises if that's what you're -- I'm not
 2  -- I'm not sure I understand --
 3  Q        Okay.  Did --
 4  A        -- what you're asking.
 5  Q        -- all right.  I'll clarify it.
 6           When you took over as management,
 7  did Randy Hames still have the authority on
 8  behalf of Hames Marina, LLC to interact
 9  with the tenants and collect their rent?
10  A        Authority was not discussed.
11  Q        Did he still serve in that role
12  of interacting with the tenants and
13  collecting their rent?
14  A        I took over that role.
15  Q        Did he -- did he still do it
16  also?
17  A        He -- I don't know of any
18  instance ever.  Someone may have called or
19  text him.  If they did, he would refer them
20  to me.  He would refer -- you know, people
21  still called him.  He -- he ran that for --
22  since --
23  Q        Okay.  I want to know what he --
```

140

```
 1  A        -- since 1981.  I mean, people
 2  still would call him.  I think, you know,
 3  people would still call him and he would
 4  refer them to me or he would, you know,
 5  tell me who had called and why and I would
 6  take care of whatever.
 7  Q        Did he still have any role in
 8  going out and checking on the property and
 9  making sure everything was okay?
10  A        I didn't ask him to, but he
11  certainly wasn't banned from the property.
12  Q        Did he have any role in --
13  A        He -- he had a mobile home there.
14  He was welcome to come to his mobile home
15  any day.
16  Q        I'm not talking about his mobile
17  home, I'm talking about on behalf of Hames
18  Marina, LLC, was he still allowed to go out
19  and check the property that was being
20  rented to other tenants?
21  A        What do you mean by, "Check the
22  property?"
23  Q        Well, you said part of your role
```

141

```
 1  is to go out and check the property and
 2  make sure everything is okay.
 3           What do you mean by that?
 4           I was just using your language.
 5  A        I feel like you're trying to ask
 6  something specific.
 7  Q        I'm asking what -- what did you
 8  mean when you said you go out and check the
 9  property, what -- how -- describe what you
10  do when you check the property?
11  A        Well, sometimes checking the
12  property could just mean driving through
13  it.
14           Other times checking the property
15  could mean getting out and checking a water
16  meter or a cable on a boat dock.
17           It could mean removing tree
18  limbs.
19           It could mean checking on a
20  vacated mobile home.
21           There's a lot of things that it
22  could mean at different days.
23  Q        Using your definition of checking
```

142

1  the property, after you took over
2  management of Hames Marina, LLC until the
3  time it dissolved, did Randy Hames still
4  have any role in checking the property?
5  A      Not as Hames Marina, no.
6  Q      Did -- do you know if he did go
7  out and check the property?
8  A      He would drive through the
9  property on occasion going to his mobile
10 home or to visit with a friend.
11 Q      Do you know if Randy Hames would
12 still have a role in evicting tenants on a
13 -- from their property after you took over
14 as management?
15 A      He would not have had a physical
16 role, no.
17 Q      When you say, "Not a physical
18 role," did he have any role in eviction --
19 in the eviction process of tenants after
20 you took over?
21 A      I don't remember exactly, but I
22 may have consulted with him on the process.
23 Q      Do you know if he filed any

143

1  eviction papers on behalf of Hames Marina,
2  LLC after you took over?
3  A      He -- he may have helped with
4  paperwork early on.
5  Q      When you say, "Early on," what do
6  you mean by that?
7  A      Okay.  I mean in the first two to
8  three months.
9  Q      And why did that change?
10 A      I had more time available in June
11 and July and I started learning how it --
12 how it went, how to run that business.
13 Q      Did you ever tell the tenants
14 that Randy Hames had no role in the
15 management of the Hames Marina, LLC?
16 A      Not in those words.  I told them
17 that I had taken over, that I was the new
18 manager.
19 Q      Have you ever filed any insurance
20 claims on behalf of Hames Marina, LLC?
