FILED
2021 Apr-30  PM 11:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

# US Exhibit 12

**Marie** ███████                                  **3/11/2020**

## Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE NORTHERN DISTRICT OF ALABAMA
3  SOUTHERN DIVISION
4
5  CIVIL ACTION NUMBER
6  5:18-cv-01055-CLS
7  2:18-cv-01096-CLS
8
9  UNITED STATES OF AMERICA,
10          Plaintiff,
11  vs
12  RANDY HAMES and HAMES MARINA, d/b/a HAMES
13  MARINA and MOBILE HOME PARK,
14          Defendants
15
16  TOMEKA BARTLETT and KAYLA CARREKER,
17          Plaintiff's
18  vs
19  RANDY ALLAN HAMES, HAMES MARINA, L L C ,
20  CHRISTIE HAMES DOLBEER, MARY CATHERINE
21  HAMES, JESSICA HAMES PENNER, ANGELA HAMES
22  SAHURIE and MIRANDA HAMES SELF,
23          Defendant's

## Page 2

1          DEPOSITION TESTIMONY OF:
2              MARIE ███████
3
4      March 11, 2020
5      9:17 a.m.
6
7  COURT REPORTER:
8  BRITTANY N. HANVEY, CCR
9  The reading and signing of this deposition
10  has not been waived.

## Page 3

1          S T I P U L A T I O N S
2          IT IS STIPULATED AND AGREED
3  by and between the parties through their
4  respective counsel that the deposition of
5  MARIE ███████ may be taken before BRITTANY
6  N. HANVEY, Certified Shorthand Reporter
7  and Notary Public, State at Large, at the
8  offices of NORMAN, WOOD, KENDRICK &
9  TURNER, BIRMINGHAM, ALABAMA, on
10  March 11, 2020, commencing at
11  approximately 9:17 a.m.
12          IT IS FURTHER STIPULATED AND
13  AGREED that the signature to and the
14  reading of the deposition by the witness
15  is not waived, the deposition to have the
16  same force and effect as if full
17  compliance had been had with all laws and
18  rules of Court relating to the taking of
19  depositions.
20          IT IS FURTHER STIPULATED AND
21  AGREED that it shall not be necessary for
22  any objections to be made by counsel to
23  any questions, except as to form or

## Page 4

1  leading questions, and that counsel for
2  the parties may make objections and assign
3  grounds at the time of trial or at the
4  time said deposition is offered in
5  evidence, or prior thereto.
6          In accordance with Rule 5(d)
7  of the Alabama Rules of Civil Procedure,
8  as amended, effective May 15, 1988, I,
9  BRITTANY N. HANVEY, am hereby delivering
10  to GREGORY YAGHMAI the original transcript
11  of the oral testimony taken
12  March 11, 2020, along with exhibits.
13          Please be advised that this
14  is the same and not retained by the Court
15  Reporter, nor filed with the Court.

**BIRMINGHAM REPORTING SERVICE**
**(205) 326-4444**

**Marie** ▮▮▮▮▮▮                                                        **3/11/2020**
Pages 5 to 8

---

Page 5

1                    I N D E X
2
3    WITNESS:
4    Marie ▮▮▮▮▮
5
6    EXAMINATION BY              PAGE
7    BY MR. YAGHMAI . . . . . . . . . . .  13
8    BY MS. SHORE . . . . . . . . . .  260
9    BY MS. DANLEY . . . . . . . . . .  263
10   BY MR. YAGHMAI . . . . . . . . .  292
11   BY MS. DANLEY . . . . . . . . . .  306
12
13
14            DEFENDANT'S EXHIBITS
15   NO.        DESCRIPTION        PAGE
16   1 - Letter                   222
17   2 - Facebook Messages        245
18   3 - Complaint                302
19
20
21
22
23

---

Page 6

1
2            A P P E A R A N C E S
3    FOR THE PLAINTIFF:
4      ELISE SANDRA SHORE
       Attorney at Law
5      Housing and Civil Enforcement
       Section Civil Acts Division U.S.
6      Department of Justice
       150 M Street NW, Room 8
7      1124 Washington, DC 20530
8      ERIN MEEHAN RICHMOND
       Attorney at Law
9      Housing and Civil Enforcement
       Section Civil Acts Division U.S.
10     Department of Justice
       150 M Street NW, Room 8
11     1124 Washington, DC 20530
12   FOR THE PLAINTIFFS:
13     CANDIS A. MCGOWAN
       Attorney at Law
14     WIGGINS, CHILDS, PANTAZIS, FISHER
       & GOLDFARB, LLC
15     The Kress Building
       301 19th Street
16     Birmingham, Alabama 35203
17     LACEY K. DANLEY
       Attorney at Law
18     WIGGINS, CHILDS, PANTAZIS, FISHER &
       GOLDFARB, LLC
19     The Kress Building
       301 19th Street
20     Birmingham, Alabama 35203
21
22
23

---

Page 7

1    FOR THE PLAINTIFFS:
2      CHAMP CROCKER
       Attorney at Law
3      207 2nd Avenue Southeast
       Cullman, Alabama 35055
4
5    FOR THE PLAINTIFFS:
6      CARLA C. WARD
       Attorney at Law
7      Northern District of Alabama
       1801 4th Avenue North
8      Birmingham, Alabama 35203
9    FOR THE DEFENDANTS:
10     GREGORY F. YAGHMAI
       Attorney at Law
11     YAGHMAI LAW, LLC
       2081 Columbiana Road
12     Birmingham, Alabama 35216
13   FOR THE DEFENDANTS:
14     KILE T. TURNER
       Attorney at Law
15     NORMAN, WOOD, KENDRICK & TURNER
       Ridge Park Place
16     1130 22nd Street South
       Birmingham, Alabama 35205
17
18   ALSO PRESENT:  Chiquita Robertson
19
20
21
22
23

---

Page 8

1              I, BRITTANY N HANVEY, a
2    Certified Shorthand Reporter of
3    Birmingham, Alabama, and a Notary Public
4    for the State of Alabama at Large, acting
5    as Commissioner, certify that on this
6    date, pursuant to the Alabama Rules of
7    Civil Procedure and the foregoing
8    stipulation of counsel, there came before
9    me at the offices of NORMAN, WOOD,
10   KENDRICK & TURNER, BIRMINGHAM, ALABAMA,
11   commencing at approximately 9:17 a m  on
12   March 11, 2020, MARIE ▮▮▮▮▮ witness in
13   the above cause, for oral examination,
14   whereupon the following proceedings were
15   had:
16
17        THE VIDEOGRAPHER:  We're now on
18   the record  This is the video deposition
19   of Marie ▮▮▮▮▮  Case numbers
20   2:18-CV-01055 and 01096-CLS in the United
21   States District Court for the Northern
22   District of Alabama, Southern Division
23   Today's date is March the 11th, 2020  The

---

**BIRMINGHAM REPORTING SERVICE**
**(205) 326-4444**

Marie ███████                                                    3/11/2020

---

Page 9

1   time is 9:17 a.m.
2        Would counsel introduce yourself
3   into the record after which the court
4   reporter will swear in the witness.
5        MR. YAGHMAI:  My name is Greg
6   Yaghmai.  I'm here for the defendant
7   daughters.
8        MR. TURNER:  Kile Turner for
9   Randy Hames and Hames Marina.
10        And just identify yourself.
11        MS. HAMES:  Mary Hames.
12        MS. DOLBEER:  Christi Dolbeer.
13        MS. SAHURIE:  Angela Sahurie.
14        MS. MCGOWAN:  I'm Candis McGowan.
15   I'm here representing the individual
16   plaintiffs.
17        MS. ROBERTSON:  Chiquita
18   Robertson.
19        MR. CROCKER:  Champ Crocker,
20   individual plaintiffs.
21        MS. DANLEY:  Lacey Danley,
22   individual plaintiffs.
23        MS. WARD:  Carla Ward with the

---

Page 10

1   U.S. Attorneys Office representing the
2   United States.
3        MS. RICHMOND:  Erin Meehan
4   Richmond with the Civil Rights Division
5   representing the United States.
6        MS. SHORE:  And Elise Shore with
7   the Civil Rights Division representing the
8   United States.
9        MARIE ███████
10        The witness, having first been
11   duly sworn or affirmed to speak the truth,
12   the whole truth and nothing but the truth,
13   testified as follows:
14        COURT REPORTER:  Are there any
15   stipulations you would like to put on the
16   record?
17        MR. YAGHMAI:  Just the usual
18   stipulations.  Are y'all --
19        MS. SHORE:  If you want to
20   specify, we -- what -- what do you -- are
21   talking about when you say --
22        MR. YAGHMAI:  What we term as the
23   usual stipulations is you don't have to

---

Page 11

1   make objections to preserve the record with
2   exceptions of the form or any kind of
3   privilege that you are asserting.
4        MS. SHORE:  Okay.  We will
5   proceed to --
6        MS. MCGOWAN:  Read and sign --
7   read and sign is in the usual stipulations.
8        MR. YAGHMAI:  Okay.  The read and
9   sign is fine.  That's fine.
10        MS. MCGOWAN:  But I don't know if
11   she wants to read and sign.
12        MR. YAGHMAI:  I don't know.
13   We'll ask --
14        MS. SHORE:  Yes.  We would like
15   to read and sign.  So we don't --
16        MR. YAGHMAI:  Okay.
17        MS. SHORE:  -- waive that.  And
18   also just -- we had some preliminary issues
19   we wanted to put on the record if now is an
20   appropriate time.  We wanted to just state
21   that there is a protective order in place
22   in this case.  It's ECF, Number 31, entered
23   in the United States case.  It's in both

---

Page 12

1   cases.  And that protects private
2   identifying information as specified on
3   pages seven, eight, and nine of the order.
4   It specifies the type of information and
5   the protections such information is
6   entitled to.
7        And to the extent any question
8   may go into that, we would assert that it's
9   protected by that protective order.  So if
10   it comes up, we will -- we will address
11   that issue accordingly.  I just wanted to
12   put it on the record.
13        And also, I wanted to place on
14   the record that there is a state case that
15   Mrs. ██████ has brought against Randy Hames
16   and Hames Marina.  And it's our
17   understanding based -- in the state case in
18   that, the number is 25-CV-2018-900078.00.
19   There is a stay that the defendants
20   requested and the Court ordered in that
21   case.  And that is a case filed by
22   Mrs. ██████.  So I just wanted to put that
23   on the record.

---

Marie ███████                                    3/11/2020



Page 13

1    MR. YAGHMAI:  Okay.  Are
2    we ready?
3          EXAMINATION
4    BY MR. YAGHMAI:
5    Q.    Could you please tell us your
6    name?
7    A.    Marie ███████.
8    Q.    Mrs. ███████  I know we've got a
9    lot of folks here today.  So I'm going to
10   try to keep it, you know, simple with you.
11   And just a couple of basic rules, if
12   there's something you don't understand,
13   will you just ask me if you don't
14   understand a question?
15   A.    Yes.
16   Q.    And can I presume that if you
17   answer the question that you've understood
18   it?
19   A.    Yes.
20   Q.    The other thing is -- I'm sure
21   your lawyer has told you, you're going to
22   have to answer out because we've got a
23   court reporter here taking everything down.

Page 14

1    So if you see me pointing at her, I'm not
2    mad at her.  I'm just trying to -- or mad
3    mad at you.  I'm just trying to get you to
4    answer the question, okay?
5    A.    Okay.
6    Q.    Have you been known as -- by any
7    other names other than Maria ███████?
8    A.    Yes.
9    Q.    And tell me what those are.
10   A.    Doris Marie ███████ is my maiden
11   name.
12   Q.    That's your maiden name.  Okay.
13   A.    ███████.
14   Q.    ███████ was your married name?
15   A.    Yes.
16   Q.    And when were you married to
17   Mr. ███████?
18   A.    I don't know -- remember the
19   dates.  It's been so long ago.
20   Q.    Do you remember which decade?
21   A.    It was in the '80s.
22   Q.    And what is Mr. ███████ first
23   name?

Page 15

1    A.    Terry.
2    Q.    And how long were you and Terry
3    married for, ballpark?
4    A.    Around nine months.
5    Q.    Okay.  Do you and Terry have
6    any children together?
7    A.    No.
8    Q.    So we've got -- you've told us
9    about -- ███████ is your last name and
10   ███████ is your last name.
11   A.    Yes.
12   Q.    What other last names have you
13   had?
14   A.    ███████.
15   Q.    And that was by marriage?
16   A.    Yes.
17   Q.    And what was Mr. ███████ first
18   name?
19   A.    Dwayne.
20   Q.    And when were you and Dwayne
21   married?
22   A.    It was also in the '80s.
23   Q.    And how long were you and Dwayne

Page 16

1    married for?
2    A.    Let's see.  About four years.
3    Four or five years.
4    Q.    And where was that -- where were
5    you living at that point, in Alabama?
6    A.    Mobile.
7    Q.    Okay.  And did you and Mr. ███████
8    have any children together?
9    A.    Yes.
10   Q.    And what are their names and
11   ages?
12   A.    ███████.
13   Q.    And how old is he?
14   A.    33.
15   Q.    Any other children with
16   Mr. ███████ other than ███████?
17   A.    No.
18   Q.    And where does he live?
19   A.    ███████.
20   Q.    And what -- does he work in
21   Cullman?
22   A.    Yes.
23   Q.    And where does he work?

Marie ███████                                                      3/11/2020

---

**Page 17**

1    A.    ███████.
2    Q.    What other last names that you
3    haven't told us about?
4    A.    █████.
5    Q.    And that was by marriage?
6    A.    Yes.
7    Q.    And what was Mr. ████ first
8    name?
9    A.    Lonnie.
10   Q.    And when were you and Lonnie
11   married?
12   A.    It was in the '90s.
13   Q.    And how long were you and Lonnie
14   married for?
15   A.    Two years.
16   Q.    And does he -- did he live in
17   Cullman at the time?
18   A.    No.
19   Q.    Where was he living?
20   A.    Demopolis.
21   Q.    Is that where you lived, in
22   Demopolis?
23   A.    Linden.

---

**Page 18**

1    Q.    And did you and Mr. ████ have
2    any children together?
3    A.    No.
4    Q.    Any other last names?
5    A.    █████.
6    Q.    All right.  And I think -- I
7    believe you said that -- was that your
8    married -- married name or --
9    A.    Yes.
10   Q.    Okay.  And what's Mr. █████
11   first name?
12   A.    Randy.
13   Q.    And how long were you and Randy
14   married for?
15   A.    20 years.
16   Q.    From approximately when to when?
17   A.    It was in the '90s.  And we
18   divorced 11 years ago.
19   Q.    All right.
20   A.    We separated 11 years ago.
21   Q.    So y'all got married in the '90s
22   and somewhere around 2009, something like
23   that?

---

**Page 19**

1    A.    2011, somewhere, that we
2    separated.
3    Q.    Do you and Randy have any
4    children together, Randy ██████?
5    A.    Adopted.
6    Q.    And what are the adopted
7    children's names?
8    A.    ████████.
9          MR. TURNER:  I'm sorry.  What was
10   that?
11         THE WITNESS:  ████████.
12   Q.    Okay.
13   A.    ████████, ███████.
14   Q.    And do they all live in Cullman
15   County?
16   A.    Yes.
17   Q.    Do they still live with you
18   currently?
19   A.    ████.
20   Q.    How old is ████?
21   A.    He's 21.
22   Q.    And how old is ████?
23   A.    23.