21 A      No, not to my knowledge.
22 Q      Have there been any -- any
23 occurrences or incidents in which you would

144

1  need to file an insurance claim on behalf
2  of Hames Marina?
3  A      No.
4  Q      Have you had to call law
5  enforcement on behalf of Hames Marina?
6  A      Yes.
7  Q      How many times?
8  A      Several.
9  Q      For what?
10 A      Theft.
11        An incident where a former tenant
12 almost ran me over.
13        And -- oh, there was a homeless
14 man I had to call about once.
15 Q      And these calls that you made to
16 law enforcement were on behalf of Hames
17 Marina, LLC?
18 A      Yes.
19 Q      When you say, "Theft," what kind
20 of theft?
21        How many times?
22 A      Multiple.
23 Q      What kind of theft?

145

1  A      Theft of the -- the cash box, the
2  boat launch cash box, there was theft
3  there.
4         There was theft of a -- someone
5  stole all the copper out of a heating and
6  air unit in one of the trailers.
7         They stole a -- a chunk section
8  of one and all the copper was stripped out
9  of it.
10 Q      Anything else on theft?
11 A      I'm trying to think what was just
12 Hames Marina and not as Marina Management.
13        I'm not exactly sure of the dates
14 of each time that I had to call law
15 enforcement that those were dates that fell
16 under Hames Marina or if those were dates
17 that fell under Marina Management.
18 Q      And you're talking about the
19 incidents you just told me about, you don't
20 -- of theft, you don't know which one they
21 fell under?
22 A      I can't remember.
23 Q      After you took over management of

146

1  Hames Marina, do you know whether Randy
2  Hames still called the police about
3  incidents?
4  A       Not to my knowledge.
5  Q       And in the rules that you had set
6  up for Hames Marian, was there any
7  prohibition about driving drunk on the
8  property?
9  A       I don't think there was a
10 specific rule about not driving drunk on
11 the property.
12 Q       Do you think that would be an
13 issue if you had tenants out there driving
14 drunk?
15 A       Yes.
16 Q       And if you received a complaint
17 about tenants driving drunk, what would you
18 have done?
19 A       I would have contacted the tenant
20 who was driving drunk, told them that I had
21 received a complaint about them driving
22 drunk, and asked them to not do that in the
23 future.

147

1  Q       Would you have called the police?
2  A       What are they driving?
3  Q       I'm sorry?
4  A       What are they driving?
5  Q       A car.
6  A       They're driving a car on the
7  pubic roads?
8  Q       Or on the property of the marina
9  -- that Marina Management was -- I mean,
10 Hames Marina was managing, would you have
11 called?
12 A       If they were driving drunk on the
13 driveway?
14 Q       Uh-huh.
15 A       If I witnessed them as a danger
16 then, yes.  But if someone called me and
17 said that someone else was driving drunk, I
18 wouldn't call the police based on a
19 secondhand report.
20         I believe it's illegal to drive
21 drunk on a public road.
22 Q       You testified earlier that you --
23 your phone that you were using for a long

148

1  up to sometimes around 2018 or '19 I think
2  you said, was not as -- provided by
3  service, it was -- you'd just buy time for
4  it?
5  A       Yes.
6  Q       Did that phone have any kind of
7  cloud access or cloud backup?
8  A       No.
9  Q       Or Internet backup?
10 A       No.
11 Q       Was it a phone where you can hook
12 it up to your computer and download
13 contents?
14 A       I have no idea.
15 Q       You had no backup method on that
16 phone?
17 A       No.
18 Q       What type of phone was it, brand
19 of phone?
20 A       I don't remember.
21 Q       Was it an iPhone or flip phone
22 or --
23 A       No, it was something I bought at

149

1  Walmart.
2  Q       Did it have email capability?
3  A       I don't believe so.
4  Q       Did it have any wireless
5  capability?