---

**Page 20**

1    Q.    Okay.  And they live in Cullman
2    County, correct?
3    A.    Yes.
4    Q.    And where does ████ work?
5    A.    ████.
6    Q.    And what about ████?
7    A.    ████.
8    Q.    And how old is ████?
9    A.    She's 20.
10   Q.    Okay.  Does ████ work anywhere?
11   A.    Yes.
12   Q.    Where is that?
13   A.    ████████.
14   Q.    And you say they were adopted.
15   Are they biological siblings?
16   A.    Yes.
17   Q.    And did you -- do you have any
18   biological relations to them?
19   A.    No.
20   Q.    Approximately how old were they
21   when -- let's say for -- let's just take
22   ████ since she's 20.  How old was ████
23   when you adopted them?

---

Marie ███████                                                    3/11/2020

## Page 21

1  A.   I got her when she was six weeks.
2  Q.   And was that when you were
3  married to Randy?
4  A.   Yes.
5  Q.   Does Randy have any biological
6  children?
7  A.   Yes.
8  Q.   And how many does he have?
9  A.   One.
10  Q.   And what's that child's name?
11  A.   ████.
12  Q.   So you and Randy together --
13  Randy ████ adopted the three kids,
14  correct?
15  A.   We adopted four.
16  Q.   You adopted four?
17  A.   (Witness nods head.)
18  Q.   Who is the fourth child?
19  A.   ████.
20  Q.   All right.  Did ████ pass away
21  or --
22  A.   No.  He lives in ████████.
23  Q.   He lives where?

## Page 22

1  A.   In ██████.
2  Q.   Okay.  And how old is ████?
3  A.   27.
4  Q.   So y'all adopted four kids at the
5  same time?
6  A.   Yes.
7  Q.   And approximately when was that?
8  A.   It was in 2000.
9  Q.   And where did that adoption take
10  place, in Cullman County?
11  A.   Moulton.
12  Q.   And all of the marriages that you
13  described, they all ended in divorce?
14  A.   Yes.
15  Q.   Are there any other marriages you
16  haven't told us about?
17  A.   Wesley ████.
18  Q.   And when did you and Wesley
19  ████ get married?
20  A.   About five years ago.
21  Q.   So that was approximately 2015 --
22  A.   Yes.
23  Q.   -- y'all got married?  How long

## Page 23

1  did y'all date before getting married?
2  A.   Almost a year.
3  Q.   Did you know him prior to y'all
4  start dating in -- around 2014?
5  A.   No.
6  Q.   And does Wesley have any children
7  that you know of?
8  A.   Yes.
9  Q.   And who are they?
10  A.   ████, ██████.
11  Q.   All right.  And where does ████
12  live these days, do you know?
13  A.   I don't know.
14  Q.   Do you know if he lives in
15  Alabama?
16  A.   Yes.
17  Q.   Do you know if he lives in the
18  Cullman area?
19  A.   I think so.
20  Q.   Do you know where he works?
21  A.   I do not.
22  Q.   When's -- when's the last time
23  you had any communication with him?

## Page 24

1  A.   It's right after our divorce.
2  Q.   So somewhere around 2015?
3  A.   Yeah, somewhere in there.
4  Q.   Any other marriages?
5  A.   No.
6  Q.   All right.  Any other -- so the
7  -- the children that you have are all
8  adopted, correct?
9  A.   Correct.
10  Q.   Are you currently working?
11  A.   Yes.
12  Q.   And where do you work?
13  A.   ██████.
14  Q.   And what is ████████?
15  A.   Nursing home.
16  Q.   It's a nursing home?  Where is it
17  located?
18  MS. DANLEY:  Elise.
19  MS. SHORE:  Objection.
20  MS. DANLEY:  We would like to
21  keep that just due to the protective order
22  location of where she works.
23  MS. SHORE:  Yes.  That we would

Marie ████████                                          **3/11/2020**
                                                 Pages 25 to 28



Page 25

1   like to keep confidential and protected
2   pursuant to the protective order and also
3   based on recent facts that have come to
4   light regarding workplaces of relatives of
5   some of our aggrieved persons including
6   Ms. ████.   So --
7       MR. YAGHMAI:  All right.  Well,
8   first of all, we --
9       MS. SHORE:  We would ask that she
10  not specify any location more definitely
11  than the county.
12      MR. YAGHMAI:  Well, first of all
13  for the record, we disagree with your
14  assertion that there's facts of con- -- you
15  know, but we can get into that later.  But
16  -- so, I mean, I'm not going to sit here
17  and waste time and get in an argument.  Are
18  you just instructing her not to answer
19  where the location of ████ is?
20      MS. SHORE:  I'm saying that
21  pursuant to the protective order that she
22  answer as specifically as possible without
23  identifying an address.

Page 26

1       Q.   (By Mr. Yaghmai:)  What city is
2            ████ located in?
3       A.   ████.
4       Q.            ?
5       A.   (Witness nods head.)
6       MS. DANLEY:  Greg, we have no
7   problem giving the attorneys this location
8   information for any --
9       MS. SHORE:  Correct.
10      MS. DANLEY: -- discovery you
11  need.  But as far as just being on a
12  deposition record transcript and available
13  to all parties, that's where that --
14      MR. YAGHMAI:  Okay.  And --
15      MS. SHORE:  And if you are
16  interested in that information pursuant to
17  the protective order, we can release it to
18  you, just not within the context of this
19  deposition.
20      MR. YAGHMAI:  All right.
21      Q.   (By Mr. Yaghmai:)  And one of
22  your children work there also, correct?
23      A.   Correct.

Page 27

1       Q.   And how long have you worked at
2            ████?
3       A.   About three months.
4       Q.   And what do you do there?
5       A.   CNA.
6       Q.   And what is a CMA (sic)?
7       A.   Certified Nursing Assistant.
8       Q.   All right.  Tell me about your
9   educational background, please.
10      A.   Graduated high school, took some
11  college classes.
12      Q.   Where did you graduate high
13  school from?
14      A.   Sweet Water.
15      Q.   And what year was that?
16      A.   1980.
17      Q.   And you say you took some classes
18  after high school?
19      A.   Yes.
20      Q.   And where did you take those?
21      A.   Alabama Southern.
22      Q.   And were they concentrated in any
23  particular area?

Page 28

1       A.   Business.
2       Q.   Any other degrees or certificates
3   post high school?
4       A.   No.
5       Q.   And so you worked as -- you're a
6   CMA at --
7       A.   CNA.
8       Q.   CNA.  Do you have any educational
9   background to be a CNA?
10      A.   I had to take classes for it.
11      Q.   Okay.  And those were the classes
12  that -- where did you take those?
13      A.   Here in Cullman.  I mean, in
14  Cullman.
15      Q.   Did you take it at a -- you know,
16  an educational -- like a college or did
17  you --
18      A.   No.
19      Q.   -- take it just through --
20      A.   Through the company.
21      Q.   Got you.  Prior to working at
22           ████, where did you work?
23      A.   ████.

**Marie** ███████                                     3/11/2020



**Page 29**

1   Q.   And where is -- what city is that
2   located?
3   A.   ███████.
4   Q.   And what is ███████?
5   A.   Nursing home.
6   Q.   And what did you do there?
7   A.   I was a CNA.
8   Q.   And how long did you work at
9   ███████?
10   A.   Two years.  A little over --
11   maybe a little over.
12   Q.   And what was the reason that you
13   left ███████?
14   A.   To go to ███████.
15   Q.   And was there a particular reason
16   you wanted to change locations of your
17   employment?
18   A.   They paid more.
19   Q.   And who was your supervisor at
20   ███████?
21   A.   Joyce -- Joyce Ann Pollard.
22   Q.   And who is your supervisor at
23   ███████?

**Page 30**

1   A.   Vickie -- I don't know her last
2   name.  I just know her as Vickie.
3   Q.   Was there some lapse of time when
4   -- from when you left ███████ and you went
5   to ███████ or did you just go straight
6   from one job to another job?
7   A.   Just straight.
8   Q.   Okay.  Prior to working at
9   ███████, where did you work?
10   A.   I worked at ███████ twice.
11   Q.   All right.
12   A.   I was at ███████.
13   Q.   And where is ███████?
14   A.   It's in Cullman.
15   Q.   Is that a nursing home?
16   A.   Nursing home.
17   Q.   And when were you there at
18   ███████?
19   A.   Last year.
20   Q.   In 2019?
21   A.   Yeah.
22   Q.   And how long were you at ███████
23   for?

**Page 31**

1   A.   Just a few months.
2   Q.   And what was the reason for
3   leaving there?
4   A.   I was their staffing coordinator,
5   and I just wanted to go back to the floor.
6   Q.   You wanted to go back where?
7   A.   To the floor.
8   Q.   Floor?  Got you.  And you say you
9   worked at ███████ twice?
10   A.   Yes.  I went back to ███████.
11   Q.   Did you work at ███████
12   immediately before ███████?
13   A.   Yes.
14   Q.   Okay.  And how long were you
15   there the first time at ███████?
16   A.   A little over a year.
17   Q.   Was there any lapse in employment
18   from --
19   A.   No.
20   Q.   -- when you went to -- All right.
21   And prior to ███████, where did you work?
22   A.   ███████.
23   Q.   And where is that located?

**Page 32**

1   A.   Jasper.
2   Q.   And is that a home health care --
3   A.   Home health.
4   Q.   And what was your job at ███████
5   ███████?
6   A.   Just sitter.
7   Q.   And approximately how long did
8   you work at ███████?
9   A.   About a year.
10   Q.   Again, was it consecutive
11   right --
12   A.   Yes.
13   Q.   -- before ███████?  Okay.  Were
14   you terminated from any of these places?
15   A.   No.
16   Q.   All right.  And prior to working
17   at ███████, where did you work?
18   A.   ███████.
19   Q.   And approximately when did you
20   work at ███████?
21   A.   I guess it was like 2018.  No.
22   Wait.  Not '18.  '16 or '17, somewhere in
23   there.  I wasn't there long.

**Marie** ███████                                    **3/11/2020**



Page 33

1    Q.    And what did you do at ███████?
2    A.    Clerk.
3    Q.    Okay.  In Cullman?
4    A.    Yes.
5    Q.    Was ███████ the first
6    sort of home health care or nursing home
7    job you had?
8    A.    No.  I worked in one in the '80s.
9    Q.    And where was that?
10   A.    Marengo County.
11   Q.    Okay.  Prior to working at
12   ███████, were you employed anywhere
13   before -- since the '80s in Marengo?
14   A.    Yes.
15   Q.    Where?
16   A.    ███████.
17   Q.    What's the name of it again?
18   A.    ███████.
19   Q.    And where is that?
20   A.    West Jefferson.
21   Q.    In ████?
22   A.    Yes.
23   Q.    All right.  And what did you at

Page 34

1    ███ --
2    A.    I was a bartender.
3    Q.    And approximately when was that?
4    Just -- again, I'm not trying to lock you
5    down on exact dates, but just ballpark.
6    A.    It was right before I went to
7    ███████ because I left there to go to work
8    at ███████.
9    Q.    Okay.  So we're still in the
10   2015 --
11   A.    Yeah.
12   Q.    -- 2016 range?  And how long were
13   you a bartender at ███████?
14   A.    I'd say about six months,
15   somewhere in there.
16   Q.    Were you terminated from there or
17   ███████?
18   A.    No.  It was just too far of a
19   drive.
20   Q.    Got you.  Okay.  And prior to
21   ███████?
22   A.    I didn't work.
23   Q.    Did you work prior to adopting

Page 35

1    the children in -- around 2000?
2    A.    No.
3    Q.    So the first employment you ever
4    had was at the ███████?
5    A.    After we adopted the kids.
6    Q.    Right.  Prior to adopting the
7    kids, did you ever work anywhere?
8    A.    Yes.
9    Q.    Do you remember where?  I know
10   we're talking about a long time ago.
11   A.    I have no idea.
12   Q.    Do you remember what you did?
13   A.    Well, I owned my own business at
14   one point.
15   Q.    And what kind of business was
16   that?
17   A.    Day care.
18   Q.    And where was that?
19   A.    ███████.
20   Q.    And was that in the '80s?
21   A.    Yes.
22   Q.    And how long did you own the day
23   care?

Page 36

1    A.    Three years.
2    Q.    And what was the reason you shut
3    it down?
4    A.    I had knee surgery.
5         MS. SHORE:  I'm going to object
6    to the characterization of shut down.  But
7    you answered it.  It's fine.
8    Q.    Have you ever been on
9    unemployment?
10   A.    No.
11   Q.    Have you ever filed for
12   bankruptcy before?
13   A.    Yes.
14   Q.    And when was that?
15   A.    When I was married to Dwayne, we
16   filed.
17   Q.    And approximately when was that
18   -- or which decade?
19   A.    The '80s.
20   Q.    And I know you're involved in a
21   lawsuit in state court.  Have you ever been
22   involved in any -- in -- I guess in the
23   federal case, too.  Have you ever been

**Marie** ███████                                          **3/11/2020**



Page 37

1    involved in any other lawsuit.
2         A.    A wreck.
3         Q.    And approximately when was that?
4         A.    Two years ago.
5         Q.    And which county was that?
6         A.    Cullman.
7         Q.    Did you actually file a lawsuit,
8    do you know?
9         A.    I did, but it was settled out of
10   court.
11        Q.    And just briefly, what kind of
12   injuries did you suffer in the -- in the
13   car wreck?
14        A.    A fractured foot.
15        Q.    Any other lawsuits you've been
16   involved in?
17        A.    No.
18        Q.    And that was in Cullman County?
19        A.    Yes.
20        Q.    Have you ever been arrested
21   before?
22        A.    No.
23        Q.    Have you -- I guess, technically

Page 38

1    you can be charged without being arrested
2    in some instance.  Have you ever been
3    charged with a crime?
4         A.    No.
5         Q.    So you've never been convicted of
6    anything?
7         A.    No.
8         Q.    Do you have social media?
9         A.    Yes.
10        Q.    And what -- do you have Facebook?
11        A.    Yes.
12        Q.    And what's your Facebook name?
13        A.    I have two.
14        Q.    All right.  And what are they?
15        A.    Marie ████ and Marie ████
16   ████.
17        Q.    Is there one that you use more
18   than the other?
19        A.    Yes.
20        Q.    Which one?
21        A.    Marie ████.
22        Q.    Okay.  When did you start using
23   the Marie ████ as opposed to the Marie

Page 39

1    ████████ as your primary Facebook
2    account?
3         A.    About a year or so ago.
4              MS. SHORE:  I'm going to object
5    to form.
6              MR. YAGHMAI:  Okay.
7              MS. SHORE:  She already answered,
8    but I'm going to object to form.
9              MR. YAGHMAI:  All right.
10        Q.    (By Mr. Yaghmai:)  Is there any
11   particular reason that you switched?  Just
12   because the divorce was final or --
13             MS. SHORE:  I'm going to object
14   to form.
15             MR. YAGHMAI:  Okay.  You got your
16   objection.
17        Q.    You can answer.
18        A.    I just made a new one.
19        Q.    And do you use the Facebook
20   account regularly?
21             MS. SHORE:  Object to form.  You
22   can answer.
23        A.    Not a whole lot.