6  A       I don't recall.
7  Q       Could you surf the web on it or
8  have Facebook or anything like that on it?
9  A       No.
10 Q       It was just a pure phone, that
11 was it?
12 A       It was a phone.
13 Q       Could you take pictures on it?
14 A       I believe so.
15 Q       How could -- how did you transfer
16 the pictures off of it?
17 A       I didn't.  I just lost them.
18 Q       Did it have the capability to
19 transfer pictures off?
20 A       I don't know.
21 Q       In nineteen -- in 2018 when you
22 were managing Hames Marina, LLC, how many
23 tenants were there?

**Page 150**

1  MR. TURNER: Did you say '18 or
2  '19?
3  Q      (By Ms. McGowan) I'm sorry, 2018
4  when you were managing Hames Marina, how
5  many tenants were there that you were
6  renting either a trailer or a lot to?
7  A      It -- it changed monthly. Like
8  close to 20. Maybe not. Maybe 35, 35 to
9  40.
10 Q      Per month?
11 A      Yes.
12 Q      And you said some of those had
13 been there for years.
14        Do you know how many were
15 long-term tenants?
16 A      There was one that had been there
17 for 40 years.
18 Q      Do you know how many long-term
19 tenants there were?
20 A      No.
21 Q      Of the trailers that were not
22 privately owned by the tenants, how many of
23 those were long-term tenants?

**Page 151**

1  A      What do you call long term?
2  Q      More than a year.
3  A      More than a year, maybe two.
4  Q      Who were the two?
5         Do you know their names?
6  A      Lindsey Hayes, Brian Pate.
7  Q      How long had Lindsey Hayes lived
8  there?
9  A      I don't recall. More than a
10 year.
11 Q      Had it been more than a year when
12 you took over management?
13 A      Yes, I believe so.
14 Q      Did Lindsey Hayes live with
15 anyone else or was she -- is that a male or
16 female?
17 A      Lindsey is a female.
18 Q      Did she live with anyone?
19 A      Yes.
20 Q      With whom?
21 A      Tim Tucker. I think that was his
22 name.
23        MR. TURNER: I think it was

**Page 152**

1  Turner.
2         THE WITNESS: Turner, Turner, Tim
3  Turner.
4         MR. TURNER: How could forget a
5  name like that?
6         THE WITNESS: I don't know.
7  Q      (By Ms. McGowan) And, Brian
8  Pate, did he live with anyone?
9  A      Yes.
10 Q      Who?
11 A      Holly Pate.
12 Q      And how long had they lived there
13 in 2018?
14 A      More than a year.
15 Q      Where -- which lot number did
16 Lindsey Hayes live in?
17 A      Number 9.
18 Q      And which lot was Brian Pate?
19 A      Number 7.
20 Q      And I think you said Mr. Pate is
21 still there?
22 A      Yes.
23 Q      Is he still on Lot 7?

**Page 153**

1  A      Yes.
2  Q      Lindsey Hayes?
3  A      Yes.
4  Q      Is still in 9?
5  A      Yes.
6  Q      Is Tim Turner still there?
7  A      No.
8  Q      When did Tim Turner leave?
9  A      I don't recall.
10 Q      Do you know who provided the
11 information on behalf of Hames Marina, LLC
12 for the responses to interrogatories?
13 A      Randy Hames.
14 Q      Did you have any involvement in
15 responding to the interrogatories?
16 A      No.
17 Q      You testified that on behalf of
18 Hames Marina Management that you had to
19 call the tenant -- you had to call the
20 police over a tenant that almost hit you?
21 A      Yes.
22 Q      Are you talking about the
23 March 14th incident with Kayla Carreker?

**154**

1  A      Yes.  And I said a former tenant.
2  She didn't live there at the time.
3  Q      But she still had not been
4  officially evicted by the court from that
5  unit, had she?
6  A      Correct.
7  Q      And she still, as such, had the
8  right to be at that trailer, did she not?