Page 40

1         Q.    All right.  What about -- do you
2    have any other social media?  Do you have
3    Twitter?
4         A.    No.
5         Q.    Instagram?
6         A.    No.
7         Q.    Tumblr?
8         A.    No.
9         Q.    Trying to go through them.
10   TikTok?
11        A.    Actually, I follow my
12   grandchildren.
13        Q.    Okay.  And what's your TikTok
14   name?
15        A.    I don't know.  My daughter set it
16   up.
17        Q.    Any other social media that maybe
18   I have not asked about?
19        A.    No.
20        Q.    Have you reviewed any documents
21   in preparation for your deposition?
22        A.    Yes.
23        Q.    And tell me what documents you

**Marie** ███████                                          3/11/2020

---

Page 41

1  reviewed.
2        MS. SHORE:  I'm going to object
3  and instruct her not to answer as that is
4  privilege.
5        MR. YAGHMAI:  That's not
6  privilege to ask her what documents -- I'm
7  not asking about any conversations. I'm
8  clearly entitled to ask her what documents
9  she's read. I mean, that's not
10 attorney-client privilege. But if you want
11 to instruct her not to answer, we -- we can
12 deal.
13       I mean, I'm not going to sit
14 here and get in a huge argument about it.
15 We can file whatever with the Court. But
16 the idea that I can't ask a witness what
17 documents they've read as attorney-client
18 privilege is just not a valid objection.
19 Plus the other thing is you don't have
20 attorney-client privilege with her.
21       MS. SHORE:  We -- okay. We
22 assert what we call common interest in
23 litigation privilege, which has been

---

Page 42

1  recognized by various courts including the
2  Northern District of Alabama in the United
3  States versus Gumbatay case. And we can
4  give you the cite for that.
5        MR. YAGHMAI:  But isn't there a
6  specific Department of Justice memorandum
7  that asks the specific question in a Fair
8  Housing Act of whether an agrieved party
9  has attorney-client privilege with -- with
10 the Department of Justice?
11       You're familiar with that,
12 aren't you, that specifically says there is
13 no attorney-client privilege with somebody
14 claiming to be an aggrieved party --
15       MS. SHORE:  We have what is
16 called a common interest in litigation
17 privilege that is protected and has been
18 recognized by the Northern District of
19 Alabama in the case which we just cited to
20 you. And I'm happy to give you a more
21 specific case citation if you'd like. I
22 have the case with me.
23       MR. YAGHMAI:  Well, let me -- let

---

Page 43

1  me ask this. If you're going to -- I mean,
2  again, there is no attorney-client
3  privilege to ask a witness what documents
4  they've reviewed in preparation for a
5  deposition. There's just not. Regardless
6  of whether you have the privilege of this
7  common -- you know, privilege that you're
8  citing whether you have it or not doesn't
9  apply to ask a witness what documents --
10 and I think any lawyer in here from Alabama
11 would tell you that for me to specifically
12 ask what documents you have reviewed.
13       MS. SHORE:  Okay. You can -- you
14 can answer that question.
15       Q.   (By Mr. Yaghmai:)  What documents
16 have you reviewed in preparation for your
17 deposition?
18       A.   Over testimony of the grand jury
19 hearing.
20       Q.   At the preliminary hearing?
21       A.   Yes.
22       Q.   Okay. The preliminary hearing
23 testimony?

---

Page 44

1       A.   Yes.
2       Q.   Anything else?
3       A.   Not that I remember.
4       Q.   All right.
5            MR. YAGHMAI:  And I do want to
6  get this on the record, and I assume you're
7  going to instruct her not to answer, but I
8  think I'm entitled to know. I mean, I am
9  going to ask what conversations you've had
10 with the department -- because there is no
11 attorney-client privilege. But what --
12 what --
13       MS. DANLEY:  But I will object
14 and instruct her not to answer because she
15 had those conversations with me.
16       MR. YAGHMAI:  Right. I'm not
17 asking conversations she's had with you. I
18 get so let me make sure I'm clear for
19 the record.
20       Q.   What conversations have you had
21 with the Department of Justice in
22 preparation for your deposition?
23       MS. SHORE:  And we -- we will

---

Page 45

1  object to the extent you're asking what we
2  talked about if that's what you're asking.
3       MR. YAGHMAI:  I am asking that.
4       MS. SHORE:  And that is
5  protected.  And I want to correct.  It was
6  the Middle District of Alabama, but there's
7  other cases that recognize the common
8  interest in litigation privilege.  And we
9  are happy if you want to preserve this
10  issue and go on and we can brief it with
11  the Court if that's what -- but we will
12  instruct her not to answer --
13       MR. YAGHMAI:  I understand.
14       MS. SHORE:  -- about the content
15  of our conversations.  The Middle District
16  case in the United States versus Gumbatay
17  --
18       MR. YAGHMAI:  You had your
19  objection.  I don't want to waste time
20  here.  I'm not going to -- we can debate it
21  later.  I just wanted to ask for the
22  record --
23       MS. SHORE:  And we can file the

Page 46

1  motions with the Court.
2       MR. YAGHMAI:  Right.  I just
3  wanted to ask the question and get you - if
4  you're going to instruct her not to
5  answer - to do it and then we'll move on.
6  That's all I'm trying do.
7       MS. SHORE:  And just for the
8  record, I'd like to also state -- which I
9  didn't state at the beginning.  There's
10  also a protective order in place in the
11  state law case that y'all got a stay in
12  Mrs. ███████ case.  So there's a
13  protective order in that case, too.  I want
14  to state that for the record.
15       MR. YAGHMAI:  That doesn't have
16  anything to do with the question that we're
17  asking right here.
18       MS. SHORE:  I know.  I just
19  wanted to put it in there at this point.
20       MR. YAGHMAI:  Okay.
21       MS. SHORE:  I did not put it up
22  front.  So --
23       MR. YAGHMAI:  Let me just get the

Page 47

1  record clear and then we can move on.
2       Q.   (By Mr. Yaghmai:)  What
3  conversations did you have with anybody in
4  the Department of Justice in preparation
5  for your deposition?
6       MS. DANLEY:  And I'm going to
7  instruct her not to answer any conversation
8  in which I, myself, or Candice is present.
9       MR. YAGHMAI:  Okay.  Well, that's
10  my question.  What --
11       MS. DANLEY:  I, myself -- I meant
12  I, myself, Champ, or Candice.
13       MR. YAGHMAI:  Okay.  And that's
14  fine.  But, I mean, if there's not a --
15  well, we can debate it again.
16       MS. SHORE:  Are you asking if she
17  talked to us or what was said?  Or if you
18  want to clarify your question and I can be
19  more specific about --
20       MR. YAGHMAI:  No.  I want to ask
21  what was said with the Department of
22  Justice --
23       MS. SHORE:  Okay.  And we will

Page 48

1  object and -- and ask her not to answer --
2       MR. YAGHMAI:  Okay.
3       MS. SHORE:  -- and instruct her
4  not to answer.  If you're asking what the
5  substance of what she talked about with us
6  with the Department of Justice and to the
7  extent that includes Department of Justice
8  with her private counsel present, we would
9  assert the common interest in litigation
10  over all of those conversations.
11       MR. YAGHMAI:  Okay.
12       Q.   (By Mr. Yaghmai:)  Did you talk
13  with somebody at the Department of Justice
14  in preparation for your deposition?
15       A.   Yes.
16       Q.   How many times?
17       A.   Twice.
18       Q.   Was it in person or on the
19  telephone?
20       A.   Person.
21       Q.   And when were they?
22       A.   One was last week and one
23  yesterday.

**Marie** ███████                                                    **3/11/2020**

Page 49

1    Q.    And approximately how long did
2    those meetings last?
3        A.    Several hours.
4        Q.    Were you shown any of the
5    documents other than the preliminary
6    hearing transcript you told us about?
7            MS. SHORE:  I mean, I will object
8    to the extent that I -- there is a -- I'm
9    going to object to anything that was
10   discussed during the meetings that
11   Mrs. ████ had with both the Department of
12   Justice and her private counsel who
13   represents her.
14           MR. YAGHMAI:  And I'll give you a
15   standing objection to that every single
16   time so you don't worry about waiving it.
17   So we just -- we can move along.  But it's
18   a different question.  But I'll give you a
19   standing objection to that.
20       Q.    (By Mr. Yaghmai:)  My question
21   is:  Were you shown any other documents
22   other than the preliminary hearing
23   transcript that we've talked about?

Page 50

1        A.    I think that's it.
2        Q.    Have you ever seen any videos --
3            MS. DANLEY:  Object -- and I want
4    to object if we were going to go with
5    objection on the record anything that I was
6    in the room and I showed her or could have
7    possibly showed her.
8        Q.    (By Mr. Yaghmai:)  Have you ever
9    seen any videos involved in any of these
10   matters?
11       A.    No.
12       Q.    Okay.  And by videos, anything
13   that Alisha Cobb has recorded, have you
14   ever seen a video of that?
15       A.    No.
16       Q.    Or Kayla Carreker?
17       A.    No.
18       Q.    Or heard any recordings
19   purporting to being Mr. Hames on the
20   recording?
21       A.    Can you repeat that?
22       Q.    Yeah.  Have you heard any
23   recordings that has been asserted that it

Page 51

1    was Randy Hames on the recording -- audio
2    recording?
3        A.    No.
4        Q.    So you've never seen any videos
5    or heard any audios regarding this matter
6    whatsoever or anything to do with
7    Mr. Hames, correct?
8        A.    Correct.
9        Q.    Okay.  Did you talk with anyone
10   outside of the Department of Justice or
11   your counsel about your deposition?
12       A.    No.
13       Q.    Or tell anybody you were even
14   giving a deposition?
15       A.    No.
16       Q.    Have you talked to Alisha Cobb
17   about your deposition?
18       A.    No.
19       Q.    Or Kayla Carreker about your
20   deposition?
21       A.    No.
22           MR. YAGHMAI:  Is that funny?  I
23   mean, I guess it is --

Page 52

1            MS. SHORE:  No.
2            MR. YAGHMAI:  -- I don't know.
3    Well, we'll delve into that in Ms. Cobb's
4    deposition.  We'll find out whether it's
5    funny or not.
6        Q.    (By Mr. Yaghmai:)  Have you
7    talked to anybody else other outside the
8    counsel or Department of Justice about
9    anything to do with your deposition?
10       A.    Just my lawyers.
11       Q.    Okay.  What about Tomeka
12   Bartlett?  Have you talked to Tomeka
13   Bartlett about your deposition?
14       A.    No.
15       Q.    When did you first meet Randy
16   Hames?
17       A.    In 2012.
18       Q.    And how did you first hear about
19   Mr. Hames?
20       A.    I was looking for a place to
21   live.
22       Q.    And where had you lived prior to
23   the 2012 when you were looking for a place

**Marie** ▓▓▓▓▓                                    **3/11/2020**

Page 53

1   to live?
2        A.    Dodge City.
3        Q.    And where is Dodge City in
4   relation to Cullman?
5        A.    It's in Cullman.
6        Q.    And did you live in a trailer
7   park there?
8        A.    No.  Just a trailer, but not a
9   park.
10       Q.    And who did you live in that
11  trailer with in Dodge City?
12       A.    My three children.
13       Q.    Anybody else?
14       A.    No.
15       Q.    And how long did you live there?
16       A.    A year.
17       Q.    Do you know who you were renting
18  it from?
19       A.    I can't remember his name.
20       Q.    How much were you paying?
21       A.    475.
22       Q.    Did you have a written lease with
23  the trailer -- the people in the trailer in

Page 54

1   Dodge City?
2        A.    Yes.
3        Q.    Do you still have that somewhere?
4        A.    No.
5        Q.    Do you remember whether you had
6   to give them a deposit or anything like
7   that or --
8        A.    Yes.
9        Q.    And what was it, one month
10  deposit?
11       A.    Yes.
12       Q.    Was there any issues that you had
13  with the trailer in Dodge City?
14       A.    No.
15            MS. SHORE:  Form -- objection to
16  form.
17       Q.    Any issues with the paying of the
18  rent?
19       A.    The last month I was there.
20       Q.    In Dodge City?
21       A.    Yes.
22       Q.    And what was the issue there?
23       A.    I had to make a choice whether to

Page 55

1   get my kids enrolled in school and things
2   that they needed or pay my rent that month.
3        Q.    And so you didn't pay the rent
4   the last month?
5        A.    Yes.
6        Q.    And were you evicted?
7        A.    I was.
8        Q.    Did you have to go through the
9   court process to get evicted or you just --
10       A.    No.  I just moved.
11       Q.    And what was your source of
12  income when you were living in the Dodge
13  City trailer?
14       A.    I had a subsidiary check from the
15  state for my adopted children.
16       Q.    And do you remember how much that
17  was?
18       A.    Around 1,600 a month.
19       Q.    Did you have -- was that tax free
20  or taxable, do you know?
21       A.    Tax free.
22       Q.    Okay.  Did you have any other
23  sources of income at that point when you

Page 56

1   were living in the Dodge City trailer?
2        A.    Child support every now and then.
3        Q.    Child support from Randy ▓▓▓▓▓?
4        A.    Yes.
5        Q.    Okay.  And was it court-ordered
6   child support?
7        A.    Yes.
8        Q.    And how much child support was he
9   supposed to pay?
10       A.    It was supposed to be 1,363.
11       Q.    Per month, correct?
12       A.    Per month.
13       Q.    All right.  And was there times
14  that he would not pay it?
15       A.    Yes.
16       Q.    Was that more than not he was not
17  paying it?
18       A.    Yes.
19       Q.    Did you ever -- was he ever taken
20  to court for child support payments?
21       A.    Yes.
22       Q.    Did the Court ever order back
23  child support that you actually received?

**Marie** ███████                                    **3/11/2020**

Page 57

1    A.    Yes.
2    Q.    And when was that?
3    A.    I don't remember exact dates.
4    Q.    Do you remember whether that
5    issue with him not paying child support was
6    going on while you lived in the Dodge City
7    trailer?
8    A.    Oh, yes.
9    Q.    All right.  Some months he was
10   making payments and some months he wasn't?
11   A.    Partial payments.
12   Q.    All right.  And do you remember
13   where you were -- would he pay you by check
14   when he did pay?
15   A.    Money order.
16   Q.    And when the state would give you
17   the subsidy of the $1,600 per month, would
18   they -- was that -- did they pay you by
19   check or direct deposit or --
20   A.    Check.
21   Q.    Okay.  And where were you banking
22   back in 2012 when you lived in Dodge City?
23   A.    ███████.

Page 58

1    Q.    It was just a regular checking
2    account?
3    A.    Yes.
4    Q.    Okay.  Did you use -- were you
5    banking at ███████ while you lived in
6    the trailer park associated with Randy
7    Hames?
8    A.    No.
9    Q.    And who were you banking with
10   then?
11   A.    Nobody.
12   Q.    You didn't have a bank account?
13   A.    No.
14   Q.    And what was the reason you
15   didn't have a bank account?
16   A.    I just shut -- I closed it down.
17   And I would cash my checks at Walmart.
18   Q.    So when the government would send
19   you the $1,600 check, you would cash it at
20   Walmart?
21   A.    Yes.
22   Q.    And would Walmart charge you a
23   fee?