9  A      Yes.
10 Q      Who told the tenants to be on the
11 lookout for Kayla?
12 A      I don't know.
13 Q      You attended the hearing and
14 heard a couple of tenants testify that they
15 had been told to be on the lookout for
16 Kayla?
17 A      I don't recall that.
18 Q      Do you recall Brian Pate
19 testifying?
20 A      I recall Brian Pate testifying.
21 I don't recall him being -- him testifying
22 that he was asked to be on the lookout.
23 Q      And do you recall any testimony

**155**

1  about tenants telling Kayla she wasn't
2  suppose to be there?
3  A      Yes.
4  Q      Did you ask any of these tenants
5  why they were telling Kayla she was not
6  suppose to be there?
7  A      No.
8  Q      Do you know who instructed these
9  tenants to tell Kayla she was not suppose
10 to be there?
11 A      I don't think anyone instructed
12 them to say that.
13 Q      Why do you say that?
14 A      It's my belief.
15 Q      And your belief is based upon
16 what?
17 A      That Hames Marina did not
18 instruct them to say that.
19 Q      You're talking about you on
20 behalf of Hames Marina did not instruct
21 them.
22        Do you know if Randy Hames
23 instructed anyone to let him know if Kayla

**156**

1  Carreker was there?
2  A      I do not.
3  Q      Did you ask any of these tenants
4  think if Randy Hames had asked -- had told
5  them to instruct him -- or that Kayla was
6  not suppose to be there?
7  A      I did not.
8  Q      Have you done any investigation
9  on behalf of Hames Marina to find out why
10 these tenants were telling her she was not
11 suppose to be there?
12 A      No.
13 Q      Did anyone advise you on behalf
14 of Hames Marina to get a warrant against or
15 to file a warrant against Kayla Carreker?
16 A      Hames Marina did not file a
17 warrant.
18 Q      But you did; correct?
19 A      Correct.
20 Q      Did anyone on behalf of Hames
21 Marina have any conversation with you about
22 filing a warrant?
23 A      No.

**157**

1  Q      Did Randy Hames have any
2  conversations with you about the incident
3  that occurred on March 14th?
4  A      Not that I recall.
5  Q      Did you discuss the March 14th
6  incident with Randy Hames?
7  A      Yes.
8  Q      When did you discuss it with him?
9  A      On March 14th was the first time.
10 Q      And, in fact, he was on the
11 telephone talking to you about the incident
12 when you were out there; correct?
13 A      Correct.
14 Q      Did you call him?
15 A      Yes.
16 Q      Why did you call Randy Hames?
17        MR. YAGHMAI:  Objection.  Are you
18 asking on behalf of Hames Marina?
19        I mean, Hames Marina can't
20 acquire a warrant.  Maybe Miranda
21 individually.
22        MS. MCGOWAN:  I'm asking her on
23 behalf of Hames Marina why she called Randy

158

```
 1  Hames on the day of the incident.
 2           THE WITNESS:  Okay.  Hames Marina
 3  did not call Randy Hames.
 4  Q       (By Ms. McGowan)  Who called
 5  Randy Hames?
 6  A       Miranda  ▮.
 7  Q       That -- you were at the marina
 8  doing work -- you testified earlier that in
 9  your job as manager of Hames Marina that
10  you had to call the police on Kayla
11  Carreker for that incident?
12  A       As an individual, yes, I called
13  the police.
14  Q       But you didn't call the police on
15  behalf -- now you're saying you didn't do
16  it as manager of Hames Marina?
17          You're changing your testimony?
18  A       Yes, I'm changing my testimony --
19          MR. TURNER:  Object to the form.
20          MR. YAGHMAI:  I'm going to object
21  to that.  She's not changing --
22  Q       (By Ms. McGowan)  You were out
23  there that day to collect rent, were you
```

159

```
 1  not, or to collect boat launch money?