Page 59

1    A.    Yes.
2    Q.    Approximately, what would they
3    charge you?
4    A.    I don't remember.
5    Q.    All right.  But if you had a
6    regular bank account, your bank wouldn't
7    charge you a fee to cash the check, right?
8    A.    Correct.
9    Q.    Was there any reason that you
10   wanted to pay a fee to cash a check as
11   opposed to not paying a fee to cash a
12   check?
13   A.    No.
14   Q.    Did ███████ shut down your
15   account for something you had done or it
16   was just something you chose to do?
17         MS. SHORE:  I'm going -- going to
18   object to form.
19   Q.    You can answer.
20   A.    I just shut it down.  I --
21   Q.    All right.  Did you ever pay the
22   money that you owed to the Dodge City
23   trailer park?

Page 60

1    A.    No.
2    Q.    Prior to living in the Dodge City
3    trailer, where did you live?
4    A.    ███████.
5    Q.    And where in ███████?  Was
6    it a trailer park?
7    A.    Yes.
8    Q.    Do you remember the name of it?
9    A.    It was owned by an individual.
10   Q.    Do you remember the individual's
11   name?
12   A.    Hershel Chandler.
13   Q.    Did you know Mr. Chandler
14   personally?
15   A.    No.  I mean, as my landlord.
16   Q.    Right.  Did you ever socialize
17   Mr. Chandler outside of him being your
18   landlord?
19   A.    No.
20   Q.    Or never dated him?
21   A.    No.  I was married.
22   Q.    And how long did you live in
23   the -- the ███████ trailer park?

Marie ██████                                              3/11/2020

Page 61

1      A.   We lived there -- I want to say
2   ten years.
3           MS. DANLEY:  What was that?
4           MR. YAGHMAI:  Ten years.
5      Q.   (By Mr. Yaghmai:)  And that was
6   when you were married to Randy ██████?
7      A.   Yes.
8      Q.   Okay.  Were you married the whole
9   time you lived in the ████████ trailer
10  park for ten years or did you meet
11  Mr. ████ during that time?
12     A.   No.  We were married.
13     Q.   And what was the rent at the
14  Hershel Chandler trailer park?
15     A.   We owned our trailer.  We just
16  paid lot rent.
17     Q.   And how much was that?
18     A.   100.
19     Q.   A hundred per month?
20     A.   Yes, sir.
21     Q.   Did y'all own the trailer the
22  entire ten years?
23     A.   Yes.

Page 62

1      Q.   Did you sell the trailer
2   presumably before you moved to Dodge City?
3      A.   No.
4      Q.   All right.  What did you do with
5   the trailer?
6      A.   After we separated, he quit
7   paying on it.  So me and the kids had to
8   move.
9      Q.   And the trailer got repossessed?
10     A.   Repossessed.
11     Q.   Do you know approximately what
12  year that was?
13     A.   I do not.
14     Q.   Well, the whole time that you
15  lived in the ████████ trailer park,
16  you had the trailer and it was repossessed
17  after that?
18     A.   Yes.
19     Q.   Prior to living -- do you
20  remember where you lived prior to the
21  ████████ trailer park?
22     A.   We lived in ████.
23     Q.   All right.  Did y'all live in a

Page 63

1   trailer park there?
2      A.   No.
3      Q.   An apartment?
4      A.   It was a trailer, but it was an
5   individual lot.
6      Q.   And were you paying just a lot
7   fee then?
8      A.   Yes.
9      Q.   Was there any issues paying the
10  lot fee when you worked at -- when you
11  lived at Mr. Chandler's lot?
12     A.   No.
13     Q.   And what was the reason you moved
14  to Dodge City?  Was it because the trailer
15  got repossessed?
16     A.   Because of being separated.
17     Q.   You moved there with the three
18  kids?
19     A.   Yes.
20     Q.   Any issues that you ever had at
21  the Dodge City trailer park?
22     A.   No.
23     Q.   And so you were getting evicted

Page 64

1   and had -- had to move somewhere else,
2   correct?
3      A.   Correct.
4      Q.   And that's when you found the
5   trailer park with Mr. Hames, correct?
6      A.   Correct.
7      Q.   And how did you hear about the --
8   the Hames Marina trailer park?
9      A.   A friend of mine was helping me
10  look for a place to live and she was riding
11  around and found it.  And the day she found
12  it, somebody was moving out.  So she
13  stopped and asked him about it.
14     Q.   And who was the friend?
15     A.   Nikki Self.
16     Q.   Are you still friends with
17  Ms. Self?
18     A.   I haven't seen her in years.
19     Q.   All right.  Do you know whether
20  she talked -- did she communicate to you
21  that she talked to Mr. Hames about, you
22  know, the availability and the price of the
23  trailer park?

Page 65

1    A.   No.
2    Q.   So she told you she saw a sign
3  for one and somebody was moving out?
4    A.   No.  They -- she seen --
5         MS. SHORE:  Objection to form.
6    Q.   Go ahead.
7    A.   She just told me she stopped and
8  talked to the people moving out.
9    Q.   Oh.  Got you.  And did
10 she communicate to you that they said there
11 was anything bad about living at the Hames
12 trailer park?
13   A.   No.
14   Q.   Obviously you wouldn't have moved
15 there if she had given you that advice,
16 correct?
17   A.   Correct.
18   Q.   And did -- who did you talk to at
19 the Hames trailer park before you moved in?
20   A.   Just Mr. Hames.
21   Q.   All right.  Tell me what you
22 remember about that initial conversation.
23   A.   She had give me the number and I

Page 66

1  called him and told him I needed a place to
2  live with my children and I was interested
3  in renting it -- or looking at it.
4    Q.   Did you communicate to him that
5  you had been evicted from the trailer park
6  you were living in?
7    A.   I did.
8    Q.   And what did he say?
9    A.   He didn't really say anything.
10   Q.   Okay.  Did you tell him why you
11 were being evicted?
12   A.   Yeah.
13   Q.   That you just couldn't pay the
14 money?
15   A.   That month, yeah.  I explained
16 why.
17   Q.   And he said -- he didn't say
18 anything about how are you going to pay me
19 if you can't pay them or something to that
20 effect?
21   A.   No.
22   Q.   And then when's the next
23 communication you had with him?

Page 67

1    A.   When I looked at the trailer and
2  he told me the price.
3    Q.   Did he show you the trailer?
4    A.   Yes.
5    Q.   And it was trailer number nine?
6    A.   Yes.
7    Q.   And you needed a three-bedroom
8  because of the children, correct?
9    A.   Correct.
10   Q.   And do you remember -- did you go
11 view the trailer with just the two of y'all
12 or who all was present?
13   A.   My children were with me.
14   Q.   All right.  And he walked you
15 around the trailer, Mr. Hames did?
16   A.   Correct.
17   Q.   Any of that communication you can
18 remember?
19   A.   Yes.
20   Q.   Tell me about it.
21   A.   He -- we looked.  There was some
22 things that needed to be cleaned and done
23 to the trailer, but I told him I would

Page 68

1  clean it.
2    Q.   Do you remember anything other
3  than the cleaning that needed to be done to
4  the trailer before you could move in?
5    A.   What do you mean by that?
6    Q.   I mean, you said there was some
7  cleaning and some other things.  And I'm
8  just asking what were the other --
9    A.   Oh.  I found out later after I
10 moved in there was like a hole in the
11 floor.
12   Q.   Where was the hole?
13   A.   At the bathtub.
14   Q.   And you didn't see it when you
15 walked around?
16   A.   It was on the side of the bathtub
17 because it was a bathtub that was raised up
18 a little bit.  And, no, I did not notice
19 it.
20   Q.   All right.  Anything else that
21 you had to do other than the cleaning that
22 needed to be fixed with the trailer -- in
23 the -- what you say the hole in the

Page 69

1   bathtub.
2       A.   No.
3       Q.   Did you ever communicate to
4   Mr. Hames after you moved in the concern
5   about the hole in the bathtub?
6       A.   Yeah.  I told him about it.
7       Q.   And what was his response?
8       A.   He really didn't say anything.
9       Q.   Did he ever fix it?
10      A.   No.
11      Q.   What did -- I mean, did it leak
12  water out of the tub or what was --
13      A.   No.
14      Q.   -- the effect of having the hole?
15      A.   Animals would come --
16          MS. SHORE:  Objection to form.
17  You can go ahead.
18      A.   Animals would come up through the
19  floor.
20      Q.   Okay.  And did you communicate
21  that to him?
22      A.   Yes.
23      Q.   On how many occasions, ballpark?

Page 70

1       A.   I don't --
2           MS. SHORE:  Objection to form.
3       A.   I don't remember.
4       Q.   And what -- so you would say,
5   look, I've got animals coming in through
6   this hole and he wouldn't do anything about
7   it?
8           MS. SHORE:  Objection to form.
9           MR. YAGHMAI:  I'll give you a
10  standing objection to form if you'd like.
11      A.   Correct.
12      Q.   And did you ever tell him if he
13  didn't fix it you weren't going to pay the
14  rent or you were going to move out?
15      A.   No, I did not.
16      Q.   Why is that?
17      A.   Because I needed a place to live
18  with my children.
19      Q.   What kind of animals were getting
20  in there?
21      A.   Cats.
22      Q.   Any other animals you can
23  remember?

Page 71

1       A.   No.
2       Q.   Any of your kids allergic to
3   cats?
4       A.   No.
5       Q.   Were you allergic to cats?
6       A.   No.
7       Q.   Okay.  Did you ask Mr. Hames if
8   there was a written lease agreement you had
9   to sign?
10      A.   No.
11      Q.   Is there any reason why?
12      A.   No.
13      Q.   Okay.  Did you -- you felt
14  comfortable enough that there was no
15  written lease agreement?
16          MS. SHORE:  Objection to form.
17  You can answer.
18      A.   He didn't offer one and I
19  didn't --
20      Q.   Okay.  And so it was -- was it
21  around September 12th is when you moved in?
22  Does that sound right?
23          MS. SHORE:  Objection to form.

Page 72

1   You can answer.
2           MR. YAGHMAI:  What's improper
3   about the question other than objecting --
4   I mean, interrupting the question?  What --
5           MS. SHORE:  She didn't --
6           MR. YAGHMAI:  What's the
7   objection to form of the question?
8           MS. SHORE:  That one, you don't
9   -- you don't have any basis to give her
10  this September 12th date.  If you want to
11  show her something that shows she moved in
12  September 12th --
13          MR. YAGHMAI:  That's not an
14  objection to the form.  I mean, that's just
15  not.  But I'll -- again, I'll give you a
16  stand -- I'm trying to get through the
17  deposition.  I will give you a standing
18  objection the entire time to every question
19  if you'd like.
20          MS. SHORE:  You can go ahead.
21  You can answer the question.
22      Q.   (By Mr. Yaghmai:)  Do you
23  remember when in September?

**Marie** ████████                                    **3/11/2020**

Page 73

1    A.   I don't remember the date.
2    Q.   Okay.  But it was in September of
3    2012, correct?
4    A.   August, September.  I don't
5    remember the date.
6    Q.   And you had to pay the $475 up
7    front before you could move in, correct?
8    A.   Correct.
9    Q.   And did you pay him with cash or
10   check?
11   A.   Cash.
12   Q.   Did you ever pay him with a
13   check?
14   A.   No.
15   Q.   All right.  Did he ever give you
16   a receipt for the cash?
17   A.   No.
18   Q.   But you were paid up through the
19   month when you gave him the $475 up front,
20   correct?
21   A.   What do you mean by --
22   Q.   So you wanted to move in?
23   A.   Yes.

Page 74

1    Q.   The monthly payment was $475?
2    A.   Yes.
3    Q.   And you gave him the $475 before
4    you moved in, correct?
5    A.   Yes.
6    Q.   And that was for the first month
7    of rent, correct?
8    A.   Yes.
9    Q.   And that's how it would be done
10   at the end of the month when your 30 days
11   would run up, you would have to pay him
12   another $475?
13   A.   Correct.
14   Q.   And that would continue as long
15   as you lived there, correct?
16   A.   Correct.
17   Q.   When he first showed you around
18   the trailer before you moved in, do you
19   remember any of the other discussions?
20   A.   No.
21   Q.   Do you remember him telling you
22   some of the rules being -- one of them
23   being that you couldn't have an animal

Page 75

1    there?
2    A.   Correct.
3    Q.   All right.  And that was a
4    trailer park rule, correct?
5    A.   Correct.
6    Q.   And you were fine with that?
7    A.   Yes.
8    Q.   Because y'all -- you and your
9    kids didn't have any pets, correct?
10   A.   Correct.
11   Q.   Okay.  Was there anything that
12   you deemed inappropriate that Mr. Hames
13   said when he first showed you -- when y'all
14   were walking around the trailer?
15   A.   No.
16   Q.   Or did you get any vibe or
17   feeling that, hey, maybe I need to stay
18   away from him or there's something -- you
19   know, something about him that just didn't
20   sit well with you?
21   A.   No.
22   Q.   Did he seem like a nice person to
23   you at that point?

Page 76

1    A.   He did.
2    Q.   Especially you told him that you
3    were getting evicted and he still, you
4    know, let you move in, correct?
5    A.   Correct.
6         MS. SHORE:  Form.  Objection.
7    Q.   Did you talk to any of the other
8    people that lived out in the trailer park
9    prior to you moving in?
10   A.   No.
11   Q.   To ask whether it was a good
12   place to live?
13   A.   No.
14   Q.   And why not?
15   A.   I didn't know anybody out there.
16   Q.   Okay.  Was there any other
17   locations of trailer parks you were looking
18   at moving in prior to moving into the Hames
19   Marina?
20   A.   No.
21   Q.   Any reason why you didn't look
22   around at other places?
23   A.   I just took the first thing that

**Marie** ███████                                          **3/11/2020**

Page 77

1  we found available because I needed to
2  move.
3       Q.   Okay.  And the eviction that you
4  got in Dodge City, I mean, did -- was it
5  just an eviction notice they put on the
6  door?
7       A.   He brought it to me.
8       Q.   He brought it to you?
9       A.   (Witness nods head.)
10      Q.   And how long do you remember
11  after the eviction notice did you actually
12  move out?
13      A.   I don't remember.
14      Q.   Okay.  But you didn't move out
15  that -- I mean, you didn't rush out to move
16  out that day, did you?
17      A.   No.
18      Q.   Did you know the process like how
19  long you had to move out once you got
20  presented the eviction notice?
21      A.   No.
22      Q.   Okay.  Or did you ask anybody,
23  hey, do I have to move today or I got a

Page 78

1  couple of weeks or --
2       A.   I did not ask.
3       Q.   Okay.  In your mind, did you have
4  any idea of how long -- whether it was
5  right or wrong, how long you had before you
6  had to move out after getting the eviction
7  notice?
8       A.   No.
9            MS. SHORE:  Form.  Objection.
10  You can answer.
11      Q.   Were any of your kids not in
12  school when you moved in September of
13  2012 at Hames Marina?
14      A.   No.
15      Q.   What grade was the youngest in,
16  do you remember?
17      A.   I don't remember.
18      Q.   All right.  And where were they
19  going to school?
20      A.   Good Hope.
21      Q.   And were they going to Good Hope
22  when you lived at Dodge City?
23      A.   They went to Cold Springs for a

Page 79

1  little while and they -- when the school
2  year started, they went to Good Hope --
3       Q.   All right.
4       A.   -- the next school year.
5       Q.   Did you know anything about Good
6  Hope before you moved in to the -- Hames'
7  trailer?
8       A.   No.
9       Q.   And what was your typical day
10  when the kids were school?  What would you
11  do all day back in September of 2012?
12      A.   I would stay at home or my grand
13  -- keep my granddaughter.
14      Q.   And what's your granddaughter's
15  name?
16      A.   ███.
17      Q.   And how old was she,███, back
18  in September of 2012?
19      A.   Two or three.
20      Q.   And who was her mother?
21      A.   ███.
22      Q.   And who was███ father?
23      A.   ███.