 2  A       Yes.
 3  Q       And you were out there in your
 4  role as manager of Hames Marina to collect
 5  the boat launch money; correct?
 6  A       Yes.
 7  Q       And did you have any discussion
 8  with anyone in your role as manager of
 9  Hames Marina about filing -- whether or not
10  criminal charges should be pressed against
11  Kayla Carreker?
12  A       No.  Kayla Carreker didn't try to
13  run over Hames Marina.
14  Q       That's not my question to you.
15          I said, did you have any
16  discussions with anyone, in your role as
17  manager of Hames Marina, on whether or not
18  to file criminal charges?
19  A       No.
20  Q       Did you have any discussions with
21  anybody whether or not Kayla Carreker was
22  violating any of the rules Hames Marina,
23  LLC?
```

160

```
 1          MR. TURNER:  You mean at the
 2  March --
 3          MS. MCGOWAN:  At the March 14th
 4  incident.
 5          MR. TURNER:  -- incident.
 6          THE WITNESS:  I listened to what
 7  the other tenants were saying and to what
 8  the tenants were saying to the police
 9  officer and to what the police officer
10  responded.
11  Q       (By Ms. McGowan)  When you told
12  the police officer that Kayla had been
13  evicted from her unit, you did so in your
14  role as manager of Hames Marina, LLC, did
15  you not?
16  A       No.
17  Q       Then if you were not telling the
18  police officer in your role as Hames
19  Marina, LLC, why would it matter if she had
20  been evicted?
21  A       It was an upsetting situation.
22  It was the first time anyone has ever tried
23  to run me offer like that.  I was scared.
```

161

```
 1  I was rattled.
 2  Q       But you told the police officers
 3  she had been evicted; correct?
 4  A       That was my understanding from
 5  what the other witnesses were saying.
 6  Q       And did you tell the police
 7  officer you were making a statement to him
 8  in your role as an individual?
 9  A       Did I tell the police officer
10  that I was making a statement as an
11  individual?
12  Q       Yes, not in any official capacity
13  on behalf of Hames Marina?
14  A       No.  I didn't realize that was
15  necessary.
16  Q       And, in fact, the police officer
17  told you that she had every right to be
18  there, didn't he?
19  A       He did.
20  Q       And Ms. Kayla Carreker drove her
21  car around yours, she did not physically
22  hit your car, did she?
23  A       She did not.
```

## Page 162

1  Q     Did you tell the police officer
2  that you were the manager of Hames Marina
3  when he came out?
4  A     I believe I may have explained
5  why I was there.
6  Q     Did you tell him you were the
7  manager?
8  A     Yes, I believe I did.
9        Again, it was a high adrenaline
10 situation and --
11 Q     That's not my question.  I just
12 said, did you tell --
13 A     I don't remember the exact words.
14 Q     Okay.  You don't -- but you've
15 heard the tape and the body cam tape in
16 trial.
17       Do you recall it saying -- you
18 saying to the police officer that you were
19 the manager?
20 A     I think that's what I said.
21 Q     After the March 14th incident,
22 did Hames Marina, LLC take any actions on
23 it further in the -- in any eviction

## Page 163

1  process against Kayla Carreker?
2  A     I don't recall at this time.
3  Q     Would there be any records to
4  reflect any action taken by Hames Marina?
5  A     There would be court records I
6  presume.
7  Q     Would there be any documents you
8  could look at to refresh your recollection?
9  A     I don't know.
10       Do you have such documents?
11 Q     I'm just asking you whether you
12 have any or you know of any documents that
13 would refresh your recollection.
14       I'm asking the questions.  Sorry,
15 you don't get to ask me questions in the
16 deposition.
17       MR. YAGHMAI:  Well, she gets to
18 ask you to clarify.  So that's not correct.
19       MS. MCGOWAN:  Well, that's not
20 asked for clarification and you know it.