Page 80

1       Q.   And███ was the son that you
2  told us about, correct?
3       A.   Correct.
4            MS. SHORE:  Objection to the
5  form.  Yeah.  There -- there is -- we can
6  correct it on the redirect, but objection
7  to form.
8       Q.   Well, who are the parents of --
9  of your granddaughter?
10      A.   ███ and ███.
11      Q.   Okay.  And were -- were -- none
12  of those were your biological children,
13  correct?
14      A.   ███.
15      Q.   Okay.  That's what I thought.  I
16  don't know if I didn't know.
17           ███ was your biological son?
18      A.   Yes.
19      Q.   And he was married to -- to
20  ███, correct?
21      A.   Correct.
22      Q.   And███ was their daughter,
23  correct?

**Marie** ████████                                    **3/11/2020**

Page 81

1      A.    Yes.
2      Q.    All right.  And were they still
3   married when you were taking care of ████?
4      A.    Yes.
5      Q.    Okay.  And how often would you
6   take care of ████ back in September of
7   2012?
8      A.    Just whenever she wanted to come
9   over.
10     Q.    Okay.  So it wasn't like a set
11  schedule or --
12     A.    No.
13     Q.    Okay.  Anything else that you
14  would do during the day when your kids were
15  at school back in September of 2012?
16     A.    No.
17     Q.    Did you have a vehicle at that
18  point?
19     A.    I did.
20     Q.    And it worked?
21     A.    Yes.
22     Q.    And it was at the mobile home,
23  correct?

Page 82

1      A.    Yes.
2      Q.    Okay.  And the whole time you
3   lived at the Hames Marina, you had an
4   operating vehicle, correct?
5      A.    Correct.
6      Q.    Would you ever socialize with any
7   of the other people in the mobile homes --
8   trailer park?
9      A.    I talked to one of my neighbors
10  down the road, but not very often.
11     Q.    And who was that?
12     A.    Renee Payne.
13     Q.    And she would be at home during
14  the day too?
15     A.    Yes.
16     Q.    All right.  Do you remember what
17  lot number she lived in?
18     A.    I do not.
19     Q.    Do you remember if she had kids
20  that lived there with her or not?
21     A.    She did.
22     Q.    Okay.  And would y'all go --
23  would your kids play together at any point?

Page 83

1      A.    Yes.
2      Q.    And were you friends with Renee
3   Payne the entire time that you lived at the
4   trailer park?
5      A.    I would say more like
6   acquaintances, you know.  I kind of stayed
7   to myself.
8      Q.    But did you meet her soon after
9   you moved in to the trailer park?
10     A.    Yes.
11     Q.    Do you still keep in touch with
12  Ms. Payne?
13     A.    No.
14     Q.    Or when's the last time you
15  communicated with her?
16     A.    It's been a long time.
17     Q.    Did you have a typical routine
18  where you would leave the trailer park back
19  in September of 2012 and go do stuff during
20  the day?
21     A.    I mean, run errands if I needed
22  to.
23     Q.    And what's your date of birth?

Page 84

1         MS. SHORE:  I'm going to object
2   that she just state the month.  Consistent
3   with the protective order, just state the
4   month and date and we can --
5         MR. YAGHMAI:  You think the
6   protective order doesn't allow me to ask
7   her on the record of what her date of birth
8   is?
9         MS. SHORE:  Well, we would -- we
10  would -- if you want to ask her that, we
11  would definitely, consistent with the
12  order, redact it for --
13        MR. YAGHMAI:  What part of the
14  order is consistent to ask somebody what
15  their date -- what part of any protective
16  order does not allow me to ask her what her
17  date of birth is?
18        MS. SHORE:  I'm just saying that
19  when we get the transcript, it will be
20  something that we deemed confidential and
21  likely redact it for certain purposes.
22        MR. YAGHMAI:  We'll cross that
23  bridge when we get there.

**Marie** ████████                                           3/11/2020

---

Page 85

1    MS. SHORE:  The date of birth is
2  mentioned as a protective order issue.
3  It's one of the categories covered by the
4  protective orders.
5    Q.    (By Mr. Yaghmai:)  What's your
6  date of birth, ma'am?
7      THE WITNESS:  Answer?
8      MS. SHORE:  You can answer it.
9    A.    ████████████████.
10   Q.    All right.
11     MS. SHORE:  And we would ask that
12  in the future if there is information from
13  the protective order that the parties --
14  consistent with the provisions of the
15  protective order, the parties who are
16  present actually leave the room because the
17  protective order provides that the parties
18  do not get that information and that --
19  unless there's a showing.
20       So if she -- you're going to ask
21  her to state on the record information
22  protected by the protective order that it's
23  clear the parties -- the attorneys can have

---

Page 86

1  the information, but the parties are not
2  covered by that information.
3       So future questions that she
4  does answer, we will ask the -- the parties
5  to leave unless, you know, we want to come
6  up with another solution to that.
7    Q.    (By Mr. Yaghmai:)  When you first
8  moved in in September of 2012, would
9  Mr. Hames -- would you see him in the areas
10  around the trailers?
11   A.    Yes.
12   Q.    And how often would he come
13  around the trailers?
14     MR. TURNER:  Just for the record,
15  her birthday is actually --
16     MR. YAGHMAI:  Yeah.  It's on
17  Alacourt I'm sure.  Yeah.  I mean, it's,
18  you know -- that's what I'm saying.  If
19  we're going to litigate a protective order,
20  the absurdity of me asking what her date of
21  birth is when it's public record in a
22  lawsuit that she's filed -- that's what I'm
23  trying to avoid doing to try to get through

---

Page 87

1  the deposition.
2      MS. SHORE:  That's fine.
3      MR. YAGHMAI:  What did I ask?
4      (Record read.)
5    Q.    (By Mr. Yaghmai:)  When you moved
6  in in September of 2012, how often -- would
7  he come around on a daily basis?
8    A.    A lot of times, yeah.
9    Q.    All right.  Was there any
10  particular time of day that he would come
11  around?
12   A.    Around lunchtime.
13   Q.    All right.
14   A.    And in the afternoons.
15   Q.    Did you see -- did you ever see
16  him talking to other people that lived in
17  the trailer park?
18   A.    I never paid attention to it.
19   Q.    So you never saw?
20   A.    No.
21   Q.    Do you remember how long after
22  you moved in that he first stopped by when
23  you talked to him?

---

Page 88

1    A.    I don't remember how long.
2    Q.    Okay.  But was it shortly after
3  you moved in?
4    A.    Yes.
5    Q.    All right.  And did y'all -- and
6  we'll get into the details of what you say
7  happened, but were there pleasant
8  conversations when you first started move
9  -- when you first moved in?
10   A.    Yes.
11   Q.    And tell me just generally what
12  y'all would talk about during those
13  pleasant conversations.
14   A.    He just --
15     MS. SHORE:  Objection to form.
16  You can answer.
17   A.    He would just ask me if
18  everything is okay, you know, if I was
19  settled in.
20   Q.    And what would you tell him?
21   A.    Yes.
22   Q.    Okay.  Anything else you can
23  remember?  Would he ask about your kids,

---

**Marie** ▬▬▬                                           3/11/2020

---

Page 89

1   like how old they were or where they went
2   to school?
3       A.   Well --
4            MS. SHORE:  Objection.  Form.
5   You can answer.
6       A.   He asked me -- well, he actually
7   asked me before I moved in about my kids.
8       Q.   Got you.  And then -- so what
9   else would y'all talk about when you first
10  moved in that was pleasant?
11      A.   I don't remember.
12      Q.   Did you ever ask about his
13  family?
14      A.   No.
15      Q.   Or ask about whether he was
16  married or not?
17      A.   No.
18      Q.   At any point, did you ever ask
19  him whether he was married?
20      A.   No.
21      Q.   At any point, did you ever ask
22  Mr. Hames whether he had a girlfriend?
23      A.   No.

---

Page 90

1       Q.   Any other topics that you can
2   remember in the pleasant conversations you
3   had with Mr. Hames?
4       A.   No.
5       Q.   Were any -- and you may not
6   remember specifics and I understand that,
7   but were any of them -- the pleasant
8   conversations that you had with Mr. Hames
9   have to do with something other than about
10  the trailer park or the trailer?
11           MS. SHORE:  Objection.  Form.
12  You can answer if you understand.
13      A.   I mean, he knew that I was going
14  through a divorce and that's -- but --
15      Q.   And so you told him that,
16  correct?
17      A.   Correct.
18      Q.   All right.  Do you remember what
19  all you told him about you going through a
20  divorce?
21      A.   No.  That I -- just that I was
22  going through a divorce.
23      Q.   And you told him it was -- I

---

Page 91

1   mean, it was hard to go through a divorce
2   because y'all had been married 20 years,
3   right?
4            MS. SHORE:  Objection.  Form.
5   You can answer.
6            MR. YAGHMAI:  I'm going to --
7   you've got to quit interrupting this
8   deposition.  You cannot object to the form
9   because you don't like the question.
10  That's not the way we do things in Alabama
11  in the Northern District.  You have a
12  standing -- I will give you a standing
13  objection to every single question.
14  Because every question that you don't like
15  when there's no basis to object to the form
16  to it, you interrupt.  And I'm trying to be
17  patient and get through this.  Tell me what
18  was wrong with that question.
19           MS. MCGOWAN:  Greg, I'm not --
20  I'm going to object to your
21  characterization of what she can do.
22           MR. YAGHMAI:  Okay.
23           MS. MCGOWAN:  You still have the

---

Page 92

1   right to object to the form under usual
2   stipulations.
3            MR. YAGHMAI:  I agree with you a
4   hundred percent.
5            MS. MCGOWAN:  And your question
6   you just asked --
7            MR. YAGHMAI:  Uh-huh.
8            MS. MCGOWAN:  -- was leading and
9   it was compound --
10           MR. YAGHMAI:  Okay.
11           MS. MCGOWAN:  -- and it was not a
12  proper formed question.
13           MR. YAGHMAI:  Okay.  Well --
14           MS. SHORE:  If you want me to
15  specify why I'm objecting to form --
16           MR. YAGHMAI:  No, I don't.
17           MS. SHORE:  -- I'm happy to do
18  that.
19           MR. YAGHMAI:  We -- we can
20  agree --
21           MS. SHORE:  I mean, if you want
22  me to do that, I will do that.  But I'm
23  objecting to form before she has a chance

---

**Marie** ███████                                           **3/11/2020**

Page 93

1  to answer so I get my objection. And I'm
2  happy to specify the type of objection that
3  Candice just articulated.
4      MR. YAGHMAI:  Not only will I
5  give you a standing objection to the form,
6  I will give it that it's timely even if she
7  answers afterwards if we can try to get
8  through the deposition is all I'm trying to
9  do.
10     MS. SHORE:  Okay.  And I would
11 say after -- is there a pending question?
12 Because after that, I think we would like
13 to take a break.
14     MR. YAGHMAI:  Well --
15     MS. SHORE:  Or I objected to the
16 form of that.  So if you want --
17     MR. YAGHMAI:  Okay.
18     MS. SHORE:  -- to either ask it
19 again in the same form that I'm going to
20 object to and I can be more specific as to
21 the way it's been -- why it's objectionable
22 or if you want to reframe it, that's up to
23 you.

Page 94

1      Q.   (By Mr. Yaghmai:)  You've told us
2  that you were going through a divorce and
3  you communicated that to Mr. Hames,
4  correct?
5      A.   Correct.
6      Q.   All right.  And going through the
7  divorce, was it difficult because you and
8  Mr. ███████  had been married for 20 years?
9      A.   Correct.
10     Q.   All right.  And did you express
11 that to Mr. Hames, which would be natural
12 saying, look, I'm going through a divorce
13 and it's, you know, something to the effect
14 that it's not pleasant to go through?
15     MS. SHORE:  I am going to object
16 to form.  If you want me to be more --
17     MR. YAGHMAI:  No.  You got your
18 objection.
19     Q.   You can answer it.
20     MS. SHORE:  Okay.  And you can
21 answer it if -- yes, you can answer it.
22     A.   I don't remember.
23     Q.   Okay.  Do you remember Mr. Hames

Page 95

1  ever telling you that his wife had passed
2  away?
3      A.   No.
4      Q.   At any point?
5      A.   No.
6      Q.   Do you remember Mr. Hames ever
7  talking about any of his daughters?
8      A.   No.
9      Q.   Had you ever met any of his
10 daughters?
11     A.   No.
12     Q.   Do you know anything about any of
13 his daughters?
14     A.   No.
15     Q.   Do you have any information or
16 evidence that they had anything to do with
17 the operation of the trailer park?
18     A.   No.
19     Q.   Anything else you can remember
20 that y'all had, you know, pleasant or
21 social conversations with Mr. Hames about
22 other than -- you've told us about getting
23 settled in the trailer.  You've told us

Page 96

1  about -- you told him that, you know, you
2  were going through the divorce.  Anything
3  else?
4      MS. SHORE:  Objection to form.
5  You can answer.
6      A.   I don't --
7      MR. YAGHMAI:  Yeah, you're right.
8  That was a terrible question.
9      A.   I don't remember.
10     Q.   Okay.
11     MS. SHORE:  Can we -- we would
12 like to take a break now.  We have been
13 going for about an hour.  Can we -- are we
14 allowed to -- we would like to take a
15 break.  So we're asking --
16     MR. YAGHMAI:  That's fine.  I
17 don't care.
18     MR. TURNER:  We can't take a depo
19 without her.
20     THE VIDEOGRAPHER:  We're off the
21 record at 10:15 a.m.
22     (Brief recess was taken.)
23     THE VIDEOGRAPHER:  We're back on

**Marie** ████████                                                    **3/11/2020**

Pages 97 to 100

---

Page 97

1    the record at 10:31 a.m.
2         MS. SHORE:  So we would just like
3    to put on the record that we are willing to
4    share information that is deemed
5    confidential under the protective order,
6    just not in the deposition.  So we would
7    ask that we do that -- because we know your
8    clients are here writing down everything.
9    And that actually is not consistent with
10   the -- to the extent that anything that's
11   already been testified to that I did assert
12   the protective order protecting, and that
13   your clients are writing it down -- and
14   we're not, you know, going to say anything
15   about that at this juncture.
16        But going forward for the
17   deposition, we would ask that anything that
18   you want to ask her that we deem protected
19   by the protective order, we will share with
20   you, but not in this forum.  And we're
21   happy to do it in another forum.
22        MR. YAGHMAI:  Thus far, the two
23   things you've said have been governed in