21       MR. YAGHMAI:  Oh, that's fine,
22 you know.  No reason to be rude to the
23 witness.

## Page 164

1        MS. MCGOWAN:  Says the pot.
2        MR. TURNER:  All right, kids.
3        THE WITNESS:  I would presume if
4  further action had been taken there would
5  be documents stating such.
6  Q     (By Ms. McGowan)  Have you
7  reviewed any such documents and you just
8  don't remember them?
9        What I'm trying to find out, you
10 said you don't recall at this time.
11       I'm trying to see if there's
12 something we can get that you've reviewed
13 that would help your recollection.
14       MR. TURNER:  I think she already
15 said one specific -- there's a specific
16 document she mentioned already.
17       MS. MCGOWAN:  The court records?
18       MR. TURNER:  Yeah.
19 Q     (By Ms. McGowan)  Is there
20 anything else?
21       Are there any notes or anything
22 in the logs or anything like that that
23 you've reviewed that would assist you is

## Page 165

1  what I'm trying to find out?
2  A     Not that I know of.
3  Q     In your ledger that you kept up
4  with each tenant, would there be any notes
5  in that?
6        Have you reviewed any notes
7  there?
8  A     I didn't have a page for Kayla
9  Carreker.  She didn't live there.  She
10 didn't pay rent there.
11 Q     But she was a tenant.
12       Do you know whether there was a
13 page, in March of 2018, if there was a page
14 in your -- the log -- the ledger kept by
15 Randy Hames?
16 A     There was a page for Kayla
17 Carreker at the time that she was living
18 there.  Once she moved out I -- I never
19 made any notes in a ledger for Kayla
20 Carreker.
21 Q     Let me ask you this question:  Do
22 you know whether there was a page in the
23 logbook kept by Randy Hames on Kayla

**Page 166**

1 Carreker?
2 Not yours, but the one you said
3 Randy had one and then you started your
4 own.
5 A   Yes, he had a page for Kayla
6 Carreker.
7 Q   Have you reviewed that page to
8 prepare for this deposition?
9 A   I've seen that page. I -- yes,
10 yes, I've reviewed that page.
11 Q   And at the time that this
12 incident happened March 14th, are -- are
13 you aware that Randy Hames had already
14 filed to evict Kayla Carreker in court?
15 A   I was not aware on March 14th.
16 Q   When did you become aware?
17 A   After March 14th.
18 Q   How did you become aware?
19 When you say, "You," are you
20 talking about Hames Marina?
21 A   No, I was talking about myself
22 again.
23 Please -- please ask the question

**Page 167**

1 again.
2 Q   On March 14th Hames Marina, LLC
3 was aware that Randy Hames had already
4 filed an eviction process in court --
5 A   Yes --
6 Q   -- against --
7 A   -- Hames Marina was aware.
8 Q   Do you know whether or not Kayla
9 Carreker had filed an answer -- did Hames
10 Marina know that she had filed an answer to
11 the eviction process?
12 A   Yes, Hames Marina knew.
13 Q   After the March 14th incident,
14 did you, as manager, go look at the answer
15 filed by Kayla to the eviction process?
16 A   After March 14th, did Hames
17 Marina look at it?
18 Q   Yes, you, as the manager on
19 behalf of Hames Marina go look at the
20 answer filed by Kayla Carreker?
21 A   No, I did not.
22 Q   And on March 16th there was a
23 preliminary hearing on Randy Hames'

**Page 168**

1 criminal cases; correct?
2 A   Correct.
3 Q   And the day before on March 15th
4 is when you individually filed a warrant;
5 correct?
6 A   Correct, not as Hames Marina.
7 MR. YAGHMAI:  Object.  Candis,
8 I'm going to object because I think you got
9 the date wrong of the preliminary hearing.
10 I think it's April 16th when the
11 preliminary hearing, not March.
12 MR. CROCKER:  It was a status
13 conference.