Page 98

1    the protective order is where was
2    ████████ located and what her date of
3    birth is.  I mean, if y'all are going to
4    assert the protective order about things
5    like a date of birth where she's got it
6    put in her public filings in her lawsuit, we're
7    going to be here all day.  I mean --
8         MS. SHORE:  Well, no.  There were
9    other things --
10        MS. DANLEY:  Where is it in her
11   public filing in a lawsuit?
12        MR. YAGHMAI:  In her state court
13   case it has a date of birth.  You can pull
14   it up on Alacourt and look.  It will have
15   the date of birth there.  But anyway --
16        MS. SHORE:  With respect to also
17   financial institutions, that was also
18   asked.  And anything that we deem
19   confidential and protected by the
20   protective order, we -- we will share with
21   you, just not in this deposition context.
22   So --
23        MR. YAGHMAI:  Okay.  Let's do it

Page 99

1    this way to kind of expedite it because,
2    again, I don't want to get in a big
3    argument about it.  If there's a question I
4    ask and you think it's deemed by the -- you
5    know, protected by the protective order --
6    covered by the protective order, just say
7    that on the record.  But also say that
8    you'll provide me the information off the
9    record.  As long as we can say that it's
10   part of the answer to the deposition if we
11   have to use it, let's say for -- and I
12   don't know.  If we have to use it for
13   summary judgement purposes, I don't want
14   the record to be devoid of some question
15   that I've asked because you deem --
16        MS. MCGOWAN:  You can send us an
17   interrogatory for something like that.
18        MR. YAGHMAI:  I understand.
19        MS. SHORE:  And just to repeat --
20   I will repeat what Ms. McGowan just said.
21   You can serve written discovery on us to
22   the extent that you want to ask for that
23   information and --

Page 100

1         MR. YAGHMAI:  But then -- then
2    y'all are going to object to it and we're
3    going to be fighting over it of something
4    I'm entitled to ask in a deposition.  But
5    anyway, if you think I've asked something
6    that violates the protective order, tell
7    her not to answer, tell -- say why you
8    think I've violated the protective order.
9         MS. SHORE:  I will do that.
10        MR. YAGHMAI:  As far as my
11   clients are being able to take notes,
12   they're clearly parties to the case and
13   they're allowed to sit there and take notes
14   for the benefit of discussing with me
15   whatever they deem necessary.
16        MS. SHORE:  Just not with respect
17   to anything covered by the protective
18   order.  And that's where we would object to
19   any further questions covering it.
20        MR. YAGHMAI:  So are we ready?
21        MS. SHORE:  Yes.
22   Q.    (By Mr. Yaghmai:)  When you moved
23   in the Hames Marina in September of 2012,

Marie ███████                                          **3/11/2020**

Page 101

1   how were the utilities handled?
2       A.   My daughter-in-law got my power
3   in her name.
4       Q.   And who is your daughter-in-law?
5       A.   ████  ████
6       Q.   And has she ever gone by ████
7   ████?
8       A.   Yes.
9       Q.   Is that her name now?
10      A.   Yes.
11      Q.   Her and ████ are divorced?
12      A.   Yes.
13      Q.   And she remarried?
14      A.   Yes.
15      Q.   And that's -- when we talk about
16  ████████, we're also talking about
17  ████████, correct?
18      A.   Correct.
19      Q.   So why did ████ -- at the time
20  ████████ get the utilities put in her
21  name?
22      A.   I really don't know.  I mean,
23  we -- she had power in her name.  It was to

Page 102

1   keep me from having to pay the deposit.
2       Q.   Did you tell Mr. Hames that y'all
3   were going to do that?
4       A.   No.
5       Q.   Is there any reason why you
6   didn't?
7       A.   I didn't think it was any of his
8   business where my -- who paid -- I mean --
9       Q.   All right.
10      A.   -- what name my utilities was in.
11      Q.   Right.  And Mr. Hames had no
12  involvement in what name the utilities were
13  in, correct?
14      A.   Correct.
15      Q.   Have you ever talked with ████
16  ████ or ████████ about Mr. Hames?
17      A.   What do you mean by -- I mean,
18  she knew -- she knew he was my landlord,
19  but --
20      Q.   Have you ever discussed anything
21  else with her about -- ████████ about
22  Mr. Hames?
23      A.   I have no idea.  I don't

Page 103

1   remember.
2       Q.   You can't remember whether you
3   ever said anything about Mr. Hames
4   whatsoever to Mr. ████ -- Ms.
5   ████ other than that he was your
6   landlord?
7       A.   I mean, I don't remember our
8   conversations.
9       Q.   So you had conversations with
10  Ms. ████ about Mr. Hames?
11      A.   I do not know if it was about
12  Mr. Hames.  She was my daughter-in-law.  I
13  do not remember the conversations that we
14  had about anything.
15      Q.   All right.
16           MS. DANLEY:  Can we specify a
17  time frame?
18      Q.   Well, at any point.
19      A.   It's been several years.  I do
20  not remember our conversations.
21      Q.   Let me narrow it down just for
22  the record.  At any point while you lived
23  out there at Hames Marina, did you have any

Page 104

1   discussions with ████████ about
2   Mr. Hames?
3       A.   I do not remember.
4       Q.   What about in December of 2019?
5       A.   I do not remember.
6       Q.   Did you ever socialize with
7   Mr. Hames?
8       A.   As -- I mean, he has been to my
9   trailer and come in, yes.
10      Q.   And you have let him in your
11  trailer, correct?
12      A.   Correct.
13      Q.   All right.  And do you have a
14  ballpark idea of how many times you let him
15  in -- willingly let him in your trailer?
16      A.   I do not.
17      Q.   Okay.
18           MS. DANLEY:  Object to the form.
19           MS. SHORE:  Objection to form.
20      Q.   Would that be something that
21  would not have been unusual while you were
22  living out there at Hames Marina?
23      A.   Not in the beginning.



Page 105

1    Q.   Okay.  At some point did that
2  change where you didn't willingly let him
3  into your trailer?
4    A.   Yes.
5    Q.   And when did that change?
6    A.   After my birthday.
7    Q.   All right.  Let's talk about your
8  birthday.  So prior to your birthday --
9  which is ███████, correct?
10   A.   Correct.
11   Q.   And the only time that you lived
12  out at Hames Marina during your birthday
13  was ███████, correct?
14       MS. SHORE:  Objection to form.
15   Q.   Is that a correct statement?
16   A.   Correct.
17   Q.   Okay.  And so prior to
18  ███████ was when you would
19  voluntarily let him into your trailer,
20  correct?
21       MS. SHORE:  Form.  Objection.
22   A.   Correct.
23   Q.   All right.  And you -- I think

Page 106

1  you told us you don't remember how many
2  times that was, do you?
3    A.   I do not.
4    Q.   All right.  Do you remember
5  anything about the discussions when you
6  would voluntarily let him into your trailer
7  prior to ███████?
8    A.   I don't remember the
9  conversations, no.
10   Q.   Would y'all talk about kids?
11       MS. SHORE:  Objection to form.
12   A.   I really don't remember the
13  conversations.
14   Q.   Okay.  But they would have been
15  something outside of any aspects of the
16  actual trailer, correct, prior to
17  ███████?
18   A.   I don't remember.
19   Q.   All right.  So ███████
20  ███ you were going through a divorce,
21  correct?
22   A.   Correct.
23   Q.   Was your divorce finalized at

Page 107

1  that point?
2    A.   No.
3    Q.   Were you dating anyone as of
4  ███████?
5    A.   No.
6    Q.   Or had you been on any dates with
7  anyone as of ███████, since
8  you got separated?
9    A.   No.
10   Q.   All right.  And Mr. Hames came by
11  your trailer on that ███████
12  , correct?
13       MS. SHORE:  Objection.  Form.
14  You can answer.
15   A.   I don't remember the date.
16   Q.   Well, did he come by on your
17  birthday?
18   A.   I don't -- no, not on my
19  birthday.
20   Q.   All right.  At some point, did he
21  come by and bring some wine?
22   A.   Yes, he did.
23   Q.   And do you remember when that

Page 108

1  was?
2    A.   It was either the weekend before
3  or the weekend after my birthday.
4    Q.   All right.  And do you remember
5  which kind of wine it was?
6    A.   Elderberry.
7    Q.   And what makes you remember that?
8    A.   Because he had mentioned it and
9  I've never had it before.
10   Q.   He had mentioned it prior
11  to coming to your trailer with the wine,
12  correct?
13   A.   Correct.
14   Q.   And did he tell you anything
15  about the history of Elderberry or how he
16  knew about it?
17   A.   I remember him saying that he
18  made it.
19   Q.   And did y'all have some
20  discussion about that?
21   A.   No.
22   Q.   Do you remember what your
23  response was when he told you he had made

**Marie** ▆▆▆▆▆                                              3/11/2020

Page 109

1   the wine?
2        A.   Just that I had never had any.
3        Q.   Got you.  Did you ask him to try
4   some?
5        A.   No.
6        Q.   Did he offer for you to try some?
7        A.   He did.
8        Q.   And what was your response?
9        A.   He -- he would -- he said that he
10  would bring me a bottle for my birthday.
11       Q.   And you said that was okay?
12       A.   I said yeah.
13       Q.   And did you like wine?
14       A.   I'm not a big drinker, but I'll
15  drink a little wine every now and then.
16       Q.   And so prior to him showing up to
17  your trailer with the wine, had y'all
18  discussed him coming over?
19       A.   No.
20       Q.   So he knocks on your door with a
21  bottle of wine, correct?
22       A.   Correct.
23       Q.   Do you remember what time of day

Page 110

1   it was?
2        A.   It was in the afternoon.
3        Q.   And were your kids home?
4        A.   No.
5        Q.   And where were they?
6        A.   At their dad's.
7        Q.   Okay.  And was there anybody else
8   there?
9        A.   No.
10       Q.   The trailer, number nine, that
11  you lived in, was there a solid door that
12  you couldn't see through that you had to
13  open to see who was at the door?
14       A.   It had two doors on it.  It had a
15  glass door and a solid door.
16       Q.   Okay.  So the solid door would be
17  on -- if you were on the inside of the
18  trailer, the --
19       A.   Yes.
20       Q.   -- solid door would be open the
21  inside?
22       A.   Yes.
23       Q.   And then when you opened that,

Page 111

1   the glass door would be sitting there,
2   correct?
3        A.   Correct.
4        Q.   And both of them had locks?
5        A.   Yes.
6        Q.   All right.  And was it your
7   typical routine to lock both the solid door
8   and the glass door, right?
9        A.   No.
10       Q.   Would you lock either one of
11  them?
12       A.   Sometimes.
13       Q.   All right.  And so he knocks on
14  your door either the weekend before or the
15  weekend after your birthday and you opened
16  the door, correct?
17       A.   Correct.
18       Q.   Did you ask who it was before you
19  opened the door?
20       A.   I just opened the front door.
21       Q.   So is that a no?
22       A.   No.
23       Q.   All right.  And you saw that

Page 112

1   Mr. Hames was standing there, right?
2        A.   Correct.
3        Q.   And you saw that he had a bottle
4   of wine, correct?
5            MS. SHORE:  Form.  Objection.
6   You can answer.
7        A.   Correct.
8        Q.   All right.  And did you open the
9   glass door at that point when you saw who
10  it was?
11       A.   Yes.
12       Q.   And were you surprised that he
13  was there with a bottle of wine?
14       A.   Yes.
15           MS. SHORE:  Objection.  Form.
16  You can answer.
17       Q.   And why were you surprised?
18       A.   I wasn't expecting him.
19       Q.   But he had told you at some point
20  he may bring you a bottle for your
21  birthday, correct?
22       A.   Correct.
23       Q.   And so when you opened the glass

## Page 113

1  door and see it's -- and start talking to
2  Mr. Hames, correct?
3      A.   Correct.
4      Q.   And what did -- who said
5  something first, was it you or him?
6      A.   I don't remember.
7      Q.   Do you remember the first thing
8  he said?
9      A.   That he brought me that bottle of
10  wine for my birthday.
11     Q.   And what did you say?
12     A.   And I told him thank you.
13     Q.   Did he make a suggestion that
14  maybe y'all should have some of the wine
15  then?
16     A.   Correct.
17     Q.   And what was your response?
18     A.   I told him to come on in, I'd get
19  some glasses.
20     Q.   All right. So you opened the
21  door, the glass door, and he comes on
22  inside, correct?
23     A.   Correct.

## Page 114

1      Q.   And you go get the wine glasses
2  from your kitchen, correct?
3      A.   Correct.
4      Q.   And --
5          MS. SHORE: Objection. Form.
6  You answered. That's fine.
7      Q.   Did he open the bottle of wine?
8      A.   Yes.
9      Q.   Do you remember whether it was a
10  screw top or he had to have a wine opener?
11     A.   I don't remember.
12     Q.   And what was the conversation, if
13  you remember, while you were in the kitchen
14  getting the glasses?
15     A.   I don't remember.
16     Q.   Where was he while you were in
17  the kitchen?
18     A.   Sitting on the couch.
19     Q.   And can you see the couch from
20  the kitchen in lot -- in trailer number
21  nine?
22     A.   Yes.
23     Q.   And I know you don't remember

## Page 115

1  specifically what was the conversation, but
2  y'all were having pleasant conversation
3  going back and forth, correct?
4      A.   Correct.
5      Q.   And you got the glasses of wine
6  and brought them over to the couch?
7      A.   No. I brought the glasses over.
8      Q.   I'm sorry. Right. You brought
9  the glasses from the kitchen over to the
10  couch?
11     A.   Yes.
12     Q.   And he was sitting down?
13     A.   Yes.
14     Q.   And there was a table right in
15  front of the couch?
16     A.   Correct.
17     Q.   And he poured a couple of glasses
18  of wine?
19     A.   Correct.
20     Q.   And did you drink some of the
21  wine?
22     A.   I went to the bathroom first and
23  then I come back.

## Page 116

1      Q.   All right. Did you just have to
2  use the restroom?
3      A.   Yes.
4      Q.   All right. Did you have a cell
5  phone at that point?
6      A.   Yes.
7      Q.   A working cell phone?
8      A.   Yes.
9      Q.   And you had reception there
10  inside your trailer at number nine?
11     A.   Yes.
12     Q.   Do you remember who your carrier
13  was?
14     A.   I don't remember.
15     Q.   Do you remember what your phone
16  number was?
17     A.   I don't remember.
18     Q.   Do you have the same phone number
19  now that you did back then?
20     A.   I don't remember.
21     Q.   And so he pours the wine in the
22  glasses, correct?
23     A.   Correct.