14 MS. MCGOWAN:  A status conference
15 on March, status conference.
16 MR. TURNER:  Status conference on
17 the criminal case?
18 MR. CROCKER:  It was on the
19 criminal cases and the eviction cases.
20 They were all consolidated with Judge Pate.
21 Q   (By Ms. McGowan)  So on
22 March 16th, there was a court hearing on
23 the consolidated cases on the eviction and

**Page 169**

1 the criminal.
2 Were you present?
3 A   Yes.
4 MR. TURNER:  Now, are you asking
5 her individually or --
6 THE WITNESS:  Was I present
7 individually?
8 Q   (By Ms. McGowan)  Were you
9 present on behalf of Hames Marina in your
10 role?
11 A   I was present.  I'm not sure what
12 my role was.
13 Q   But you were there?
14 A   I was there.
15 Q   If you were not there on behalf
16 of Hames Marina, LLC, who was there because
17 they were a party?
18 Do you know who was there
19 representing Hames Marina?
20 A   Randy Hames.
21 Q   Let me show you what I'm marking
22 as Private Plaintiff's Exhibit No. 3.
23 Is that right?

```
                                                      170
1              Are we up to 3?
2         MS. DANLEY:  Yep.
3         (Whereupon, said document was
4         marked for identification as
5         Private Plaintiff's Exhibit 3 to
6         the deposition of Miranda ▮▮▮).
7    Q    (By Ms. McGowan)  And it contains
8   -- for the record, it contains Bates
9   Private Plaintiff's Supplement Initial
10  Disclosures Private Plaintiff 000266, 267
11  and 269, 270.
12        Have you ever seen these
13  documents before?
14  A     I've seen similar documents.  I'm
15  not certain if I've seen this exact
16  document.
17        Hames Marina -- Hames Marina has
18  seen this document.
19  Q     So these -- this is the complaint
20  filed in the District Court of Cullman by
21  Randy Hames naming Hames Marina and Mobile
22  Park against Kayla Carreker.  Asking for
23  eviction.
```

```
                                                      171
1         And you see the date this was
2   filed, was 2-13 at the top?
3   A     Yes.
4   Q     And this was filed on behalf of
5   Hames Marina by Randy Hames?
6   A     Yes.
7   Q     Do you know how the amount was
8   calculated that -- that was owed, fifteen
9   sixty?
10  A     Yes.
11  Q     How was that calculated?
12  A     It was unpaid rent, plus
13  attorney's fees.
14  Q     What entitled Hames Marina to get
15  attorney's fees?
16  A     State of Alabama.
17  Q     Was there a lease in which
18  attorney's fees were entitled to?
19  A     This is just asking.  It's not a
20  -- this isn't a judgment, this is just
21  asking.
22  Q     But how much of that was rent and
23  much of it was attorney's fees?
```

```
                                                      172
1   A     I would have to look at the
2   ledger page on Kayla Carreker to answer
3   that question.
4   Q     Have you gone to, back when you
5   took over as management, to see how much
6   rent, back rent was owed by Kayla Carreker?
7   A     Yes.
8   Q     When did you do that?
9   A     I don't recall.
10  Q     Was it before or after the
11  March 16th status conference?
12  A     Hames Marina reviewed those
13  documents before and after.
14  Q     Do you know how much Kayla
15  Carreker's monthly rent was?
16  A     If you'll show me that ledger
17  page, I'll gladly discuss the rent.
18  Q     But you don't know sitting here?
19        You don't have any independent
20  memory of how much it was?
21  A     I think I do and I don't want to
22  say the wrong number.
23  Q     What do you think it was?
```

```
                                                      173
1   A     I think the rent was $400 a
2   month.  I would have to relook at the
3   ledger page to confirm that.
4   Q     This was Lot 4B?
5   A     Yes.
6   Q     Did anyone on behalf of Hames
7   Marina notify law enforcement that Kayla
8   Carreker would be at that March 16th status
9   conference?