**Marie**████████                                          3/11/2020

---

Page 117

1    Q.    And you drink some of the wine,
2  correct?
3        A.    Correct.
4        Q.    Did y'all finish -- well, strike
5  that.
6            Did he finish his entire glass of
7  wine, do you remember?
8        A.    Yes.
9        Q.    Did you finish your entire glass
10  of wine?
11        A.    I had half a glass.
12        Q.    Did he pour himself another glass
13  of wine?
14        A.    Yes.
15        Q.    Okay.  And everything is still
16  pleasant at this point, correct?
17        A.    Yes.
18        Q.    Do you know approximately how
19  long it was from when he first knocked on
20  the door to y'all -- until you drank your
21  half a glass of wine?  Just ballpark.
22        A.    I don't remember.
23        Q.    I mean, was it more than five

---

Page 118

1  minutes?
2        A.    I don't remember.
3        Q.    You can't give me any kind of
4  range of whether --
5        A.    Maybe ten, somewhere in there.
6        Q.    Ten minutes?
7        A.    (Witness nods head.)
8        Q.    Is that a yes?
9        A.    Yes.
10        Q.    All right.  And so the
11  conversation was pleasant at that point.
12  He started -- he poured his second glass of
13  wine.  Did he drink that?
14            MS. SHORE:  Objection.  Form.
15  You can answer.  Go ahead.
16        Q.    Did he drink the second glass of
17  wine?
18        A.    Repeat that.
19        Q.    Yes, ma'am.  You've told us that
20  you drank a half glass of wine the entire
21  time, correct?
22        A.    Yes.
23        Q.    And that he finished his glass of

---

Page 119

1  -- first glass of wine, correct?
2        A.    Correct.
3        Q.    And that he poured himself a
4  second glass of wine?
5        A.    Correct.
6        Q.    Do you remember whether he drank
7  the second glass of wine?
8        A.    Correct.
9        Q.    He drank the entire thing?
10        A.    He did.
11        Q.    All right.  Did he pour himself a
12  third glass of wine?
13        A.    He drank the bottle.
14        Q.    All right.  So -- well, he wasn't
15  drinking out of the bottle, was he?
16        A.    No.
17        Q.    Did he pour a third glass of
18  wine?
19        A.    I don't know if there was any
20  left.  I don't remember.
21        Q.    And did he attempt to fill up
22  your -- since you had drank only half a
23  glass, did he attempt to fill up the rest

---

Page 120

1  of your glass?
2        A.    I told him I didn't want anymore.
3        Q.    And he respected that?
4        A.    Yes.
5        Q.    Everything at this point, he had
6  had two glasses of wine and you had had
7  half a glass of wine and --
8            MS. SHORE:  Objection.  Form.
9  You can answer.
10            MR. YAGHMAI:  Well, I haven't
11  even finished the question yet.  So --
12        Q.    He drank the two glasses of wine,
13  you drank the half a glass of wine and it
14  was still pleasant up to this point,
15  correct?
16        A.    Correct.
17        Q.    And you can't tell us anything
18  that y'all talked about or any areas or
19  subjects that y'all talked about up to this
20  point?
21        A.    I don't remember.
22        Q.    I mean, did you talk about his
23  family?

---

Page 121

1    A.   I don't remember.
2         MS. SHORE:  Asked and answered.
3    Q.   Your family?
4    A.   I don't remember.
5    Q.   And the reason I'm asking you
6    category -- you may not remember off the
7    top, but I'm trying to see if I can refresh
8    your memory if I mention a certain category
9    of topics.  That's the reason I'm asking
10   you.
11        Did you talk about your divorce
12   at all?
13   A.   I don't remember.
14   Q.   And did you communicate to him
15   that your children were gone to their dad's
16   for the whole weekend?
17   A.   Yes.
18   Q.   And was that before you let him
19   in?
20   A.   No.  It was after.
21   Q.   At what point during the process
22   did you let him know that your kids were
23   gone to their dad's the whole weekend?

Page 122

1    A.   Right after he come in, he asked
2    me where my children was.
3    Q.   And you said they're gone for the
4    weekend?
5    A.   Yes.
6    Q.   Do you remember whether you left
7    your front door open after you let him in,
8    either the glass one or the solid one?
9    A.   I don't remember.
10   Q.   At some point did it get
11   impleasant -- unpleasant while y'all were
12   sitting there drinking wine?
13   A.   Yes.
14   Q.   And how long was it from the time
15   that Randy Hames knocked on the door until
16   the conversation got unpleasant?
17   A.   I'm not sure about the time frame
18   of how long.
19   Q.   Do you have a range?
20   A.   I don't -- I don't.
21   Q.   Okay.  Well, earlier you said you
22   thought it was at least ten minutes while
23   it was pleasant.

Page 123

1    A.   Yes.
2    Q.   So it had to have been longer
3    than that, correct?
4    A.   Yeah.  Correct.
5    Q.   All right.  And would you
6    typically have your cell phone on you, just
7    as a routine?
8    A.   I mean, I'm sure it was in the
9    living room somewhere.
10   Q.   Sure.
11   A.   I don't carry it with me
12   everywhere I go.
13   Q.   Would you typically be in a
14   conversation where you'd be on your phone
15   like sending text messages or something
16   like that?
17   A.   No.
18   Q.   Because it's rude?
19   A.   (Witness nods head.)
20   Q.   And you were sitting on the couch
21   with Randy Hames while y'all were drinking
22   wine?
23   A.   Correct.

Page 124

1    Q.   All right.  Were y'all sitting
2    like on the opposite ends of the couch or
3    were y'all sitting next to each other?
4    A.   I was sitting on the end.  He was
5    sitting not in the middle but toward the
6    middle.
7    Q.   All right.  Towards the middle on
8    your side or towards the middle on the
9    opposite end of the couch?
10   A.   Not right beside me, but close to
11   where I was.
12   Q.   And up to the point that it got
13   unpleasant, you didn't have any problems
14   with that, did you?
15   A.   Correct.
16   Q.   All right.  And you didn't
17   communicate to him that he needed to scoot
18   over or anything like that, did you?
19   A.   No.
20   Q.   And was it something he said or
21   did that first made it unpleasant?
22   A.   Something he said.
23   Q.   And what did he say?

**Marie** ▮▮▮▮                                    **3/11/2020**

---

Page 125

1     A.    That I notice you have a tongue
2   ring and I'm sure you know how to use it.
3     Q.    And what did you say to him?
4     A.    I said that's inappropriate.
5     Q.    And what did he say when you told
6   him it was inappropriate?
7     A.    I don't remember exactly what he
8   said.
9     Q.    Did you get up off the couch when
10  he -- when you told him it was
11  inappropriate?
12    A.    I did not.
13    Q.    Why not?
14    A.    I thought he would stop, you
15  know, drop it.
16    Q.    Did he bring it up again after
17  you said it was inappropriate?
18    A.    Yes.
19    Q.    Was it immediate -- like was it
20  just immediately he said something about
21  the tongue ring, you said it was
22  inappropriate, and then he brought it back
23  up again?

---

Page 126

1     A.    Yes.
2     Q.    And what did he say the second
3   time that was inappropriate?
4     A.    That I should give him a blow
5   job.
6     Q.    All right.  And when he told you
7   that -- told you that, what did you say to
8   him?
9     A.    I told him no.
10    Q.    And what did he say when you told
11  him no?
12    A.    That if I didn't he would have me
13  evicted.
14    Q.    And at that point were y'all --
15  when he asked you for a blow job, were
16  y'all still sitting on the couch?
17    A.    Yeah.
18    Q.    And did you get up off the couch
19  when he asked you that?
20    A.    No.
21    Q.    Why not?
22    A.    I was kind of stunned --
23    Q.    He wasn't --

---

Page 127

1     A.    -- at what he said.
2     Q.    Right.  And he wasn't physically
3   doing anything towards you aggressively?
4   It was just the words that upset you,
5   correct?
6           MS. SHORE:  Objection.  I'm
7   sorry.  Form.
8     Q.    You can answer.
9           MS. SHORE:  Form.
10    Q.    You can answer.
11    A.    Repeat the question, please.
12    Q.    He wasn't physically doing
13  anything aggressive towards you that was
14  upsetting you, it was the words that were
15  upsetting you, correct?
16    A.    Correct, at the time.
17    Q.    All right.  And what did you say
18  when he told you you could be evicted?
19    A.    I asked him how because I paid my
20  rent.
21    Q.    And what did he say?
22    A.    He said, I'm a lawyer, I can do
23  anything I want.

---

Page 128

1     Q.    And at this point, were y'all
2   still on the couch?
3     A.    Yes.
4     Q.    And when he told you that he was
5   a lawyer, he could do anything that he
6   wanted, what did you say?
7     A.    I don't remember what I said.
8     Q.    But y'all were still sitting on
9   the couch, correct?
10    A.    Correct.
11    Q.    All right.  Did you at any point
12  try to get up and leave the couch during
13  these conversations?
14    A.    No.
15    Q.    All right.  And he didn't --
16  Mr. Hames didn't do anything to prevent you
17  from getting up off the couch physically,
18  did he?
19    A.    He undone his pants.
20    Q.    But I'm talking about he didn't
21  try to --
22    A.    No.
23    Q.    Ma'am?

---

**Marie** ▮▮▮                                             3/11/2020

Page 129

1    A.   No.
2    Q.   All right.
3         MS. DANLEY:  She was answering a
4    question and you didn't let her finish.
5    Q.   Now, I want to make sure the
6    record is clear.  Mr. Hames didn't do
7    anything physically to prevent you from
8    leaving the couch, correct?
9    A.   No.
10   Q.   And that's a correct statement?
11   A.   Yes.
12   Q.   And you say he began to unzip
13   his pants, correct?
14   A.   Correct.
15   Q.   And was he still sitting on the
16   couch when he was unzipping his pants?
17   A.   He stood up.
18   Q.   All right.  When he stood up, did
19   you stand up and try to walk away?
20   A.   No.
21   Q.   Why not?
22   A.   I was scared.
23   Q.   Scared of what?

Page 130

1    A.   I had a lot running through my
2    mind at the time about losing my place to
3    live.
4    Q.   Did you say anything to him when
5    he started to unzip his pants?
6    A.   I don't remember.
7    Q.   Did he say anything to you when
8    he unzipped his pants?
9    A.   No.
10   Q.   Okay.  Did you attempt to call
11   someone when he started talking about blow
12   jobs and that he was a lawyer and was
13   powerful?
14   A.   No.
15   Q.   Why not?
16   A.   Because I didn't have my cell
17   phone with me.
18   Q.   Did you attempt to retrieve your
19   cell phone?
20   A.   No.
21   Q.   Why not?
22   A.   I don't know.
23   Q.   And what happened after he

Page 131

1    unzipped his pants?
2    A.   He grabbed my head.
3    Q.   He grabbed your head with what?
4    A.   His hand.
5    Q.   And where did he grab your head?
6    A.   On the back of my head.
7    Q.   And what did he say when he
8    grabbed the back of your head?
9    A.   I don't remember.
10   Q.   And did you say anything?
11   A.   I don't remember.
12   Q.   Did you try to remove his hand?
13   A.   I don't remember.
14   Q.   Did you try to -- whether it was
15   -- remove his hand or anything, did you try
16   to move away from him?
17   A.   I tried to move my head.
18   Q.   Okay.  And what happened when you
19   tried to move your head?
20   A.   He just pressed down.
21   Q.   So it's your testimony that he
22   physically overpowered you?
23   A.   Yes.

Page 132

1    Q.   And did he do anything else to
2    physically overpower you other than grab
3    your head?
4    A.   No.
5    Q.   Did you say anything while this
6    was going on?
7    A.   I don't remember.
8         MS. SHORE:  Form.
9    Q.   Did he say anything while this
10   was going on?
11   A.   I don't remember.
12   Q.   Okay.  Well, whether you remember
13   the specific words, do you remember whether
14   words were even spoken by either one of
15   you?
16   A.   I don't remember.
17        MS. DANLEY:  Marie, do you need
18   to take a break?
19        THE WITNESS:  No.
20        MR. YAGHMAI:  Are you sure?  I
21   don't mind at all.
22        THE WITNESS:  I just want to get
23   it over with.

## Page 133

1    MR. YAGHMAI:  Okay.

2    Q.    (By Mr. Yaghmai:)  And did you

3  scream or anything like that?

4    A.    No.

5    MS. SHORE:  Objection.

6    Q.    Was there any particular reason

7  you didn't?

8    A.    I just didn't want to lose my

9  place to live with my kids.

10    Q.    Did you tell Mr. Hames to stop?

11    A.    I did.

12    Q.    And what did he say?

13    A.    I don't know exact words.

14    Q.    But he said something in

15  response?

16    A.    Yes.

17    Q.    All right.  And was this at the

18  same time that he had grabbed the back of

19  your head?

20    A.    I don't remember.

21    Q.    Prior to this, had you ever

22  mentioned to Mr. Hames anything about

23  having a tongue ring prior to him

## Page 134

1  showing --

2    A.    I --

3    Q.    -- you the bottle of wine?

4    A.    I didn't mention it.  You could

5  see it.

6    Q.    You could see it?

7    A.    (Witness nods head.)

8    Q.    Ma'am?

9    A.    Yes.

10    Q.    Okay.  And so what happened next?

11    A.    He pushed my head down.

12    Q.    To the ground?

13    A.    No.

14    Q.    To where?

15    A.    To his private part.

16    Q.    And you said he had unzipped his

17  pants.  Had he pulled out his penis too?

18    A.    Yes.

19    Q.    All right.  And was his penis

20  erect when he pushed your head to his

21  private parts?

22    A.    I don't remember.

23    Q.    Did you perform oral sex?

## Page 135

1    A.    Yes.

2    Q.    Did he say anything the entire

3  time you were performing oral sex?

4    A.    I don't think so.

5    Q.    And did he ejaculate?

6    A.    Yes.

7    Q.    And where did he ejaculate?

8    A.    My mouth.

9    Q.    Do you have any judgment - you

10  may not, I understand - any judgment on how

11  long it was during the oral sex?

12    A.    No.

13    Q.    And after he ejaculated, did he

14  zip up his pants?

15    A.    Yes.

16    Q.    And did he sit on the couch?

17    A.    No.

18    Q.    Did he go to the bathroom?

19    A.    No.

20    Q.    Did he walk into the kitchen?

21    A.    No.

22    Q.    All right.  Were you still

23  sitting on the couch during the entire time

## Page 136

1  of the oral sex?

2    A.    Yes.

3    Q.    After he zipped up his pants, did

4  you sit further back on the couch?

5    A.    I don't remember.

6    Q.    All right.  How long was he there

7  after the oral sex before he left?

8    A.    He just left.

9    Q.    He didn't say a word?

10    A.    No.

11    Q.    Did you say anything to him?

12    A.    No.

13    Q.    Did you walk outside when he

14  left?

15    A.    No.

16    Q.    Where did you go once he left?

17    A.    In my bedroom.

18    Q.    So you went straight from the

19  couch to your bedroom, correct?