10  A     Did Hames Marina notify law
11  enforcement?
12  Q     Uh-huh.
13  A     Not to my knowledge.
14  Q     Do you know if anyone did?
15        MR. TURNER:  Notified law
16  enforcement?
17        MS. MCGOWAN:  Yes, that she would
18  be there.
19        MR. TURNER:  That Hames Marina
20  would be there?
21        MS. MCGOWAN:  No, that Kayla
22  Carreker would be at that hearing on the
23  16th.
```

### 174

```
 1              THE WITNESS:  I don't know.
 2     Q        (By Ms. McGowan)  Let me show you
 3     what I'm marking as Exhibit No. 4.
 4              (Whereupon, said document was
 5              marked for identification as
 6              Private Plaintiff's Exhibit 4 to
 7              the deposition of Miranda ████).
 8              And this is a one page,
 9     handwritten document containing
10     Supplemental Initial Disclosures Private
11     Plaintiff 000265.
12              This is the answer that Kayla
13     Carreker filed on -- in response to Exhibit
14     No. 3.
15              Did Hames Marina, LLC receive
16     this response?
17     A        Yes.
18     Q        And in this response Ms. Carreker
19     makes the allegation when she filed this on
20     February 20th, on 2018 that she -- that
21     Randy Hames has evicted her and she left
22     due to the mold infested home and sexual
23     harassment.
```

### 175

```
 1              As a result of receiving this
 2     answer about the sexual harassment in
 3     February of 2018 by Kayla Carreker in this
 4     answer filed with the court, did Hames
 5     Marina undertake any investigation into
 6     this allegation of sexual harassment?
 7     A        Hames Marina determined that this
 8     was not true.
 9     Q        How did Hames Marina determine
10     that it was not true?
11     A        Because Randy Hames said he
12     didn't do it.  He said it was not true.
13     Q        When did Randy -- when did Hames
14     Marina determine that it was not true?
15     A        Upon receiving it.
16     Q        In February?
17     A        When it was received.
18     Q        Did Hames Marina do any
19     investigation, other than ask Randy Hames,
20     whether it was true or not?
21     A        Hames Marina listened to the
22     testimony at the preliminary hearing.
23     Q        In April?
```

### 176

```
 1              The April preliminary hearing or
 2     which preliminary hearing?
 3     A        Yes.
 4     Q        In February of 2018, did Hames
 5     Marina do any investigation to determine
 6     whether or not the allegation of sexual
 7     harassment was true or not?
 8     A        Randy Hames determined it was not
 9     true.
10     Q        By just denying it?
11     A        Yes.
12     Q        Did anyone on behalf of Hames
13     Marina go do any investigation and talk to
14     any witnesses or to Ms. Carreker in
15     February or March of 2018 regarding this
16     allegation of sexual harassment?
17     A        Not that I recall at this time.
18     Q        And you said that you -- that
19     Hames Marina listened to the testimony; is
20     that correct?
21     A        Yes.
22     Q        What testimony?
23     A        Kayla Carreker.
```

### 177

```
 1              Who gave testimony that day?
 2              Kayla Carreker gave testimony
 3     that day and it was listened to.
 4     Q        By whom?
 5     A        By everyone in the courtroom.
 6     Q        But by whom on behalf of Hames
 7     Marina?
 8     A        Randy Hames.
 9     Q        No one else?
10              Was Randy Hames the only person
11     on behalf of Hames Marina who listened to
12     the testimony in April to determine that
13     the allegation was not true?
14     A        All five of his -- all of his
15     daughters listened to that testimony as
16     well.
17     Q        But I'm talking about on behalf
18     of Hames Marina, LLC.
19              You said that Hames Marina, LLC
20     determined that the allegation of sexual
21     harassment was not true.
22              And you said that was based on
23     Randy denying it and listening to the
```