20    A.    Yes.

21    MR. YAGHMAI:  Ma'am, I don't --

22  you'll probably have to pull your hand

23  away.  Or we can take a break if you want

**Marie** ███████                                              **3/11/2020**

---

### Page 137

1  to. I just -- just for the -- the video,
2  we've got to get your hand away from your
3  mouth. Do you want to keep going or would
4  you like to take a break?
5      MS. SHORE: Can you not hear her
6  with her hands --
7      MR. YAGHMAI: Huh-uh. I can't.
8      MS. SHORE: Okay. Marie, if you
9  -- if you can speak louder. I think the
10  attorney is asking you to speak louder. I
11  don't think it's a problem with your hand.
12  Using the Kleenex, if you can just make
13  sure that your answers are loud enough so
14  that the video can get it.
15      THE WITNESS: Okay.
16      MR. YAGHMAI: Do you want to keep
17  going or do you want to take a break?
18      THE WITNESS: Take a break.
19      MR. YAGHMAI: Okay.
20      THE VIDEOGRAPHER: We're off the
21  record at 11:02 a.m.
22      (Brief recess was taken.)
23      THE VIDEOGRAPHER: We're back on

---

### Page 138

1  the record at 11:17 a.m.
2      MR. CROCKER: Lacey is not back
3  yet.
4      MR. YAGHMAI: Oh, okay.
5      (Off the record.)
6      THE VIDEOGRAPHER: We're back on
7  the record at 11:18 a.m.
8      Q.   (By Mr. Yaghmai:) Ma'am, before
9  we took a break, you said that after
10  Mr. Hames left you went to your bedroom,
11  correct?
12      A.   Correct.
13      Q.   Did you do anything in your
14  bedroom that you remember?
15      A.   I laid down on my bed and cried.
16      Q.   And how long did you cry for in
17  your bed?
18      A.   I don't remember.
19      Q.   Did you call anybody?
20      A.   No.
21      Q.   Did you call -- were you dating
22  Mr. ████ at this point, Wesley ████?
23      A.   No.

---

### Page 139

1      Q.   Did you know him at this point?
2      A.   No.
3      Q.   Did you call -- in your mind --
4  strike that.
5      In your mind, had you just been
6  raped by Mr. Hames?
7      MS. DANLEY: Object to form.
8      MS. SHORE: Objection. Form.
9      Q.   You can answer.
10     A.   I just -- I was ashamed at the
11  time.
12     Q.   Yes, ma'am. But my question is:
13  In your mind, at that point, he had
14  forcibly made you perform a sexual act,
15  correct?
16     A.   Correct.
17     Q.   Physically forcibly made you
18  perform a physical act, correct?
19     A.   By putting his hand on the back
20  of my head, yes.
21     Q.   And so in your mind had he raped
22  you?
23     MS. DANLEY: Objection.

---

### Page 140

1      MS. SHORE: Objection to form.
2      A.   If that's what you want to call
3  it. I -- I mean, I don't call it rape.
4      Q.   Okay.
5      A.   But he physically made me perform
6  oral sex on him.
7      Q.   All right. And did you call a
8  friend and tell them that?
9      A.   No.
10     Q.   Why not?
11     A.   Because I was ashamed and
12  embarrassed.
13     Q.   Did you call the police?
14     MS. SHORE: Objection. Form.
15  You can answer.
16     A.   No.
17     Q.   Why not?
18     A.   Because I was ashamed and
19  embarrassed.
20     Q.   Was there any other reason you
21  didn't call the police other than you were
22  ashamed or embarrassed?
23     A.   I was scared that I would lose my

---

**Marie** ███████                                    3/11/2020

Page 141

1  place to live with my children.
2      Q.   So you thought if you had called
3  the police and reported somebody for
4  physically assaulting you that you would
5  then get evicted from where you were living
6  even though you had paid all your rent?
7      A.   Yes.
8      Q.   And what was that based on?
9      A.   Him saying that he could do
10  whatever he wanted to do because he was a
11  lawyer.
12      Q.   Did you think that he could
13  physically assault you solely because he
14  was a lawyer?
15      MS. SHORE:  Objection.  Form.
16  You can answer.
17      Q.   I mean, you didn't believe that,
18  did you?
19      A.   At the time, I really didn't know
20  what to believe.
21      Q.   Did you try to talk to someone to
22  see whether if somebody could physically
23  assault you solely because they were a

Page 142

1  lawyer?
2      MS. SHORE:  Objection.  Form.
3  You can answer.
4      A.   No.
5      Q.   Is there any reason why not?
6      A.   Because I didn't want to talk
7  about it.
8      Q.   All right.  Any other reason?
9      A.   No.
10      Q.   When is the next time you saw
11  Mr. Hames after this encounter you had with
12  him?
13      A.   When he stopped by to pick up the
14  rent money.
15      Q.   All right.  And approximately how
16  long was that after the oral sex incident?
17      A.   The following month.
18      Q.   And he stopped by the trailer?
19      A.   Correct.
20      Q.   And he knocked on the door?
21      A.   He -- no.  I was outside.
22      Q.   Do you remember what you were
23  doing outside?

Page 143

1      A.   I was out there with my children.
2      Q.   All right.  And that did he say
3  to you?
4      A.   He had just pulled up and I give
5  him the -- I give him the rent money.  I
6  had called him and told him I had it.
7      Q.   All right.  Did you have his cell
8  phone?  Is that how you would get in touch
9  with him?
10      A.   Yes.
11      Q.   All right.  Did you text him at
12  all?
13      A.   No.
14      Q.   At any point, have you ever text
15  Mr. Hames that you remember?
16      A.   Not that I remember, no.
17      Q.   Had you ever called him for
18  anything other than the rent on his cell
19  phone?
20      MS. DANLEY:  Object to form.
21      MS. SHORE:  Object to form.  Yes.
22      A.   I don't remember.  I don't think
23  so.

Page 144

1      Q.   Did you ever have any
2  conversation with Mr. Hames on the phone
3  outside of anything to do about the trailer
4  or the rent?
5      MS. SHORE:  Object to form.  If
6  you want to have a specified time frame.
7      Q.   You can answer.
8      A.   Not that I remember.  I don't
9  know.
10      Q.   You don't know one way or the
11  other?
12      A.   One way or the other.
13      Q.   Okay.  And when he came to pick
14  up the rent in October of 2012, did he get
15  out of his vehicle and walk up to you when
16  you were outside?
17      A.   No.
18      Q.   You walked over to him?
19      A.   Over to the car.
20      Q.   And you handed him the rent?
21      A.   Correct.
22      Q.   And did he say anything to you?
23      A.   He said I should go down to the

Page 145

1    end of the marina to his trailer.
2        Q.    And what did you say?
3        A.    I said, no, I'm here outside with
4    my children.
5        Q.    All right.  Did he say why he
6    wanted you to go down to the end of the
7    marina to his trailer?
8        A.    No, he did not.
9        Q.    Did you say anything other than
10   no, hey, I'm here with my kids?
11       A.    I just told him no.
12       Q.    Because you were there with your
13   kids, right?
14       A.    Yeah.  Well, I wasn't going down
15   there anyway.
16       Q.    Okay.  Anything else in that
17   conversation when he came to pick up the
18   October rent, 2012?
19       A.    No.
20       Q.    From September after the oral sex
21   incident until you paid the October rent,
22   what other living arrangements did you try
23   to make?

Page 146

1        A.    None.
2        Q.    Did he -- Mr. Hames ever suggest
3    to you any other time that you should go
4    down to his trailer at the end of the
5    trailer park?
6        A.    Yes.
7        Q.    Do you remember when the next
8    time it was after October of 2012?
9        A.    I'm not sure.
10       Q.    Do you remember what your
11   response was?
12       A.    No.
13       Q.    Was there any follow-up
14   discussion by Mr. Hames when you told him
15   no you weren't going?
16       A.    No.
17       Q.    When is the first time you ever
18   told someone that Mr. Hames had physically
19   sexually assaulted you?
20             MS. DANLEY:  Object to form.
21       Q.    You can answer.
22       A.    It was actually after Kayla
23   Carreker got in touch with me.

Page 147

1        Q.    Okay.  And when was that?
2        A.    2017.
3        Q.    How did Kayla Carreker get in
4    touch with you?
5        A.    At the time, she was on my
6    Facebook page and she sent me a message
7    asking me to call her.
8        Q.    And did you call her?
9        A.    I did.
10       Q.    What did she say on the Facebook
11   page?
12       A.    On the Facebook page?
13       Q.    Other than just to call her?
14       A.    Just to call her.
15       Q.    Did she send you a private
16   message or she actually post it on your
17   public Facebook wall?
18       A.    No.  Sent me a private message.
19       Q.    Okay.  Did she tell you why she
20   wanted you call?
21       A.    No.
22       Q.    Did you know her?
23       A.    Yes.

Page 148

1        Q.    How did you know her?
2        A.    She was friends with my kids.
3    They went to school together.
4        Q.    Which -- at Good Hope?
5        A.    Yes.
6        Q.    She had a child at Good Hope at
7    the same time your kids were?
8        A.    No.  She was a child at Good
9    Hope.
10       Q.    All right.  Kayla Carreker was?
11       A.    Yeah.  She was in school.
12       Q.    Okay.  And -- and I'm sorry if I
13   asked you this.  Did she tell you why to
14   call her or just to call her?
15       A.    Just to call her.
16       Q.    And which one of your children
17   were -- was Kayla Carreker friends with?
18       A.    She knew all three of my
19   children.
20       Q.    Was she closer to age with any of
21   them?
22       A.    I want to say █████.
23       Q.    Okay.  And had you ever seen her

Page 149

1    outside of Good Hope prior to her Facebook
2    messaging you to call her?
3         MS. SHORE: Objection. Form.
4    You can answer.
5         A.    I don't remember if -- you know,
6    if I seen her outside. I'm sure I did.
7         Q.    In -- in what context would that
8    be, like --
9         A.    Sporting events or --
10        Q.    Were you friends with any family
11   members of Kayla Carreker?
12        A.    No.
13        Q.    When -- when do you think the
14   first time you met Kayla Carreker was?
15        A.    I don't remember.
16        Q.    Or maybe what grade one of your
17   kids were in, if that helps --
18        A.    No.
19        Q.    -- as far as the reference?
20        A.    Probably about -- maybe the 10th,
21   11th grade.
22        Q.    Okay.
23        A.    I'm not sure.

Page 150

1         Q.    That ███ was in the 10th or
2    11th grade?
3         A.    Yeah.
4         Q.    And then Kayla was in the same
5    grade?
6         A.    Yes.
7         Q.    And you didn't know her parents
8    at all?
9         A.    No.
10        Q.    So she sends you a Facebook
11   message in 2017 to call her. Did you
12   already have her phone number?
13        A.    No.
14        Q.    And she gave you the phone
15   number?
16        A.    Yes.
17        Q.    And tell me what you remember
18   about the conversation -- the first
19   conversation you had with Kayla Carreker in
20   2017 on the phone.
21        A.    She asked me if I lived in
22   Hame -- that -- she asked me if I lived in
23   Hames trailer park at one point and I said,

Page 151

1    yes, I did. And she told me what happened
2    to her.
3         Q.    What did she tell you that
4    happened to her during that phone call?
5         A.    That Mr. Hames was asking her for
6    sex because she didn't have the rent money.
7         Q.    Anything else you remember Kayla
8    Carreker telling you in that phone
9    conversation?
10        A.    She said that she got it on video
11   or voice recorder or something. I don't --
12        Q.    And so what did you tell Kayla
13   Carreker?
14        A.    I told her I lived out there, but
15   I didn't tell her what happened.
16        Q.    All right. Did she ask you if
17   anything had happened to you while you
18   lived there?
19        A.    No. I don't remember. She just,
20   you know, asked me when I lived there. I
21   think she asked me what year I lived there.
22        Q.    And so she tells you that
23   Mr. Hames' proposition is sex for as

Page 152

1    opposed to evicting her, but she didn't ask
2    you whether Mr. Hames had made any sexual
3    advances towards you?
4         A.    I don't remember. I -- I think
5    she may have.
6         Q.    And did you -- go ahead. I'm
7    sorry.
8         A.    No. Go. You.
9         Q.    She may have what?
10        A.    She said that -- asked me to, you
11   know, meet up with them.
12        Q.    So you -- you hadn't told her
13   during that phone call that Mr. Hames had
14   physically sexually assaulted you?
15        A.    No.
16        MS. DANLEY: Object to form.
17        Q.    And she just wanted to meet up
18   with you?
19        A.    Yes.
20        Q.    And where did she want to meet
21   you?
22        A.    At Alisha Coats' house.
23        Q.    And you also know her as Alisha

**Marie** ███████                                        3/11/2020

---

Page 153

1    Cobb?
2       A.    Yeah.  Yeah.
3       Q.    Alisha Coats and Alisha Cobb --
4       A.    Yeah.
5       Q.    -- correct?
6       A.    Correct.
7       Q.    Same person to you?
8       A.    Yeah.
9       Q.    And did you ask her why -- strike
10   that.
11         Did you ask Kayla Carreker why
12   she wanted you to meet up at Alisha Coats
13   Cobb's house?
14      A.    I don't remember if -- she just
15   said that Alisha, her, and Tomeka would be
16   there because of some dealings with Randy
17   and if I had any to come over there.  They
18   wanted to talk to us.
19      Q.    Any dealings at all with him or
20   any dealings with regards to sexual
21   advances?
22      A.    I guess any dealings at all.  I
23   didn't really ask.  I went over.

---

Page 154

1       Q.    Why did you go over?
2       A.    I just -- I went over because,
3    you know, they had told me what happened to
4    them and, you know, it happened to me.
5       Q.    Yes, ma'am.  But you hadn't told
6    them that, correct?
7       A.    Correct.
8       Q.    And did you know Tomeka Bartlett
9    before Kayla Carreker called you and asked
10   you to go over there?
11      A.    No, I did not.
12      Q.    Did you know Alisha Cobbs Coats?
13      A.    No, I did not.
14      Q.    Okay.  Did Kayla tell you that
15   something had happened to either Tomeka or
16   Alisha when she asked you to come meet
17   them?
18      A.    I don't remember if she did or
19   not.
20      Q.    Where did y'all meet?
21      A.    At Alisha's house.
22      Q.    Had you ever been to Alisha's
23   house before?

---

Page 155

1       A.    No.
2       Q.    Had you ever -- did you even know
3    who she was?
4       A.    No.
5       Q.    Who all was there?
6       A.    Alisha, Tomeka, Kayla, and Hannah
7    Hazelrig.
8       Q.    Did you know Hannah Hazelrig?
9       A.    Yes.
10      Q.    How did you know Hannah Hazelrig?
11      A.    That's Renee Payne's daughter.
12      Q.    So Renee Payne is the one that
13   you told us earlier that lived out in the
14   trailer park that you became friends with,
15   correct?
16      A.    Correct.
17      Q.    Was Renee there?
18      A.    No.
19      Q.    And I think you told us that at
20   no point while you worked at Hames --
21   worked at -- lived at -- strike that.
22         At no point when you lived out at
23   the Hames trailer park did you tell Renee

---

Page 156

1    what had happened to you, correct?
2       A.    Correct.
3       Q.    All right.  And then when
4    you went to the -- did you -- well, strike
5    that.
6         How long did the meeting last
7    for?
8       A.    I don't remember.
9       Q.    I mean --
10      A.    I mean, it was long -- maybe
11   about an hour or longer.
12      Q.    And what do you remember Kayla
13   Carreker saying at that meeting?
14      A.    Only that she -- what Randy had
15   come up and told her if -- you know, if she
16   didn't have her rent money or whatever that
17   she could do the sexual favors or she -- he
18   would evict her.
19      Q.    And did you say anything in
20   response to Kayla sharing her story?
21      A.    I didn't want Kayla or Tomeka or
22   Hannah, any of it, heard by them because
23   they are young.

---

**BIRMINGHAM REPORTING SERVICE**
**(205) 326-4444**