FILED
2021 Apr-30  PM 11:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

# US Exhibit 12a

**Marie** ███████                                          **3/11/2020**

## Page 1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF ALABAMA

3            SOUTHERN DIVISION

4

5    CIVIL ACTION NUMBER

6    5:18-cv-01055-CLS

7    2:18-cv-01096-CLS

8

9    UNITED STATES OF AMERICA,

10            Plaintiff,

11    vs

12    RANDY HAMES and HAMES MARINA, d/b/a HAMES

13    MARINA and MOBILE HOME PARK,

14            Defendants

15

16    TOMEKA BARTLETT and KAYLA CARREKER,

17            Plaintiff's

18    vs

19    RANDY ALLAN HAMES, HAMES MARINA, L L C ,

20    CHRISTIE HAMES DOLBEER, MARY CATHERINE

21    HAMES, JESSICA HAMES PENNER, ANGELA HAMES

22    SAHURIE and MIRANDA HAMES SELF,

23            Defendant's

## Page 2

1         DEPOSITION TESTIMONY OF:

2            MARIE ███████

3

4       March 11, 2020

5       9:17 a.m.

6

7    COURT REPORTER:

8    BRITTANY N. HANVEY, CCR

9    The reading and signing of this deposition

10    has not been waived.

## Page 3

1         S T I P U L A T I O N S

2            IT IS STIPULATED AND AGREED

3    by and between the parties through their

4    respective counsel that the deposition of

5    MARIE ███████ may be taken before BRITTANY

6    N. HANVEY, Certified Shorthand Reporter

7    and Notary Public, State at Large, at the

8    offices of NORMAN, WOOD, KENDRICK &

9    TURNER, BIRMINGHAM, ALABAMA, on

10    March 11, 2020, commencing at

11    approximately 9:17 a.m.

12            IT IS FURTHER STIPULATED AND

13    AGREED that the signature to and the

14    reading of the deposition by the witness

15    is not waived, the deposition to have the

16    same force and effect as if full

17    compliance had been had with all laws and

18    rules of Court relating to the taking of

19    depositions.

20            IT IS FURTHER STIPULATED AND

21    AGREED that it shall not be necessary for

22    any objections to be made by counsel to

23    any questions, except as to form or

## Page 4

1    leading questions, and that counsel for

2    the parties may make objections and assign

3    grounds at the time of trial or at the

4    time said deposition is offered in

5    evidence, or prior thereto.

6            In accordance with Rule 5(d)

7    of the Alabama Rules of Civil Procedure,

8    as amended, effective May 15, 1988, I,

9    BRITTANY N. HANVEY, am hereby delivering

10    to GREGORY YAGHMAI the original transcript

11    of the oral testimony taken

12    March 11, 2020, along with exhibits.

13            Please be advised that this

14    is the same and not retained by the Court

15    Reporter, nor filed with the Court.

Marie ███████                                                    **3/11/2020**

---

**Page 5**

1             I N D E X
2
3     WITNESS:
4     Marie ███████
5
6     EXAMINATION BY          PAGE
7     BY MR. YAGHMAI . . . . . . . . . . . 13
8     BY MS. SHORE . . . . . . . . . . 260
9     BY MS. DANLEY . . . . . . . . . . 263
10    BY MR. YAGHMAI . . . . . . . . . 292
11    BY MS. DANLEY . . . . . . . . . . 306
12
13
14         DEFENDANT'S EXHIBITS
15    NO.       DESCRIPTION          PAGE
16    1 - Letter                   222
17    2 - Facebook Messages            245
18    3 - Complaint                302
19
20
21
22
23

---

**Page 6**

1     A P P E A R A N C E S
2
3     FOR THE PLAINTIFF:
4       ELISE SANDRA SHORE
        Attorney at Law
5       Housing and Civil Enforcement
        Section Civil Acts Division U.S.
6       Department of Justice
        150 M Street NW, Room 8
7       1124 Washington, DC 20530
8       ERIN MEEHAN RICHMOND
        Attorney at Law
9       Housing and Civil Enforcement
        Section Civil Acts Division U.S.
10      Department of Justice
        150 M Street NW, Room 8
11      1124 Washington, DC 20530
12    FOR THE PLAINTIFFS:
13      CANDIS A. MCGOWAN
        Attorney at Law
14      WIGGINS, CHILDS, PANTAZIS, FISHER
        & GOLDFARB, LLC
15      The Kress Building
        301 19th Street
16      Birmingham, Alabama 35203
17      LACEY K. DANLEY
        Attorney at Law
18      WIGGINS, CHILDS, PANTAZIS, FISHER &
        GOLDFARB, LLC
19      The Kress Building
        301 19th Street
20      Birmingham, Alabama 35203
21
22
23

---

**Page 7**

1     FOR THE PLAINTIFFS:
2       CHAMP CROCKER
        Attorney at Law
3       207 2nd Avenue Southeast
        Cullman, Alabama 35055
4
5     FOR THE PLAINTIFFS:
6       CARLA C. WARD
        Attorney at Law
7       Northern District of Alabama
        1801 4th Avenue North
8       Birmingham, Alabama 35203
9     FOR THE DEFENDANTS:
10      GREGORY F. YAGHMAI
        Attorney at Law
11      YAGHMAI LAW, LLC
        2081 Columbiana Road
12      Birmingham, Alabama 35216
13    FOR THE DEFENDANTS:
14      KILE T. TURNER
        Attorney at Law
15      NORMAN, WOOD, KENDRICK & TURNER
        Ridge Park Place
16      1130 22nd Street South
        Birmingham, Alabama 35205
17
18    ALSO PRESENT:  Chiquita Robertson
19
20
21
22
23

---

**Page 8**

1            I, BRITTANY N HANVEY, a
2     Certified Shorthand Reporter of
3     Birmingham, Alabama, and a Notary Public
4     for the State of Alabama at Large, acting
5     as Commissioner, certify that on this
6     date, pursuant to the Alabama Rules of
7     Civil Procedure and the foregoing
8     stipulation of counsel, there came before
9     me at the offices of NORMAN, WOOD,
10    KENDRICK & TURNER, BIRMINGHAM, ALABAMA,
11    commencing at approximately 9:17 a m  on
12    March 11, 2020, MARIE ███████ witness in
13    the above cause, for oral examination,
14    whereupon the following proceedings were
15    had:
16
17           THE VIDEOGRAPHER:  We're now on
18    the record  This is the video deposition
19    of Marie ███████  Case numbers
20    2:18-CV-01055 and 01096-CLS in the United
21    States District Court for the Northern
22    District of Alabama, Southern Division
23    Today's date is March the 11th, 2020  The

---

**BIRMINGHAM REPORTING SERVICE**
**(205) 326-4444**

Page 157

1    Q.   Right.
2    A.   So me and Alisha went outside and
3  talked.
4    Q.   All right.  How did the -- come
5  about that you and Alisha got outside?  I
6  understand why.  I'm --
7    A.   I asked her to go outside.
8    Q.   All right.  What did -- and we'll
9  talk about that in a second.  What did
10  Alisha Cobbs claim happen to her with Randy
11  during this meeting when all four of y'all
12  are present?
13    A.   All I knew, it had to do with her
14  children.
15    Q.   And she didn't explain anything
16  more than that?
17    A.   No.
18    Q.   And what did Hannah Hazelrig say?
19    A.   I -- I don't remember what she
20  had to say because I really didn't pay that
21  much attention to her.
22    Q.   Why is that?
23    A.   Because I -- I just didn't.

Page 158

1    Q.   You just didn't find her to be
2  trustworthy?
3    A.   Yeah.
4      MS. DANLEY:  Object to form.
5    Q.   Okay.
6      MS. SHORE:  Objection.  Form.
7      MR. YAGHMAI:  Well, she's already
8  answered yes.
9    Q.   (By Mr. Yaghmai:)  What about
10  Tomeka Bartlett, what did she say happened
11  to her?
12    A.   I don't -- I don't remember.
13    Q.   Did you kind of tune her out
14  also?
15    A.   I just don't remember.
16    Q.   All right.  So the only people
17  you remember anybody saying what happened
18  to them was Kayla Carreker and then Alisha
19  said something about her kids, correct?
20    A.   Yes.
21    Q.   And then you asked Alisha to go
22  outside, correct?
23    A.   Correct.

Page 159

1    Q.   Was that after you had heard what
2  everybody had to say or was it in the
3  beginning?
4    A.   I don't remember if it was
5  either/or.
6    Q.   All right.  And what did you tell
7  Alisha Cobbs?
8    A.   I told her what happened that
9  night.  That's the first time I talked
10  about it.
11    Q.   Did you tell Alisha Cobbs in that
12  meeting that -- that Randy had threatened
13  to evict you if you didn't give oral sex?
14    A.   I did.
15    Q.   Did you tell her that he had
16  physically forced you to perform oral sex?
17    A.   I did.
18    Q.   What else did you tell Alisha
19  Cobb while y'all were outside, just the two
20  of you?
21    A.   Just how he would come and set in
22  my driveway or ride by all the time or --
23  just little things that happened over the

Page 160

1  months I lived there.
2    Q.   Anything else you can remember
3  you told Alisha Cobbs?
4    A.   No.
5    Q.   Ma'am?
6    A.   No.
7    Q.   What did Alisha Cobbs say?
8    A.   That I needed to get in touch
9  with an investigator.
10    Q.   An investigator for whom?
11    A.   Cullman County Sheriff's
12  Department.
13    Q.   And did you?
14    A.   I did.
15    Q.   How long after the meeting with
16  Alisha Cobbs did you get in touch with the
17  Cullman County Sheriff's Department?
18    A.   I think it was the next day I
19  called.
20    Q.   During that meeting when it was
21  you, Tomeka, Kayla, Alisha, and Renee, did
22  anyone discuss a lawsuit?
23      MS. DANLEY:  Object to form.

**Marie** ███████                                          3/11/2020

Page 161

1    A.    Renee wasn't there.
2    Q.    Not Renee.  Hannah.  Strike --
3  let's start over.  In that meeting where it
4  was you and Alisha and Hannah and Kayla and
5  Tomeka, did anybody discuss a lawsuit?
6    A.    No.
7    Q.    Did anybody discuss money?
8    A.    No.
9    Q.    Never said a word about it, that
10 maybe -- maybe somebody could get some
11 money out of Randy Hames because of what he
12 did?
13   A.    No.
14   Q.    At any point, has Alisha Cobbs
15 ever talked to you about a lawsuit?
16   A.    No.
17   Q.    Or at any point, has Alisha Cobbs
18 talked to you about trying to get money?
19   A.    No.
20   Q.    What about Kayla, have y'all ever
21 discussed a lawsuit?
22   A.    No.
23   Q.    Or discussed money?

Page 162

1    A.    No.
2    Q.    And what about Hannah, have y'all
3  ever discussed a lawsuit?
4    A.    No.
5    Q.    Or money?
6    A.    No.
7    Q.    Did you ever talk to Renee, after
8  Hannah showed up to that meeting, about
9  Randy or Hames Marina?
10   A.    No.
11   Q.    Did you ever talk to any of these
12 people about money or a lawsuit?
13   A.    No.
14   Q.    And did you tell the Cullman
15 County Sheriff's Department that Randy
16 Hames physically forced you to give him
17 oral sex?
18         MS. DANLEY:  Object to form.
19   A.    Yes.
20   Q.    I'm not talking about the
21 threatening of the eviction of the rent.
22 I'm talking about where you described that
23 he physically forced your head and wouldn't

Page 163

1  let you up while you gave him oral sex?
2         MS. SHORE:  Objection to form.
3  You can answer.
4    A.    I don't remember.
5    Q.    You don't remember whether you
6  told the Cullman County Sheriff's
7  Department that he physically forced your
8  head into his private parts?
9    A.    He had me write out a statement.
10   Q.    All right.
11   A.    And I can't remember what I wrote
12 in the statement.
13   Q.    Okay.  Were there times after
14 October of 2012 when you described you gave
15 the rent money to Randy in person, correct?
16   A.    Repeat that, please.
17   Q.    Okay.  So you've told us the next
18 time you saw Randy after the sexual assault
19 was when you gave him the rent money in
20 person in October of the 2012, correct?
21   A.    Correct.
22   Q.    And did you see Randy again
23 before paying the rent in November of 2012?

Page 164

1    A.    In passing, yeah.  Riding down
2  the road, if I was outside, he would
3  stop --
4    Q.    Okay.
5    A.    -- occasionally.
6    Q.    And he would stop and say hello
7  to you?
8    A.    Yeah.  And try to get me to go
9  down to his trailer.
10   Q.    Was there any other discussions
11 other than him trying to get you down to
12 the trailer?
13   A.    No.
14   Q.    He would stop, say hello.  What
15 would you say to him?
16         MS. SHORE:  Objection to form.
17 You can answer.
18   A.    Hi.  You know, my kids were out
19 there.
20   Q.    Right.  And you would say hi
21 back?
22   A.    Yeah.
23   Q.    And then he would say, hey, why

**Marie** ▮▮▮▮▮▮                                    **3/11/2020**

Page 165

1  don't we go down to the -- to my trailer?
2      A.   Correct.
3      Q.   And you would say, no, my kids
4  are here?
5      A.   Correct.
6      Q.   All right.  And then what would
7  he say, if anything?
8      A.   Nothing.
9      Q.   He would just say okay?
10      A.   And he would leave.
11      Q.   And then he would drive off,
12  correct?
13      A.   Yes.
14      Q.   Would he stay inside of his
15  vehicle the whole time?
16      A.   Yes.
17      Q.   Okay.  Did you see him from when
18  you paid the October rent -- well, strike
19  that.
20          Did you pay the November 2012
21  rent in person at the trailer park?
22          MS. SHORE:  Form.  Objection.
23      A.   I think that's when I would start

Page 166

1  taking it to his law office.
2      Q.   Yes, ma'am.  Let's talk about
3  that.  So you think the first time you took
4  money to his law office to pay rent was
5  November of 2012?
6      A.   It was sometime in there.  I'm
7  not exactly sure of the dates --
8      Q.   Okay.
9      A.   -- or the month.
10      Q.   And you would pay him every
11  30 days, correct?
12      A.   Correct.
13      Q.   So it wasn't on the 1st of the
14  month.  It would be 30 days after you moved
15  in and then 30 days after that and so
16  forth?
17      A.   It was actually on the 15th of
18  every month.
19      Q.   Okay.  And so you believe the
20  first time you went to his office to pay
21  him was in November of 2012, correct?
22      A.   Correct.
23      Q.   And approximately how far was his

Page 167

1  office from the trailer park, like driving
2  time-wise?
3      A.   Maybe 20 minutes -- 15,
4  20 minutes.
5      Q.   Okay.  And so you would drive to
6  -- 15, 20 minutes to his office and walk
7  into his office, correct?
8      A.   Correct.
9      Q.   And would you go by yourself?
10      A.   Yes.  Because I would go during
11  the day while my kids were at school.
12      Q.   And so then you would physically
13  walk into his office and he would have a
14  secretary or receptionist up front?
15      A.   No.  Not -- there might have been
16  one a few times, but very seldom was there
17  anybody in that office.
18      Q.   Was there any time that you went
19  there to pay rent that there was a
20  secretary or front desk receptionist there?
21      A.   Like I said, a couple of times.
22      Q.   Okay.
23      A.   A few times.

Page 168

1      Q.   Did you ever go to Mr. Hames'
2  office for any other reason than paying
3  rent?
4          MS. DANLEY:  Object to form.
5      A.   Not when I lived there, no, in
6  the trailer.
7      Q.   So while you lived there, the
8  only time you went --
9      A.   Yeah.
10      Q.   -- there is to pay rent?
11      A.   Yes.
12      Q.   Okay.  And a couple of times
13  there was a secretary or a receptionist
14  there?
15      A.   Yes.
16      Q.   Did you ever attempt to give the
17  secretary or receptionist the rent to give
18  to Randy?
19      A.   No.
20      Q.   Why.
21      A.   Because I didn't know that was an
22  option.
23      Q.   Why did you not know that was an

**Marie** ▮▮▮▮▮

Page 169

1  option?
2      A.   Because he -- I always paid him
3  the rent.
4      Q.   So in your mind, you couldn't pay
5  somebody that worked for him to give him
6  the rent?
7      A.   I did not know it was an option.
8      Q.   Did you ask?
9      A.   No.
10     Q.   Why not?
11     A.   Because I -- I didn't.  I always
12 give it to him.
13     Q.   And would you wait in his office
14 on him if he wasn't there?
15     A.   No.
16     Q.   Okay.  Did you ever have to wait
17 for -- to see Mr. Hames to give him the
18 rent in his office?
19     A.   No.
20     Q.   So every time you went by to pay
21 rent, he was there?
22     A.   There was a time or two that he
23 was not in and I left and come back when he

Page 170

1  was there.
2      Q.   Was -- the time or two that he
3  was not there, was there anybody there,
4  period, like a receptionist or secretary?
5      A.   I think one day the doors were
6  just locked.
7      Q.   Okay.  What about the other time?
8  You show up --
9      A.   I -- I think there was.
10     Q.   A receptionist or secretary?
11     A.   Yes.
12     Q.   Okay.  And then you left to go do
13 something else and then came back, correct?
14     A.   Correct.
15     Q.   And so when you went into --
16 would Randy come out to the front and you
17 would pay him?
18     A.   No.  I would have to pick up a
19 phone and call back there and he would say
20 come on back.
21     Q.   Okay.  And would you go on back?
22     A.   I would.
23     Q.   All right.  And would you walk

Page 171

1  into his office or would he just meet you
2  outside of it or what?
3      A.   I would go in his office.
4      Q.   All right.  Did you ask him just
5  to come out -- was there a hallway there
6  out -- right outside his office?
7      A.   Yes.
8      Q.   Did you ever say, hey, just come
9  out here and let me give you the rent?
10     A.   No, I didn't.
11     Q.   And why is that?
12     A.   I -- I figured I would just walk
13 in, give him the money and leave.
14     Q.   All right.  So -- and it was
15 always in cash, right?
16     A.   Yes.
17     Q.   All right.  Would it be just in
18 an envelope or you would just hand him the
19 cash?
20     A.   Just hand him the cash.
21     Q.   All right.  And so your intention
22 was just to walk in, put the cash on the
23 desk, and then walk right back out?

Page 172

1      A.   Correct.
2      Q.   And is that what you would do?
3      A.   Sometimes he would ask me, you
4  know, is everything okay over there and --
5      Q.   And what would you say?
6      A.   Yeah, it's fine.  And then he
7  would bring up small talk.
8      Q.   All right.  And would you small
9  talk back with him?
10     A.   A little bit.  Not --
11     Q.   All right.  Would you sit down in
12 a chair in his office?
13     A.   In front of his desk while he was
14 behind the desk.
15     Q.   Yes, ma'am.
16     A.   Yeah.
17     Q.   That was the normal routine?
18     A.   Yes.
19     Q.   All right.  And would he say
20 anything else other than the small talk or
21 about how the trailer was?
22     A.   Yes.
23     Q.   And what would he say?

**Marie** ██████                                                    **3/11/2020**

---

Page 173

1    A.   That I should meet him at the end
2  of the marina at his trailer or he would
3  walk around the desk and try to grab on me
4  and I'd excuse myself and leave.
5    Q.   All right.  When you went to --
6  when the first time you went to his office
7  in November of 2012, did he just mention
8  about meeting you down to the trailer park
9  or is that when he physically walked
10  around?
11    A.   Repeat.
12    Q.   Yes, ma'am.  When the first time
13  you went to his office to pay the rent, you
14  said you believe it was November of 2012.
15  My question is:  Was this one of these
16  occasions that he said something about
17  meeting him at the trailer?
18    A.   I don't remember if it was that
19  time or not.
20    Q.   Okay.  Was this the occasion that
21  you say he physically walked around and
22  tried to grab you and you excused yourself?
23    A.   I don't remember if it was at

---

Page 174

1  that point because I went after that to pay
2  it at his law office.
3    Q.   Yes, ma'am.  But I'm talking
4  about --
5    A.   It was -- you know, I don't
6  remember that particular date.
7    Q.   Okay.  Yes, ma'am.  And I don't
8  remember the date -- I'm not asking you to
9  remember the specific date.  I'm just
10  talking about -- was it the first time that
11  you showed up to his law office to pay the
12  rent that he said something about you
13  meeting him at the trailer?
14    A.   I don't remember --
15    Q.   Okay.  Yes, ma'am.
16    A.   -- if it was --
17        MS. SHORE:  I'm going object to
18  form.  You can answer.
19    Q.   Okay.  If you don't know, that's
20  fine.
21    A.   Yeah.
22    Q.   I just want to make sure we're on
23  the same page as far as the question.

---

Page 175

1        And do you remember one way or
2  the other when the first time you went to
3  go pay the rent in his law office that he
4  walked around and physically touched you?
5    A.   I do not.
6    Q.   Okay.
7    A.   It could -- it could have been
8  any of those times.
9    Q.   Yes, ma'am.  Was there an
10  occasion that you showed up to his law
11  office where he didn't mention -- well,
12  strike that.
13        Was there a time that you showed
14  up to his law office to pay rent that you
15  did not mention -- all right.  Let me ask
16  it one more time.
17        Was there an occasion when you
18  showed up to his law office to pay the rent
19  where he did not mention about you meeting
20  him down at the trailer?
21    A.   Yeah.
22        MS. DANLEY:  Object to form.
23        MS. SHORE:  I'm going to object

---

Page 176

1  to form.
2    Q.   Okay.  And was there a time that
3  you did go up to his law office to pay the
4  rent where he did not physically try to
5  touch you?
6    A.   Yes.
7    Q.   Okay.  You say -- was it on one
8  occasion that he walked around his desk and
9  tried to physically touch you?
10    A.   No.  It was several.
11    Q.   All right.  Can you quantify how
12  many several is?
13    A.   Two or three.
14    Q.   All right.  And you would be
15  sitting in the chair, correct, in his
16  office in front of his desk?
17    A.   Actually, I was getting ready to
18  walk out.
19    Q.   Okay.  Y'all had already chatted,
20  you were getting ready to walk out, and he
21  walked around, correct?
22    A.   Correct.
23    Q.   And where on your body did he

---

**Marie** ▮▮▮▮                                   3/11/2020

---

Page 177

1  physically try to touch you?
2      A.   My breast and in between my legs.
3      Q.   All right.  And the two or three
4  times that he did it was that he tried to
5  touch you in both areas or were there
6  different times for different areas?
7      A.   Different times.
8      Q.   And you say you would just excuse
9  yourself and leave, correct?
10      A.   Yes.
11      Q.   And you would just push his hands
12  away or you would just -- just keep
13  walking?
14      A.   I just turned around and walked
15  off.
16      Q.   Did he try to stop you from
17  walking off?
18      A.   No.
19      Q.   Did he say anything to you while
20  you were walking off?
21      A.   No.
22      Q.   Did you say anything to him?
23      A.   No.

---

Page 178

1      Q.   When he was grabbing either your
2  breast or in between your legs in his law
3  office, did you say anything to him?
4      A.   I said don't do that.
5      Q.   And what did he say?
6      A.   Nothing.
7      Q.   Okay.
8      A.   I turned around and walked off.
9      Q.   Yes, ma'am.  After the first time
10  he did that where he tried to physically
11  touch you when you tried to pay rent at his
12  law office, why not just mail him a check?
13      A.   Because I don't -- didn't have a
14  bank account at the time.  I didn't do
15  checks.
16      Q.   Why not send somebody else up
17  there to pay the rent in person for you?
18      A.   I don't know.  Everybody worked
19  and I was home all day.  I would get my
20  check, go cash it and go pay my bills and
21  do my errands that day.
22      Q.   Well, this man had at this
23  point -- this man at this point had already

---

Page 179

1  sexually assaulted you, correct?
2          MS. DANLEY:  Object to form.
3          MS. SHORE:  Form.
4      Q.   Ma'am?
5      A.   Correct.
6      Q.   And the reason that you didn't
7  want to send somebody else up there is
8  because you didn't want to break your
9  routine of cashing your check the day you
10  got it and paying your bills?
11          MS. SHORE:  Objection.  Form.
12  You can answer.
13      A.   I really didn't have anybody to
14  send.  My son was at work.  I wasn't going
15  to send my daughter-in-law.
16      Q.   Well, at some point your
17  boyfriend had moved in, right?
18      A.   About a month before we moved
19  out.
20      Q.   But that's how you paid the rent
21  for that month, right?
22          MS. SHORE:  Objection.  Form.
23  You can answer.

---

Page 180

1      Q.   By going to the -- by physically
2  going to Mr. Hames' office and paying for
3  it, correct?
4      A.   Correct.
5      Q.   Did you ask your boyfriend to go
6  up there and pay the rent?
7      A.   He was at work.
8      Q.   So is that a no?
9      A.   That's a no.  He was at work.
10      Q.   Is there any reason you didn't
11  ask for the receipt when you paid in cash?
12      A.   No.  I didn't think about it.  I
13  mean, I trusted him as far as, you know, me
14  paying my rent.
15      Q.   Yes, ma'am.  And your boyfriend
16  who became your husband was Wesley ▮▮▮▮,
17  correct?
18      A.   Correct.
19      Q.   And he moved into lot number
20  nine.  Do you know about when?
21      A.   I want to say around end of May,
22  first of June.  Wait.
23      Q.   Yeah.  I believe you had moved

---

**Marie** ███████                                                    3/11/2020

---

Page 181

1   out in May --
2       A.    No.  That was May when we moved
3   out.  It was a month before.  So March.
4       Q.    All right.
5       A.    It was March.
6       Q.    So March of 2013, Wesley ███
7   moves in, correct?
8       A.    Yes.
9       Q.    And he brought a dog, correct?
10      A.    Correct.
11      Q.    And Mr. Hames had an issue with
12  the dog being there, correct?
13      A.    Correct.
14      Q.    And he had expressed that, right?
15      A.    Correct.
16      Q.    And when you had moved in,
17  Mr. Hames had told you that dogs weren't
18  allowed, correct?
19      A.    Correct.
20      Q.    He -- Mr. Hames never expressed
21  to you that he had an issue with Mr.
22  ███████ moving in, correct?
23      A.    No.

---

Page 182

1       Q.    Is that a correct statement?
2       A.    That's a correct statement.
3       Q.    And he never expressed to you
4   that he had an issue that you had a
5   boyfriend, did he?
6       A.    No.
7       Q.    Did you ever tell Mr. ████ that
8   you did not want to be at home alone during
9   the day because you were concerned that
10  Mr. Hames may stop by?
11      A.    He knew about him sitting outside
12  my house on, you know, occasion.
13      Q.    How did he know that?
14      A.    I told him.
15      Q.    And what did you tell him about
16  that?
17      A.    I just told him I was
18  uncomfortable with him pulling up in my
19  yard.
20      Q.    And what did Mr. ████ say?
21      A.    I don't remember what he said.
22      Q.    To your knowledge, did he ever
23  confront Mr. Hames?

---

Page 183

1       A.    No.
2       Q.    To your knowledge, did he ever go
3   outside and say anything to Mr. Hames at
4   all when he supposedly sitting out in
5   your front yard?
6       A.    He didn't do it while --
7             MS. SHORE:  Objection.
8       A.    -- Wesley was there.
9       Q.    All right.  Did he do it while
10  Wesley was living in the trailer?
11      A.    Yes.
12      Q.    And is this one of these
13  occasions where he would pull up in the
14  yard and then you would go outside and he
15  would say -- Mr. Hames would say, why don't
16  we go down to my trailer?
17      A.    No.
18            MS. SHORE:  Objection.  Form.
19      Q.    Ma'am?
20      A.    No.
21      Q.    Okay.  Tell me when Mr. Hames
22  started just pulling up in your yard to the
23  best of your knowledge.

---

Page 184

1       A.    Okay.  It would be like lunchtime
2   when he would ride through the trailer
3   park.
4       Q.    Yes, ma'am.  I'm talking about
5   what month did he start?
6       A.    Oh, I don't know.
7       Q.    Okay.  And do you remember when
8   the first time you noticed him that he
9   would ride through the trailer park?
10      A.    Well, he did it just about
11  everyday.
12      Q.    All right.  During lunchtime?
13      A.    And in the afternoons.
14      Q.    All right.  And how often would
15  he pull and stop in front of your trailer?
16      A.    I would say maybe two or three
17  times a week.
18      Q.    All right.  And would he come
19  knock on your door?
20      A.    Sometimes.
21      Q.    And --
22      A.    Because my car would be out
23  there.

---

**Marie** ▮▮▮▮                                    3/11/2020

Page 185

1    Q.    Yes, ma'am.  And was there any of
2  the occasions that you actually opened the
3  door and talked to him?
4    A.    No.
5    Q.    Were there any occasions that you
6  just sat inside?
7    A.    Yes.
8    Q.    And that was every time?
9    A.    Every time.
10        MS. DANLEY:  Objection.
11        MS. SHORE:  Objection.  Form.
12        MR. YAGHMAI:  Why is that such a
13  funny question?  Are you --
14        MS. SHORE:  You're
15  mischaracterizing her testimony.  I will
16  articulate my objection to form.  You're
17  mischaracterizing her prior testimony.
18        MR. YAGHMAI:  I'm not
19  mischaracterizing it.  But that's why we've
20  got the video, to make sure nobody is
21  mischaracterizing anything.
22    Q.    (By Mr. Yaghmai:)  At -- when you
23  told Mr. ▮▮▮▮ that Mr. Hames was sitting

Page 186

1  out there, did he suggest about -- doing
2  anything about it?
3    A.    No.
4    Q.    And you told him -- you told
5  Mr. ▮▮▮▮ and he had no response, correct?
6    A.    We were actually looking for a
7  place to move after he moved in.
8    Q.    So was it -- were y'all trying to
9  get a bigger place?
10    A.    We was trying to just get out of
11  there.
12    Q.    Yes, ma'am.  But were you trying
13  to get a bigger place?
14    A.    Yes.
15    Q.    Because it was a full trailer
16  when you had your three kids and yourself
17  there, correct?
18    A.    Correct.
19    Q.    Okay.  And so when Mr. ▮▮▮▮
20  moved in, y'all were trying to find a
21  different location, correct?
22    A.    Correct.
23    Q.    All right.  And did you find a

Page 187

1  different location?
2    A.    Yes.
3    Q.    And where was that?
4    A.    Hanceville.
5    Q.    And what was the -- was it a
6  trailer park?
7    A.    No.  It was a house.
8    Q.    It was a house.  And how big was
9  the house?
10    A.    Four bedrooms.
11    Q.    All right.  And once Mr. ▮▮▮▮
12  moved in, did y'all continuously live
13  together until you got divorced?
14    A.    Yes.
15    Q.    And where did he work at the
16  time, Mr. ▮▮▮▮?
17    A.    American Protein.
18    Q.    And what did he do at American
19  Protein?
20    A.    Truck driver.
21    Q.    All right.  So at that point with
22  your income and his income, y'all had the
23  ability to -- rent a bigger house,

Page 188

1  correct?
2    A.    Correct.
3    Q.    And how long, to the best of your
4  recollection, did it take y'all to actually
5  find a place in Hanceville before you
6  actually moved there?  If y'all started
7  looking in March of 2013, how long did it
8  take y'all to find a place?
9    A.    About three, four weeks, you
10  know.
11    Q.    Okay.  And as soon as Mr. ▮▮▮▮
12  moved in, that's when y'all started having
13  discussions, hey, we need to move somewhere
14  bigger?
15    A.    Yes.
16    Q.    And then it took y'all about
17  three or four weeks to -- to find a place
18  in Hanceville and to move in?
19    A.    Yes.
20    Q.    And do you remember how much the
21  rent -- were y'all -- did y'all rent the
22  house or buy the house?
23    A.    We rent.

Page 189

1     Q.    And do you remember how much your
2   rent was in Hanceville?
3     A.    I do not.
4     Q.    Was it more than the 475?
5     A.    Yes.
6     Q.    Was it significantly more than
7   the 475?
8     A.    I don't think it was -- maybe 5,
9   600, somewhere in there.
10    Q.    Yes, ma'am.  And approximately
11  how far was the closest trailer to yours if
12  you're on number nine?  I mean, was the --
13  number ten or number eight just right next
14  to you or --
15    A.    Yes.
16    Q.    Okay.  There wasn't -- you didn't
17  have some acreages or --
18    A.    No.
19    Q.    -- or land or anything like that,
20  did you?
21    A.    No.
22    Q.    And when Mr. Hames would park out
23  in your yard, as you say, how would you

Page 190

1   know that he was out there?
2     A.    When you're coming up that gravel
3   road, you can hear a vehicle.
4     Q.    And so when you would hear a
5   vehicle during lunchtime, you would presume
6   it was Mr. Hames, correct?
7     A.    Pretty much.
8     Q.    And when you heard the gravel
9   road in the afternoon, the same thing you
10  would presume is Mr. Hames, correct?
11    A.    Correct.
12    Q.    Did Mr. Hames ever say anything
13  to you about evicting you other than during
14  -- or right before the oral sex incident?
15    A.    No.
16    Q.    Did Mr. Hames ever physically
17  assault you or physically touch you other
18  than the oral sex incident you told us
19  about and the time -- and the times you've
20  told us when you went to his office to pay
21  rent?
22    A.    No.
23          MS. DANLEY:  Object to form.

Page 191

1     Q.    Okay.  After you went to the
2   Cullman County Sheriff's Department, have
3   you talked --
4          MS. DANLEY:  She didn't answer
5   the question, did she?
6          MR. YAGHMAI:  Yeah.
7          MS. DANLEY:  Oh.  Sorry.  I
8   couldn't hear her.
9          MR. YAGHMAI:  She said no.
10    Q.    (By Mr. Yaghmai:)  After -- after
11  you went to the Cullman County Sheriff's
12  Department, did you ever meet with Alisha
13  Cobbs in person?
14    A.    Yes.
15    Q.    And how long after when you went
16  to the Cullman County Sheriff's Department
17  did you meet her?
18    A.    I don't remember.
19    Q.    I mean, was it within weeks or
20  months or years?
21    A.    Probably weeks.
22    Q.    Okay.  And where would you have
23  met Alisha Cobbs?

Page 192

1     A.    At her house.
2     Q.    And who all was present there?
3     A.    Just me and Alisha.
4     Q.    Did you keep in contact with
5   Alisha from when you had just met her a
6   couple of weeks before?
7     A.    We did a little bit.  But not --
8   it wasn't -- we may have a conversation
9   every now and then.
10    Q.    Did y'all exchange phone numbers
11  that first time you went to her house?
12    A.    Yes.
13    Q.    Because that was the first time
14  you had met her, correct?
15    A.    Yes.
16    Q.    And that was the first time you
17  had ever communicated with her was in
18  person when you went to her house?
19    A.    Correct.
20    Q.    And y'all exchanged phone
21  numbers, correct?
22    A.    Correct.
23    Q.    And was y'all's normal way of

Page 193

1    communicating via text message?
2        A.   I think it was just phone calls.
3        Q.   Okay.  Phone calls.  What about
4    through Facebook, did y'all communicate
5    that way?
6        A.   A little bit maybe.  Not much.
7    I -- I haven't talked to her in a -- in a
8    while.
9        Q.   Yes, ma'am.  But I'm talking
10   about back then when you were talking to
11   her, would y'all communicate via Facebook?
12       A.   I don't even think we were
13   friends on Facebook at the beginning.
14       Q.   At any point, did y'all become
15   Facebook friends?
16       A.   Yes.
17       Q.   And at any point did y'all
18   communicate via Facebook?
19       A.   I don't remember if I did or not.
20       Q.   If you did, would it have been
21   through the private messenger or would it
22   have been on the public pages?
23       A.   The public pages probably.

Page 194

1        Q.   Why would you communicate with
2    her --
3        A.   I mean, just sharing stuff,
4    liking stuff, making comments.
5        Q.   Okay.  Would y'all
6    ever communicate publically about any of
7    the situation which y'all claim with Mr.
8    Hames or Hames Marina?
9        A.   No.
10       Q.   So when you say about
11   communicating, y'all are talking about
12   something else?
13       A.   Yeah.  Totally different.
14       Q.   You might put something of your
15   granddaughter and she may like it or
16   something like that?
17       A.   Yes.
18       Q.   All right.  Did y'all ever
19   communicate via Facebook messenger?
20       A.   I think she had sent me her phone
21   number because she had changed phone
22   numbers.
23       Q.   Yes, ma'am.  Anything else?

Page 195

1        A.   I don't remember.
2        Q.   All right.  And so when you went
3    to Alisha Cobbs' house the second time, it
4    was just the two of you, correct?
5        A.   Correct.
6        Q.   And what were the conversations
7    y'all had there?
8        A.   I don't remember exactly what we
9    talked about.
10       Q.   Well, did y'all talk about
11   Mr. Hames?
12       A.   I don't remember.  I'm --
13   probably.  I'm not sure exactly what.
14       Q.   Well, how did it go about that
15   you were going to go over there?
16       A.   She just invited me to come over.
17       Q.   And was it like on a -- did you
18   bring your kids?
19       A.   No.  My kids are grown.
20       Q.   Yes, ma'am.  I'm talking about at
21   the time.
22       A.   This was -- the only time I ever
23   met Alisha was 2017.  And my kids are

Page 196

1    grown.
2        Q.   Yes, ma'am.  Were you over there
3    just to hang out or were y'all over there
4    to specifically talk about whether, you
5    know, a case --
6        A.   Just to hang out.
7        Q.   Okay.  But you think y'all would
8    have talked about Mr. Hames, correct?
9        A.   We may have; we may not have.  I
10   don't remember.
11       Q.   Has Ms. Cobbs ever mentioned to
12   you about a lawsuit or money regarding
13   Mr. Hames?
14       A.   No.
15       Q.   And I'm not talking about you
16   saying anything.  But has she ever told you
17   anything about her trying to get money or
18   to sue Mr. Hames?
19       A.   All she told me is she had an
20   attorney.
21       Q.   Okay.
22       A.   And that's it.
23       Q.   All right.  And did she tell you

Page 197

1  anything about the attorney or whether you
2  needed to talk to the attorney?
3      A.   Yeah.
4      Q.   She told you you needed to talk
5  to the attorney, correct?
6      A.   Yes.
7      Q.   And that you might need to hire
8  an attorney, correct?
9      A.   She just told me I could talk to
10  an attorney.
11      Q.   Right.  For the purposes of
12  potentially hiring an attorney, correct?
13      A.   I -- yes.
14      Q.   All right.  And who was the
15  attorney that she told you to contact?
16      A.   Champ Crocker.
17      Q.   All right.  Did Alisha ever take
18  you over there to Mr. Crocker's office?
19      A.   No.
20      Q.   Or did y'all get on a conference
21  call together so she could introduce you to
22  him?
23      A.   No.

Page 198

1      Q.   Prior to hiring Mr. Crocker, did
2  you ever talk to him as being a potential
3  witness?
4      A.   No.
5      MS. DANLEY:  Object to form.
6      Q.   Do you remember when -- well,
7  strike that.
8      Do you remember how long it was
9  between Alisha Cobbs suggesting that you
10  could hire an attorney to when you actually
11  hired an attorney?
12      A.   I don't remember.
13      Q.   I mean, was it weeks, months,
14  years?
15      MS. SHORE:  Objection.  Form.
16      Q.   If you know.
17      MS. SHORE:  You can answer.
18      Q.   I'm just trying to get a time
19  frame.
20      A.   Maybe weeks.  I don't know.
21      Q.   Yes, ma'am.  Did she -- did
22  Alisha, when she's recommending that you
23  talk to an attorney, also tell you that

Page 199

1  Kayla Carreker had hired an attorney?
2      A.   I don't think so.
3      Q.   Okay.  Or at the time that you
4  went to go hire an attorney, did you have
5  any knowledge from anyone that Ms. Carreker
6  had hired an attorney?
7      A.   I don't think so.  I didn't find
8  out until I went to the attorney office.
9      Q.   Until you went to Mr. Crocker's
10  office?
11      A.   Yes.
12      Q.   All right.  What about
13  Tomeka Bartlett?
14      A.   No.
15      Q.   Did Ms. Cobbs tell you that
16  Ms. Bartlett hired an attorney?
17      A.   No.
18      Q.   Did you have any knowledge about
19  Ms. Bartlett having an attorney prior to
20  you going to Mr. Crocker's office?
21      A.   No.
22      Q.   Any other meetings that you can
23  remember that you've had with Ms. Cobbs

Page 200

1  that -- you've told us about two of them.
2  Are there any other ones you can remember?
3      A.   There was only two.
4      Q.   That's the only two times you've
5  met her?
6      A.   Yeah.  I was -- I've only been to
7  her house twice.
8      Q.   Have you met her anywhere else?
9      A.   No.
10      Q.   Or seen her anywhere else?
11      A.   No.
12      Q.   So the only two times that you --
13      A.   Well, court.
14      Q.   Yes, ma'am.  In what context of
15  court?
16      A.   Well, I -- wait.  I take that
17  back.  I did ride with her to court when we
18  had to go do that preliminary hearing.
19      Q.   The two of y'all road together?
20      A.   Yes.
21      Q.   Did she come pick you up from
22  your house?
23      A.   No.  I went over to her house.

**Marie** ▊▊▊▊

---

Page 201

1   Q.   And so that was the third time
2   you had been to her house?
3   A.   Yes.
4   Q.   Did y'all talk anything about it?
5   A.   I don't remember the conversation
6   on the way over there.  I didn't even go in
7   her house.
8   Q.   Yes, ma'am.  You just drove over
9   there and hopped in her car?
10   A.   Yes.
11   Q.   And you don't remember the
12   conversations to there?
13   A.   No.
14   Q.   And do you remember the
15   conversations back from court?
16   A.   No.  I don't remember them.
17   Q.   Are those the only three times
18   you've ever met Alisha Cobbs in person?
19   A.   Yes.
20   Q.   And I don't mean whether it's at
21   her house.  I mean anywhere.
22   A.   Anywhere.
23   Q.   That's the only three physical

---

Page 202

1   times you've ever --
2   A.   Yes.
3   Q.   -- seen her in your life?  Let me
4   finish the question just for the record.
5        Are those the only three times
6   you've ever physically seen Alisha Cobbs in
7   your life?
8   A.   Yes.
9        MS. DANLEY:  Object to the form.
10   Q.   Other than that first meeting at
11   Ms. Cobbs' house where Tomeka Bartlett was
12   there, have you ever seen Ms. Bartlett in
13   person?
14   A.   Only at the hearing.
15   Q.   At the preliminary hearing?
16   A.   Yes.
17   Q.   Did y'all have any communications
18   whatsoever?
19   A.   No.
20   Q.   Were you sitting in the courtroom
21   when she testified?
22   A.   No.
23   Q.   Were you sitting in the courtroom

---

Page 203

1   when Ms. Cobbs testified?
2   A.   No.
3   Q.   Have you ever talked to
4   Ms. Bartlett, whether it was in person or
5   not, other than seeing her in court and
6   that first time at Alisha Cobbs' house?
7   A.   No.
8   Q.   You've never communicated with
9   her via text?
10   A.   No.
11   Q.   Or phone conversation?
12   A.   No.
13   Q.   Facebook?
14   A.   No.
15   Q.   Other than the one time that she
16   reached out to you?  Any other -- that
17   you've told us about.
18        MS. DANLEY:  Object to form.
19   A.   She didn't reach out to me.  She
20   was just at the same place that I was, at
21   Alisha's house.
22   Q.   Yes, ma'am.  Okay.  What about
23   Kayla Carreker?  I know you knew her

---

Page 204

1   before --
2   A.   Yes.
3   Q.   -- but have you seen her since
4   that meeting at Alisha Cobbs' house?
5   A.   Yes.
6   Q.   And where is that?
7   A.   She come by my house one day and
8   brought her child.
9   Q.   What year was that,
10   approximately?
11   A.   It was several years ago.  Maybe
12   a year or so ago.
13   Q.   Did y'all talk any -- I'm sorry.
14   Go ahead.
15   A.   About a year or so ago.
16   Q.   Did y'all talk anything about
17   Mr. Hames at all?
18   A.   No.
19   Q.   Had Mr. Hames ever been in your
20   trailer other than when he first showed it
21   to you and other than when he brought the
22   wine?
23        MS. DANLEY:  Object to form.

---

Page 205

1    A.   Yeah.
2    Q.   When was that?
3    A.   The day that I was in my tub and
4  my -- I was keeping my granddaughter.  And
5  I got out of the tub because she went in
6  the living room.  She was in there with me.
7  And I threw on a robe and I walked in my
8  living room and he was standing in the
9  living room with my granddaughter.
10   Q.   When was that?
11   A.   I don't remember.
12   Q.   Was it after the -- let me strike
13 that.
14        Was it after the sexual assault
15 incident?
16        MS. DANLEY:  Object to form.
17   A.   It was after.
18   Q.   All right.  And was it during the
19 day -- during the school day?
20   A.   Yes.
21   Q.   And so you were just there
22 keeping your granddaughter?
23   A.   Yes.

Page 206

1    Q.   And you were in the bathtub with
2  her?
3    A.   No.  She was in the bathroom
4  while I was in the bathtub.
5    Q.   Got you.  And then she ran out
6  into the -- into the living room?
7    A.   Yes.
8    Q.   Did you hear anybody coming in
9  the house?
10   A.   No.
11   Q.   And so you walked out there in
12 your bath robe?
13   A.   Yes.
14   Q.   And where was Mr. Hames standing?
15   A.   In the middle of my living room
16 right next to my granddaughter.
17   Q.   And did it startle you that he
18 was in your living room?
19   A.   Yes.
20   Q.   And what did you say when you saw
21 him standing there?
22   A.   I asked him what he was doing in
23 my house.

Page 207

1    Q.   And what did he say?
2    A.   I don't remember what he said,
3  but I did ask him to leave.
4    Q.   And did he leave?
5    A.   Yes.
6    Q.   All right.  And so this whole
7  conversation of you talking to him -- you
8  asked him to leave immediately, correct?
9    A.   Correct.
10   Q.   And he immediately left, correct?
11   A.   Yes.
12   Q.   Okay.  Did you call the police
13 then?
14   A.   No.
15   Q.   Why not?
16   A.   I did not call the police because
17 -- like I said, he made me feel threatened
18 as losing my home with my children.  And
19 I needed a place to live with my children.
20   Q.   Well, did you feel threatened
21 that he was around your granddaughter?
22   A.   Yes, I did.  I mean, after the
23 fact, I didn't want him around any of my

Page 208

1  kids.
2    Q.   After the -- the sexual assault
3  incident, correct?
4    A.   Yes.
5        MS. DANLEY:  Object to form.
6    Q.   You didn't want him around --
7        MS. SHORE:  Objection.  Form.
8    Q.   You didn't want him around your
9  kids or your granddaughter, correct?
10   A.   Correct.
11   Q.   Was he ever in your house other
12 than that occasion that you've -- you
13 hadn't told us about?
14   A.   Not that I remember.
15   Q.   Yes, ma'am.  Was there ever a
16 time that he was there where you had
17 invited him in other than what you've
18 already told us?
19   A.   No.
20   Q.   Did you warn any of your
21 neighbors that, hey, maybe y'all need to
22 keep a lookout for Randy?
23   A.   No.



Page 209

1    Q.   Why not?
2    A.   I just didn't.  You know, I
3  stayed to myself.  And, you know, I really
4  didn't associate with a whole lot of people
5  over there.
6    Q.   Well, you knew Renee had a child,
7  right, a female child?
8    A.   Yes.
9    Q.   Did you ever say to her, hey, you
10  might want to look out for Randy?
11    A.   No.  She was living out there
12  before I did.
13    Q.   Yes, ma'am.  Did she ever
14  communicate to you that, hey, you needed to
15  look out for Randy?
16    A.   No.
17    Q.   Did anybody ever communicate to
18  you that lived out there --
19    A.   No.
20    Q.   -- to look out for Randy?
21    A.   No.
22    Q.   But even after he had assaulted
23  you and been in your house when --

Page 210

1       MS. SHORE:  Objection to form.
2    Q.   -- your granddaughter was there,
3  you didn't think you should tell Renee that
4  -- just a heads up that, hey, maybe look
5  out for Randy?
6    A.   No.
7    Q.   Okay.
8    A.   I did not.
9    Q.   Did Mr. ██████ ever tell you that
10  he had any communications with Randy at
11  all?
12    A.   No.
13    Q.   Did you ever see him have any
14  communications with Randy at all?
15    A.   No.
16    Q.   At the time you were living there
17  in the Hames Marina, did you have a credit
18  card that you used?
19    A.   No.
20    Q.   All right.  Do you know who
21  ███████ is?
22    A.   Yes.
23    Q.   And who is that?

Page 211

1    A.   That is my ex-daughter-in-law's
2  sister.
3    Q.   Your ex-daughter-in-law's sister.
4  All right.  Have you ever spoken to Ms. ████
5  about Randy?
6    A.   No.
7    Q.   Did she ever live at the trailer
8  park?
9    A.   Yes.
10    Q.   All right.  Do you know when?
11    A.   It was after I had moved out.
12    Q.   All right.  And did you tell her
13  about living at the trailer park about
14  maybe recommending that she could live
15  there?
16    A.   No, I did not.
17    Q.   Okay.  Did you ever have -- who
18  was she married to?
19    A.   I don't know who she was married
20  to.
21    Q.   Okay.  And you said she was --
22  how was she -- how did you know her again?
23  I'm sorry.

Page 212

1    A.   She was my daughter-in-law's --
2  ex-daughter-in-law's sister.
3    Q.   She was Kayla's sister?
4    A.   Uh-huh.
5    Q.   Is that a yes?
6    A.   Yes.
7    Q.   All right.  And did --
8       MS. SHORE:  Objection.  Form.
9    Q.   Did -- so you never mentioned
10  anything about Randy to Ms. ██, did you?
11    A.   No.  I really didn't talk to her.
12    Q.   Okay.
13    A.   I hardly ever seen her.
14    Q.   All right.  So she's never told
15  you that she knows anything about Randy or
16  Hames Trailer Park?
17    A.   No.
18    Q.   Or Hames Marina?
19    A.   No.
20    Q.   No.  And what about ████████
21  ███████, do you know who that is?
22    A.   I have no clue who that is.
23    Q.   What about ██████████, do you

**Marie** ███████                                      **3/11/2020**



Page 213

1   know who that is?
2       A.   I don't know who that is.
3       Q.   Do you know who███████ is?
4       A.   Yes.
5       Q.   And who is ███████?
6       A.   She lived behind me.
7       Q.   In which -- while you were living
8   there?
9       A.   Yes.
10      Q.   All right.  Do you remember which
11  number she lived in?
12      A.   It was the one before mine.  I
13  don't know the numbers.
14      Q.   And did --
15      A.   Eight, I guess.
16      Q.   Yes, ma'am.  Did she -- was she
17  already there when you moved in?
18      A.   No.
19      Q.   She moved in afterwards, correct?
20      A.   Correct.
21      Q.   When you and Mr ███████ moved
22  out, were -- was she still living there?
23      A.   Yes.

Page 214

1       Q.   And did she have children?
2       A.   Yes.
3       Q.   Were they around your kids' age?
4       A.   Yes.
5       Q.   And would they play together?
6       A.   Yes.
7       Q.   And so y'all would sit out there
8   and chat while your kids were playing?
9            MS. SHORE:  Objection.  Form.
10  You can answer.
11      A.   Yes.
12      Q.   All right.  Did y'all ever hang
13  out outside of the Hames Marina with --
14  maybe with your kids?
15      A.   No.
16      Q.   Or without your kids?
17      A.   No.
18      Q.   Did ███████ ever tell you
19  anything about Mr. Hames or the Hames
20  Marina?
21      A.   No.
22      Q.   Did you ever tell her anything
23  about Mr. Hames or Hames Marina?

Page 215

1       A.   No.
2            MS. DANLEY:  Object to form.
3       Q.   Just to clarify for the record,
4   you never complained about Randy to ███████
5   ███████, did you?
6       A.   No.
7       Q.   When is the last time you talked
8   to ███████, you think?
9       A.   Oh.  It's been over a year.
10      Q.   All right.  In what context was
11  that?
12      A.   We were friends on Facebook, and
13  I sent her a message.  She had a grandbaby.
14      Q.   Any other communication with her?
15      A.   Not really.
16      Q.   But, again, nothing to do with
17  your claim or any --
18      A.   No.
19           MS. SHORE:  Objection.  Form.
20  You can answer.  You did.
21           MR. YAGHMAI:  Just off the record
22  real quick.
23           THE VIDEOGRAPHER:  We're off the

Page 216

1   record at 12:15.
2            (Off the record.)
3            (A lunch recess was taken.)
4            THE VIDEOGRAPHER:  We're back on
5   the record at 1:17 p.m.
6       Q.   (By Mr. Yaghmai:)  Mrs. ███████
7   you told us that you and Wesley moved into
8   a four-bedroom house after you left Hames
9   Marina, correct?
10      A.   Correct.
11      Q.   And do you know who the landlord
12  was?
13      A.   I can't remember his name.
14      Q.   Was it an individual or a
15  company?
16      A.   An individual.
17      Q.   And do you remember what the
18  address is?
19      A.   No.
20      Q.   Or do you have anything that
21  could refresh your mem- -- any -- not with
22  you today, but in general, anything that
23  you could look at that would tell you what



Page 217

1    the address was?
2        A.    I don't remember it.
3        Q.    Yes, ma'am.  I understand you
4    don't remember, but do you think you have
5    anything in your possession or access to
6    that at a later point you could go back and
7    look and find out what the address was?
8        A.    No.
9        Q.    Okay.  Or anything that could
10   tell you who the landlord was?
11       A.    No.
12       Q.    How would the rent be paid there,
13   by cash?
14       A.    Cash.
15       Q.    Every time?
16       A.    Yes.
17       Q.    And would the landlord give a
18   receipt for that?
19       A.    No.
20       Q.    And so the entire time that y'all
21   were at the four-bedroom house if you paid
22   cash, there was no receipt provided?
23       A.    No.

Page 218

1        Q.    Is that a correct statement?
2        A.    That's correct.
3        Q.    Did your son, ████, ever live in
4    the trailer?
5        A.    With me?
6        Q.    Yeah.
7        A.    No.
8        Q.    At Hames trailer park?
9        A.    No.
10       Q.    All right.  Did you ever have a
11   chance to introduce him to Mr. Hames, ████?
12       A.    I didn't introduce him.  I think
13   he met him when I was moving in.
14       Q.    Okay.  Do you remember that
15   specifically or you don't know?
16       A.    To the best of my knowledge.
17       Q.    Okay.  Did -- did Mr. Hames help
18   you move in at all?
19       A.    No.
20       Q.    Okay.  But your son, ████, did?
21       A.    Yes.
22       Q.    Do you independently remember
23   them having a conversation or you just

Page 219

1    think that maybe Mr. Hames met ████ because
2    ████ was out there?
3        A.    To the best of my knowledge, he
4    was just out there.
5        Q.    Okay.  And you don't have any
6    recollection of Mr. Hames ever talking to
7    ████ do you?
8             MS. DANLEY:  Object to form.
9        A.    At which point?
10       Q.    At any point.
11       A.    I'm not sure unless it was down
12   when he was fishing at the marina.
13       Q.    So ████ would come fishing in the
14   marina?
15       A.    Yes.
16       Q.    And was that the entire time that
17   you've lived at the marina?
18       A.    Fishing there?
19       Q.    Yes, ma'am.
20       A.    Yeah.
21       Q.    Okay.  Would you -- do you ever
22   remember Mr. Hames going down there and
23   talking to ████ while they're -- while he

Page 220

1    was fishing?
2        A.    I don't know.
3        Q.    Do you know whether they ever
4    fished together, Mr. Hames and ████?
5        A.    I do not know.
6        Q.    Okay.  Did ████ ever talk to you
7    about that or tell you that he fished with
8    Mr. Hames?
9        A.    No, he did not.
10       Q.    Okay.  Did you ever ask Mr. Hames
11   that -- if it was okay that your son who
12   was not living there would come down there
13   and go fishing?
14       A.    He said that my kids could come
15   fishing out there.  He did say that.
16       Q.    Mr. Hames said that?
17       A.    Yes, he did.
18       Q.    Was that after you had already
19   moved in or --
20       A.    Yes.
21       Q.    And would y'all ever talk about
22   your kids fishing, you and Mr. Hames?
23       A.    No.

**Marie** ████████                                           3/11/2020

Page 221

1    Q.   But after you moved in, Mr. Hames
2  told you the kids could come fishing and
3  the kids would come fishing, correct?
4    A.   Correct.
5       MS. SHORE:  Form. Objection.
6  Form.  You can answer.
7    Q.   Which one of your kids would go
8  fishing at the Hames Marina?
9    A.   All of them would fish.
10   Q.   And the only child that you had
11  that did not live at the marina was ████?
12   A.   Yes.
13   Q.   Okay.  And they all -- all four
14  of your kids would fish throughout the
15  entire time you lived at Hames Marina,
16  correct?
17   A.   Do -- repeat that.
18   Q.   I'm talking about as far as the
19  time frame -- the four -- your four kids
20  coming down there to fish at the Marina.
21  This occurred the entire -- basically the
22  entire time while you were at the marina,
23  correct?

Page 222

1    A.   Correct.
2       MS. SHORE:  Objection. Form.
3  You can answer.
4       (Defendant's Exhibit 1 was marked
5       for identification.)
6    Q.   Let me show you what I've marked
7  as Defendant's Exhibit Number 1.
8       MR. YAGHMAI:  I don't have an
9  extra.  It's just the copy of the letter
10  from the Department of Justice.
11      MS. SHORE:  Is there a Bates
12  number on this?
13      MR. YAGHMAI:  I don't think so.
14      MS. SHORE:  Okay.
15      MS. DANLEY:  We need a Bates
16  number.
17      MR. YAGHMAI:  Well, why do I need
18  a Bates number to mark an exhibit at a
19  deposition?
20      MS. DANLEY:  Well, has it been
21  produced?
22      MR. YAGHMAI:  Yes.  Y'all -- it's
23  a letter from the Department of Justice

Page 223

1  that y'all produced, correct?
2       MS. DANLEY:  I didn't produce
3  it --
4       MS. SHORE:  This was attached to
5  -- this was attached to their discovery.
6  Just for clarification of the record, this
7  was a letter that was attached to --
8       MS. DANLEY:  Can I have a copy of
9  that?
10      MS. SHORE:  -- one of the
11  defendant's --
12      MR. YAGHMAI:  Yeah.  You can get
13  a copy of it.  I just --
14      MS. DANLEY:  I just meant while
15  we're talking about it.
16      MR. YAGHMAI:  Well, I don't have
17  -- this is the only copy I have other than
18  that.  It's just a -- it's a letter from
19  Ms. Shore -- this one is a letter from Ms.
20  Shore to Monica Lafont talking about the
21  Department of Justice enforcing the Fair
22  Housing Act.  I mean, I don't -- you can
23  look at it.  I just --

Page 224

1       MS. DANLEY:  Okay.
2       MR. YAGHMAI:  Do you know which
3  letter I'm talking about?
4       MS. DANLEY:  I do now.
5       MR. YAGHMAI:  Okay.
6       MS. SHORE:  And for the record,
7  that's being marked as Exhibit 1?
8       MR. YAGHMAI:  That's what I said,
9  yeah.
10      MS. SHORE:  Okay.  What is the
11  date just so we have --
12      MR. YAGHMAI:  August 6th, 2019.
13      MS. DANLEY:  You said August --
14      MR. YAGHMAI:  6th, 2019.
15   Q.   (By Mr. Yaghmai:)  Are you done
16  looking at it, ma'am?
17   A.   (Witness nods head.)
18   Q.   And I know you're not Ms. Lafont.
19  Do you know who Monica Lafont is?
20   A.   I do not.
21   Q.   All right.  Have you ever
22  received a letter similar to this from the
23  Department of Justice?

**Marie** ████████                                         **3/11/2020**

Page 225

1    A.    No, I have not.
2    Q.    Or received a letter from
3  Ms. Shore about any allegations of Fair
4  Housing Act violations?
5    A.    No, I have not.
6    Q.    Is it your intention in the
7  federal case where the Department of
8  Justice is a plaintiff, are you asking for
9  monetary damages in that case?
10    A.    Repeat that.
11    Q.    In the -- in the -- do you
12  understand that there's a federal case of
13  the Department of Justice that Ms. Shore
14  represents has brought against Mr. Hames
15  and Hames Marina, correct?
16    A.    Correct.
17    Q.    My question is:  Are you seeking
18  money in that lawsuit that the Department
19  of Justice has brought?
20        MS. SHORE:  Objection.
21        MR. YAGHMAI:  Okay.  I don't know
22  what your objection is, but whatever.
23    Q.    You can answer.

Page 226

1        MS. SHORE:  She -- I'm going to
2  object that we filed the lawsuit and that
3  we seek is different in that we seek
4  damages according to the Fair Housing Act.
5  We seek damages on behalf of Mrs. ████.
6  And so she's not -- she's not in a position
7  to state a legal conclusion about this case
8  or state what the United States' position
9  is on this case with respect to her or her
10  damages that we are seeking on her behalf.
11        MR. YAGHMAI:  Well, I appreciate
12  the improper speaking objection.  I'll give
13  you an objection to the form.
14    Q.    (By Mr. Yaghmai:)  My question
15  is:  Have you ever -- let me ask you this.
16  Have you ever received any paperwork from
17  the Department of Justice or the United
18  States federal government regarding
19  Mr. Hames or Hames Marina?
20    A.    No, I have not.
21    Q.    And do you -- are you seeking
22  money from the lawsuit that the Department
23  of -- or asking for money of the lawsuit

Page 227

1  that the Department of Justice has brought?
2        MS. SHORE:  Objection.  Same --
3  same objection.
4        MR. YAGHMAI:  You've got your
5  objection.
6    Q.    You can answer.
7    A.    I didn't know anything about it.
8    Q.    You don't know one way or the
9  other?
10    A.    No.
11    Q.    Okay.
12    A.    I mean, I -- I have no clue.
13    Q.    So you've never -- have you ever
14  signed any documents with -- with the
15  federal government regarding the claims
16  against Hames or Hames -- Randy Hames or
17  Hames Marina?
18    A.    Not to my knowledge I have not.
19    Q.    All right.  At one of the
20  criminal hearings for Mr. Hames, several of
21  you wore matching T-shirts, correct?
22    A.    Correct.
23    Q.    And what did the matching

Page 228

1  T-shirts say?
2    A.    I can't remember all the words.
3    Q.    Basically what --
4    A.    It was about human trafficking.
5    Q.    It was about human trafficking?
6    A.    Yes.
7    Q.    Was it about something about you
8  wouldn't be silenced?
9    A.    Yes.  I think that -- to the best
10  of my knowledge, yes.
11    Q.    Yes, ma'am.  Do you still have
12  the T-shirt?
13    A.    No.
14    Q.    What did you do with the T-shirt?
15    A.    Threw it away.
16    Q.    All right.  Do you remember who
17  was wearing that at Mr. Hames' criminal
18  hearing?  Or tell me who all you do
19  remember wearing it.
20    A.    Alisha.
21        MR. CROCKER:  Object to the form.
22  It wasn't a criminal hearing.
23    Q.    Do you remember where you were

Marie ▉▉▉▉                                                    **3/11/2020**

---

### Page 229

1  wearing the T-shirt?
2      A.   The preliminary hearing.
3      Q.   Okay.  Tell me who all was
4  wearing --
5      A.   No.  It wasn't a prelim- -- was
6  it?
7      Q.   Was it an arraignment?
8      A.   Yeah, something like that.
9      Q.   It was something where
10  Mr. Hames --
11     A.   We -- we wasn't testifying.  We
12  was sitting --
13     Q.   Yes, ma'am.  But it was something
14  to do with Mr. Hames' criminal proceedings,
15  correct?
16     A.   Correct.
17     Q.   All right.  And where were y'all
18  wearing the T-shirts, inside the courtroom?
19     A.   Yes.
20     Q.   Tell me who you remember wearing
21  the T-shirts.
22     A.   Alisha.
23     Q.   Alisha Cobb.

---

### Page 230

1      A.   Tomeka.
2      Q.   Tomeka Bartlett.
3      A.   Kayla.
4      Q.   Kayla Carreker.
5      A.   And me.
6      Q.   And yourself.
7      A.   Yes.  I don't remember if anybody
8  else was.
9      Q.   Who came up with this T-shirt
10  idea?
11     A.   Alisha.
12     Q.   And was this something y'all
13  discussed at one of these meetings that you
14  told us about or does that spark your
15  memory that there might have been a
16  different meeting?
17     A.   It wasn't a meeting.  She just
18  called me and told me that she had ordered
19  some or had some made.
20     Q.   And did you say anything to her
21  in response to her telling you the T-shirts
22  were made?
23     A.   No.

---

### Page 231

1      Q.   Did you say, I don't want to wear
2  the T-shirt?
3      A.   I did not.
4      Q.   And what was the reason they threw
5  the T-shirt away?
6      A.   I just wasn't going to wear it
7  anymore.  So --
8      Q.   Did you only wear it the one
9  occasion?
10     A.   Yes.
11     Q.   Were there any Facebook posts by
12  anybody about the occasion where y'all
13  showed up into court wearing T-shirts?
14          MS. DANLEY:  Object to form.
15     A.   No, not to my knowledge.  I
16  didn't.
17     Q.   You didn't see any?
18     A.   I didn't see any and I sure
19  didn't post none.
20     Q.   Have you ever posted anything on
21  social media about Hames or Hames Marina?
22     A.   No, I have not.
23     Q.   Have you seen Ms. Cobb -- Alisha

---

### Page 232

1  Cobb, any post she has made about Hames --
2  Randy Hames or Hames Marina?
3      A.   Not to my knowledge, no.
4      Q.   Or Kayla Carreker?
5      A.   Not to my knowledge, no.
6      Q.   Or Tomeka Bartlett?
7      A.   No.  Not to my knowledge, no.
8      Q.   Or anyone?  Have you seen any
9  public social media post regarding Randy
10  Hames or the Hames Marina?
11     A.   Not to my knowledge, no.
12     Q.   All right.  At any point since
13  you left Hames Marina, have you recommended
14  for somebody to live there?
15     A.   My son and my ex-husband.
16     Q.   All right.  So let's talk about
17  your son.  Which son did you recommend?
18     A.   ▉▉▉.
19     Q.   And ballpark, when did you
20  recommend to ▉▉▉ to move to Hames Marina?
21     A.   I want to say 2017, but I'm not
22  sure.
23     Q.   All right.  Where was ▉▉▉ living

---

**BIRMINGHAM REPORTING SERVICE**
**(205) 326-4444**

**Marie** ████████                                      **3/11/2020**



Page 233

1  at that point prior to looking for
2  somewhere to live, do you know?
3      A.    He was living with his soon-to-be
4  ex-wife.
5      Q.    All right.  So they were getting
6  a divorce?
7      A.    Yes.
8      Q.    And her name is ████ also,
9  correct?
10     A.    Correct.
11     Q.    And he was looking to move out,
12 correct?
13     A.    Correct.
14     Q.    And he was looking for somewhere
15 to move?
16     A.    Correct.
17     Q.    And where were they living at the
18 time they were married when he was about to
19 get -- move out?
20     A.    Dodge City.
21     Q.    All right.  And you recommended
22 to ████ that he should look at Hames
23 Marina, correct?

Page 234

1      A.    Correct.
2      Q.    And tell me about the
3  conversation you had with ████.
4      A.    Well, he -- he had asked me if I
5  knew if Randy had any openings out there.
6      Q.    And what did you tell him?
7      A.    I told him I didn't know.
8      Q.    Did you tell him that you would
9  try to contact Randy to see whether there
10 were any openings?
11     A.    I don't remember if I did or not.
12     Q.    And who was ████ going to move
13 out there with, by himself?
14     A.    By himself.
15     Q.    Was he looking for a
16 three-bedroom or --
17     A.    Really, one, two.
18     Q.    And did you contact Randy to see
19 whether there was a trailer for ████ to
20 live in?
21     A.    I did.
22     Q.    How did you contact Randy?
23     A.    His office.

Page 235

1      Q.    All right.  Did you call his cell
2  phone?
3      A.    No.
4      Q.    You called his office?
5      A.    I called his office.
6      Q.    And did you speak with the
7  secretary or you spoke with Randy directly?
8      A.    Randy directly.
9      Q.    Tell me what you said to Randy
10 and what he said to you.
11     A.    I told him that ████ was going
12 through a divorce and he was looking for a
13 place to live.
14     Q.    And what did Randy say?
15     A.    He said he had one trailer.
16     Q.    All right.  Did y'all --
17     A.    That ████ could come look at it.
18     Q.    Yes, ma'am.  Did y'all have --
19 did he say, hello, good to hear from you or
20 anything like small talk before y'all
21 started talking about ████ moving out
22 there?
23     A.    I don't remember.

Page 236

1      Q.    Okay.  Don't remember one way or
2  the other?
3      A.    One way or the other.
4      Q.    Do you remember whether you
5  engaged or asked any small talk of Randy?
6      A.    I don't remember one way or -- or
7  the other.
8      Q.    Okay.  And then he told you he
9  had one trailer possibly available for
10 ████, correct?
11     A.    Correct.
12     Q.    Did you communicate that to ████?
13     A.    I did.
14     Q.    All right.  And did ████ go out
15 there and look at the trailer, to your
16 knowledge?
17     A.    Yes, he did.
18     Q.    And did he end up moving in?
19     A.    No.
20     Q.    And do you know why?
21     A.    He found somewhere cheaper.
22     Q.    All right.  Somewhere near Dodge
23 City?

Marie ▮▮▮▮                                           **3/11/2020**

Page 237

1    A.   Hanceville.
2    Q.   When he lived in Dodge City, did
3  he live in the same trailer complex that
4  you lived in before you moved to Hames
5  Marina?
6    A.   I didn't live in a trailer
7  complex --
8    Q.   Okay.
9    A.   -- there.
10   Q.   Not in Dodge City?
11   A.   No.
12   Q.   Okay.  Did he live in the same
13  complex in Dodge City where you lived in
14  before?  Did ▮▮▮?
15       MS. SHORE: Objection.  Form.
16  You can answer it --
17   Q.   Go ahead.
18       MS. SHORE:  -- if you understand
19  it.
20   A.   Repeat that.
21   Q.   You lived in Dodge City at some
22  point, correct?
23   A.   Yes.

Page 238

1    Q.   Did ▮▮▮ ever live in that same
2  place where you lived in Dodge City?
3    A.   He lived on one side of the
4  interstate; I lived on the other.
5    Q.   Yes, ma'am.  Okay.  So you
6  communicate to ▮▮▮ he -- that Randy said
7  he has a place available, but he found
8  somewhere cheaper, correct?
9    A.   Correct.
10   Q.   And then you mentioned earlier
11  about your ex-husband -- recommending to
12  him that he could move in to the Hames
13  trailer, correct?
14   A.   Correct.
15   Q.   Was that before or after ▮▮▮?
16   A.   I don't remember if it was before
17  or after.
18   Q.   Was it around the same kind of
19  time frame or was it spread out by six
20  months, a year?
21   A.   No.  It was around the same time
22  frame.
23   Q.   And so your ex-husband -- you

Page 239

1  mean Randy ▮▮▮, correct?
2    A.   Correct.
3    Q.   And was Randy looking -- was he
4  moving out there by himself going through a
5  divorce or --
6    A.   No.
7    Q.   He was looking to move out there
8  with his wife?
9    A.   Correct.
10   Q.   And what's -- is he still married
11  to her?
12   A.   Yes.
13   Q.   And what's her name?
14   A.   Gina.
15   Q.   And they had children too,
16  correct?  Or she had children?
17   A.   Grown.
18   Q.   All right.  Were they looking to
19  move into the trailer complex with children
20  or just the two of them?
21   A.   Just the two of them.
22   Q.   Okay.  Tell me how the
23  communications with Randy ▮▮▮ you had

Page 240

1  when he expressed that he was looking for
2  somewhere to move.
3    A.   He said he wanted to live closer
4  to -- to our kids and if I could try to
5  help him and Gina find a place to live.
6    Q.   How far -- when you and Wesley
7  ▮▮▮ moved out to the house, how far was
8  that from Hames Marina, ballpark?
9    A.   Miles or --
10   Q.   Just driving distance.  Or diving
11  time.
12   A.   Maybe ten, 15 minutes.
13   Q.   And so Randy ▮▮▮ wanted to
14  move somewhere closer to -- to where your
15  kids were?
16   A.   Correct.
17   Q.   All right.  And did he say any
18  other specifications other than he just
19  wanted to move somewhere closer to where
20  the kids where?
21   A.   No.
22   Q.   All right.  And then you
23  suggested maybe to get in touch with Randy

**Marie** ███████                                              3/11/2020

Page 241

1   Hames to see whether there was a trailer
2   available, correct?
3       A.   Correct.
4       Q.   All right.  And did -- what was
5   Randy ███████ response, sure?
6       A.   When I told him?
7       Q.   Yeah.  When you suggested maybe
8   he should move to Hames Marina.
9       A.   I told him I'd keep looking, you
10  know --
11      Q.   Okay.
12      A.   -- and find something they could
13  afford.
14      Q.   All right.  Did he give you a
15  budget of what they were looking for?
16      A.   Yes.
17      Q.   And what was that?
18      A.   No more than 5, 550.
19      Q.   All right.
20      A.   Or -- or less.
21      Q.   And you had communicated to Randy
22  ███████ that you had actually lived in the
23  mobile homes out there where Randy had,

Page 242

1   correct?
2       A.   Correct.
3       Q.   Did you -- were you friendly with
4   his wife, Randy ███████?
5       A.   Not --
6       Q.   As much as you could be?
7       A.   Not -- yeah.  As much as I could
8   be.
9       Q.   Okay.  Did you -- and did you
10  communicate with Randy Hames about Randy
11  ███████ looking for somewhere to live?
12      A.   I did.
13      Q.   And how did you do that?
14      A.   By phone.
15      Q.   Okay.
16      A.   Wait.  I think on Facebook first
17  and then I talked to him on the phone.
18      Q.   Okay.  So -- and we'll go -- so
19  you contacted Randy Hames by Facebook and
20  then you called him on the phone?
21      A.   Yes.
22      Q.   Okay.  And what did you tell
23  Randy Hames when you called him on the

Page 243

1   phone regarding Randy ███████?
2       A.   That he was looking for a place
3   to live, him and his wife, and if -- I
4   wanted to know if he had anything open and
5   how much.
6       Q.   Okay.  And was there small talk
7   during the phone conversation?
8       A.   No.
9       Q.   All right.  And what did Randy
10  Hames say?
11      A.   I think he said he had one -- one
12  bedroom to the best of my knowledge.
13      Q.   In Randy ███████ budget range?
14      A.   Yes.
15      Q.   And did Randy Hames make -- you
16  know, say anything like, hey, thanks for
17  trying to refer somebody over here or
18  thanks --
19      A.   No.
20      Q.   -- for trying to send your son
21  too?
22      A.   No.
23      Q.   All right.  Did you communicate

Page 244

1   to Randy ███████ what Randy Hames had told
2   you, that he had some availability and what
3   the price was?
4       A.   I did.
5       Q.   And did Randy ███████ move in
6   there?
7       A.   No.
8       Q.   Do you know -- did Randy ███████
9   communicate to you why he didn't?
10      A.   They stayed where they were at.
11      Q.   They stayed where they were?
12      A.   Yes.
13      Q.   And decided not to move?
14      A.   Yes.
15      Q.   Did you ever communicate to Randy
16  ███████ that Randy Hames had sexually
17  assaulted you?
18      A.   No, I did not.
19      Q.   And why is that?
20          MS. SHORE:  Objection.  Form.
21  You can go ahead.
22      A.   Because I didn't want to tell my
23  ex-husband about it.

**Marie** ████████                                          **3/11/2020**

Page 245

1    Q.   Okay.  Did you recommend to Randy
2    ████ or put him in touch with any other
3    potential landlords?
4    A.   No.
5    Q.   All right.  Did you recommend or
6    put your son, ████, in touch with any other
7    potential landlords?
8    A.   No.  Because I didn't know
9    anybody.
10        (Defendant's Exhibit 2 was marked
11        for identification.)
12    Q.   All right.  Let me show you what
13   I'll mark as Defendant's Exhibit Number 2,
14   which is Bates stamped Hames 177.
15        MS. SHORE:  Can we go off the
16   record for a minute, please?
17        MR. YAGHMAI:  Sure.
18        THE VIDEOGRAPHER:  We're off the
19   record at 1:36.
20        (Discussion was held off the
21        record.)
22        THE VIDEOGRAPHER:  We're back on
23   the record at 1:38 p.m.

Page 246

1    Q.   (By Mr. Yaghmai:)  Do you
2    recognize what I've marked as Defendant's
3    Exhibit Number 2?
4    A.   Yes.
5    Q.   Are those Facebook messages
6    between you and Randy Hames?
7    A.   Yes.
8    Q.   And so at the time you had Marie
9    ████ ████ as your Facebook account,
10   correct?
11   A.   Yes.
12   Q.   And I know it's hard to read some
13   of this stuff, but my understanding you can
14   look.  It was -- the first message was
15   4/12/2017; is that correct?  Because if you
16   look on the next page when y'all were
17   exchanging messages, the 2017 is more
18   legible.
19   A.   Yes.
20   Q.   All right.  So the first message
21   is April 12th of 2017, correct?
22   A.   Correct.
23   Q.   Had you had any other Facebook

Page 247

1    communications with --
2        MR. TURNER:  Hold on just a
3    second.  Elise, do you want her to make
4    some copies?
5        MS. SHORE:  That -- if we can go
6    off the record.
7        THE VIDEOGRAPHER:  We're off the
8    record at 1:38.
9        (Discussion was held off the
10       record.)
11       THE VIDEOGRAPHER:  We're back on
12   the record at 1:41 p.m.
13    Q.   So April 12th, 2017, Randy sends
14   the first message.  Had he communicated
15   with you or you communicated with him via
16   Facebook messenger prior to April 12th of
17   2017?
18   A.   No.
19   Q.   All right.  So he says, Marie,
20   you're looking great.  And then is that
21   you're response saying, thank you, how are
22   you?
23   A.   Yes.

Page 248

1    Q.   All right.  And he says, doing
2    well, some -- stop in sometime and say
3    hello.  And your response is, I will when I
4    get a chance.  I work all the time.
5    56 hours in four days.  Correct?  That's
6    your response?
7    A.   Correct.
8    Q.   Where were you working 56 hours
9    in four days back in April of 2017?
10   A.   ████.
11   Q.   He responds, oh my, looking
12   forward to seeing you.  And you say, same
13   here, correct?
14   A.   Correct.
15   Q.   Okay.  And then you ask, do you
16   have anything for rent.  And then -- that's
17   your response, correct?
18   A.   Yes.
19   Q.   Or your statement, do you have
20   anything for rent.
21   A.   Yes.
22   Q.   And he responds, yes, several.
23   Who wants to rent and how many bedrooms are

**Marie** ███████                                              3/11/2020

Page 249

1   needed?  And is it your response, it's my
2   ex-husband and his wife, three bedrooms if
3   possible?  That's your response, correct?
4       A.    Correct.
5       Q.    And that's -- we're talking about
6   your ex-husband Randy ██████ --
7       A.    Yes.
8       Q.    -- and his wife?  And then
9   he says, what is his name?  And you respond
10  -- your response is Randy ██████ it's my
11  kid's dad, correct?
12      A.    Correct.
13      Q.    And he asked if you recommend him
14  and you say yes.  Did you take that as
15  meaning you recommend him as being a good
16  tenant there?
17      A.    Yes.
18      Q.    And then you say, I've come by
19  two days in a row to see you, sad Emoji
20  face, correct?
21      A.    Yeah.  That's what's on there.
22      Q.    And that's what you sent,
23  correct?

Page 250

1       A.    Correct.
2       Q.    You had gone by where two days in
3   a row to try to see Randy Hames back in
4   April of 2017?
5       A.    By his law firm.
6       Q.    All right.  And where had you
7   driven from the first time you had went?
8       A.    I was in town.
9       Q.    Well, I mean, were you -- where
10  were you living at that point?  How far
11  away from his law firm were you living back
12  in April of 2017?
13      A.    ██████, I believe. ██████.
14      Q.    Ma'am?
15      A.    ██████
16      Q.    Okay.  And how far of a drive is
17  that time-wise?
18      A.    Ten -- maybe ten minutes.
19      Q.    All right.  And the first time
20  you went by his office, was his secretary
21  there or receptionist there?
22      A.    I think the door was locked.
23      Q.    All right.  Then you came by the

Page 251

1   next day after when you think the door was
2   locked, correct?
3           MS. DANLEY:  Object to form.
4       A.    I don't remember if I stopped or
5   if I just drove by.  I do not remember.
6       Q.    Would you be able to tell whether
7   Randy Hames was in his office just by
8   driving by it?
9       A.    No.
10      Q.    Well, what you told him is that
11  you come by two days in a row to you see
12  you, correct?
13      A.    Correct.
14      Q.    And what was the purpose of you
15  trying to go see Randy Hames back in 2017?
16      A.    That was to talk to him about
17  ██████ getting a trailer.
18      Q.    All right.  And I believe it's --
19  and it's kind of cut off, but that was in
20  June of 2017 when you came by there to see
21  him two days in a row, correct?
22      A.    Yes.  I can't tell.
23      Q.    Well, I think it's easier --

Page 252

1   it's a little more legible and his response
2   was, I hate that I missed you, try again.
3   And that was June 3rd of 2017, correct?
4       A.    Correct.
5       Q.    So you would have sent the --
6   I've come by two days in a row to see you
7   would have been in June of 2017, correct?
8       A.    Yes.
9       Q.    All right.  Why did you not just
10  Facebook message him and ask him about
11  whether he had anything available for ██████
12  like you did with Randy ██████ as opposed
13  to going by to see him?
14      A.    I was in town, so I was just
15  going to stop by there.
16      Q.    And then when he responded, hate
17  that I missed you, try again, you say,
18  what, have a good day.  And then you
19  corrected yourself.  You asked him what day
20  is a -- is good to come by, is that what
21  was supposed to say, correct?
22          MS. SHORE:  Objection.  Form.
23  You can answer.

**Marie** ███████                                    **3/11/2020**

Page 253

1    A.   Yes.
2    Q.   Because the first message you had
3  sent was, what?  Have a good day.  And that
4  didn't make sense, correct?
5    A.   Correct.
6    Q.   And then you corrected that by
7  saying, what day is good to come by is what
8  that was supposed to say, correct?
9    A.   Yes.
10    Q.   And you were referring to the
11  message you had sent right above where it
12  said, what, have good day, right?
13    A.   Yes.
14    Q.   Was there any other reason that
15  you were going to go by his office to see
16  him other than to ask about your son, ████?
17    A.   No.
18    Q.   And he responds, I'm going to
19  Atlanta tomorrow to watch a Braves game.
20  Will look at my schedule for next week and
21  let you know.  Look forward to seeing you.
22  And your response was what?
23    A.   Okay, see you soon.

Page 254

1    Q.   Then I think if you look at the
2  bottom of where it's Bates stamped 180 --
3  do you see that?  It says November 3rd,
4  2:09 p.m.?
5    A.   Yes.
6    Q.   All right.  And then the next
7  page, 181, is kind of the duplicative of
8  some of the messages - probably just by
9  printing it out - was duplicative of some
10  of the messages that we've talked about,
11  correct?
12    A.   Yes.
13    Q.   All right.  And then he messages
14  you on November 3rd.  It says, you enjoying
15  your day off question mark.  It was on
16  page 181.
17    A.   Oh.  Yes.
18    Q.   All right.  And what was your
19  response?
20    A.   Just getting some things done.
21    Q.   And then he responds, well, if
22  you're out and about, stop in, say hello,
23  would like to see how pretty you are in

Page 255

1  person.  And what was your response?
2    A.   I said okay.
3    Q.   Did you ever stop by again?
4    A.   No.
5    Q.   Why did you tell him that you
6  would stop by if you were out and about?
7    A.   I was actually just pacifying
8  him.
9    Q.   Well, why wouldn't you just not
10  respond?
11    A.   I don't know.
12    Q.   Why didn't you just block him?
13  You know how to block somebody on Facebook,
14  don't you?
15    A.   I did -- I did block him after
16  that.
17    Q.   Why didn't you block him before
18  that?
19    A.   I just didn't.
20    Q.   And you're saying after -- how
21  long after November 3rd of 2017 did you
22  block him on Facebook?
23    A.   Then.

Page 256

1    Q.   That same day?
2    A.   I believe it was that afternoon,
3  yes.
4    Q.   And why did you block him?
5    A.   I just didn't want any more
6  contact with him.
7    Q.   Had you already had any of these
8  meetings with Alisha Cobbs that you've told
9  us about as of April 12th, 2017?
10    MS. DANLEY:  Object to form.
11    A.   To my knowledge, no.
12    Q.   Had you had any of these meetings
13  with Alisha Cobbs that you've told us about
14  as of June 6th of 2017?
15    A.   I don't remember dates.
16    Q.   Or whether you remember the exact
17  date -- by the time you had sent that
18  message on June 6th of 2017, had you
19  already had the meeting with Alisha Cobbs?
20    A.   No.
21    Q.   Okay.  As of November 3rd, when
22  the last messages are exchanged between you
23  and Randy Hames, had you already had that

**Marie** ▮▮▮▮▮                                          3/11/2020



Page 257

1  meeting with Alisha Cobbs?
2      A.   To the best of my knowledge, no.
3      Q.   Did you ever tell Alisha Cobbs
4  that you had exchanged Facebook messengers
5  with Randy Hames where you told him you
6  would come by his office twice?
7      A.   To the best of my knowledge, no.
8      Q.   Why wouldn't you tell her that?
9      A.   Because I didn't think it was any
10 of nobody's business what I — messages I
11 send or —
12     Q.   Did you ever tell the Cullman
13 County Sheriff's Department that you had
14 sent messages with Randy Hames in April,
15 June, or November of 2017?
16         MS. DANLEY:  Object to form.
17     A.   To the best of my knowledge, no.
18     Q.   Why not?
19     A.   I just didn't.
20     Q.   Did you ever tell the Cullman
21 County prosecutors that you had exchanged
22 Facebook messengers with Randy Hames either
23 April, June, or November of 2017?

Page 258

1          MS. SHORE:  Objection.  Form.
2  You can answer.
3      A.   To the best of my knowledge, no.
4      Q.   And why wouldn't you have told
5  the Cullman County prosecutors that you had
6  had voluntary exchanges of messages with
7  Randy Hames?
8      A.   I just didn't.  I didn't — it
9  didn't cross my mind when I was talking
10 with them.
11     Q.   Well, did you tell the — either
12 the Cullman County Sheriff's Department or
13 the Cullman County District Attorney's
14 Office that you had gone, physically, to
15 Randy Hames' office in 2017 to talk to him?
16     A.   No, I did not.
17         MS. DANLEY:  Object to form.
18     Q.   And why is that?
19         MS. SHORE:  Objection.  Form.
20     Q.   Why is that?
21     A.   Because I just didn't.
22     Q.   Well, did you just think it was
23 not important to tell them that, that you

Page 259

1  had still had communication with Randy
2  Hames?
3          MS. SHORE:  Objection.  Form.
4      A.   I didn't think about it.
5      Q.   Okay.  And when you went by his
6  office two times in 2017, Randy had not
7  asked you to come there.  You went there on
8  your own, correct?
9          MS. SHORE:  Objection.  Form.
10 You can answer.
11     A.   No.  I just went on my own.
12     Q.   Right.
13     A.   Yes.
14         MR. YAGHMAI:  Give me about a
15 four-minute break because I think I'm done.
16 Let me just talk to them for one second.  I
17 think I'm done.
18         THE VIDEOGRAPHER:  We're off the
19 record at 1:51 p.m.
20         (Off the record.)
21         THE VIDEOGRAPHER:  We're back on
22 the record at 2:00 o'clock p.m.
23         MR. YAGHMAI:  I don't have any

Page 260

1  more questions.  I just offer Exhibit 1 and
2  2 for purposes of the deposition.
3          MS. SHORE:  Can we go off the
4  record for a minute again?
5          (Discussion was held off the
6          record.)
7          THE VIDEOGRAPHER:  Back on the
8  record at 2 o'clock p.m.
9              EXAMINATION
10 BY MS. SHORE:
11     Q.   Yes, Mrs. ▮▮▮▮▮, I just have
12 some follow-up questions.  You had talked
13 about your children.  And you have one
14 biological children — one biological
15 child; is that correct?
16     A.   That's correct.
17     Q.   And who is that?
18     A.   ▮▮▮▮▮▮.
19     Q.   Okay.  And you mentioned that you
20 had a supervisor when you were working —
21 was it at ▮▮▮▮▮▮?
22     A.   ▮▮▮▮▮.
23     Q.   ▮▮▮▮  And you mentioned her

Page 261

1  name as Joyce Pollard.  Can you spell that
2  for the record, please?
3       A.    P-O-L-L-A-R-D, I believe --
4       Q.    Okay.
5       A.    -- is how she spells it.
6       Q.    Thank you.  You also mentioned
7  that you were involved in one -- one
8  lawsuit involving a car accident.  And were
9  you represented by counsel in that case?
10      A.    It was settled out of court.  A
11 lawyer had taken it.
12      Q.    The case?
13      A.    Yes.
14      Q.    Okay.  And you -- you received
15 money as a result of that car accident
16 and --
17      A.    Correct.
18      Q.    -- you were represented by
19 counsel, correct?
20      A.    Correct.
21      Q.    Okay.
22            MS. SHORE:  If I can go off the
23 record for a minute, please.

Page 262

1            THE VIDEOGRAPHER:  We are off the
2  record at 1:0 -- 2:03 p.m.
3            (Off the record.)
4            THE VIDEOGRAPHER:  Back on the
5  record at 2:03 p.m.
6       Q.    (By Ms. Shore:)  Mrs. ▇▇▇▇, you
7  testified earlier in response to Mr. Hames'
8  daughter's attorney's question regarding
9  correspondence with the United States.  Is
10 it possible you might have received a
11 letter from us at some point in time after
12 we did talk to you?
13      A.    I don't remember receiving any
14 letter.
15      Q.    Okay.  But it's possible you
16 might have and you just don't remember as
17 you testified today.
18      A.    It's -- possibly and I just not
19 looked at it.  Because my kids would get
20 the mail sometimes.
21            MS. SHORE:  Thank you.  I have no
22 further questions.
23            MS. DANLEY:  Can you hear me from

Page 263

1  back here?
2            THE WITNESS:  Yes.
3            MS. DANLEY:  Okay.  All right.
4            MS. SHORE:  I didn't -- do you
5  want the microphone?
6            MS. DANLEY:  Do we need it?
7            THE VIDEOGRAPHER:  Yes, please.
8                  EXAMINATION
9  BY MS. DANLEY:
10      Q.    Okay.  Mrs. ▇▇▇▇, I -- let's go
11 back to -- you were talking --
12            MS. DANLEY:  Mr. Yaghmai, am I
13 saying that right?
14            MR. YAGHMAI:  Yaghmai.
15            MS. DANLEY:  Yaghmai.
16            MR. YAGHMAI:  Or Greg.
17            MS. DANLEY:  I can say Greg?
18 That's fine.
19            MR. YAGHMAI:  Yes, ma'am.
20      Q.    (By Ms. Danley:)  When Greg was
21 asking you about Wesley ▇▇▇▇ and when you
22 got divorced, you were dating Mr. ▇▇▇▇
23 while you were living at Hames Marina,

Page 264

1  correct?
2       A.    Correct.
3       Q.    And that was in approximately --
4  when you moved out in May/June of 2013?
5       A.    Correct.
6       Q.    Okay.  When did you and
7  Mr. ▇▇▇▇ get married?
8       A.    Actually, September 27th of the
9  following year.
10      Q.    Of 2013 or 2014?
11      A.    2014.
12      Q.    Okay.  And you said you were
13 divorced approximately five years ago?
14      A.    Yes.  We were only married eight
15 months.
16      Q.    You were only married eight
17 months.  So that would be sometime in 2015
18 you were divorced in?
19      A.    Correct.
20      Q.    Okay.  You testified earlier that
21 all of your children are adopted.  Is there
22 any of the children that are not legally
23 adopted that you refer to casually as your



Page 265

1  children?
2    A.   Yes.
3    Q.   Which ones are those?
4    A.   ████████ , ████████ ,
5  and ████████ .
6    Q.   ████████ , that was
7  Mr. ████ biological child?
8    A.   Yes.
9    Q.   Okay. But you raised her -- or
10 helped raise her?
11   A.   I helped raise her.
12   Q.   Okay. And you refer to her
13 casually as one of your children?
14   A.   Yes.
15   Q.   And you said ████████ ?
16   A.   ████████
17   Q.   ████████ . Can you describe your
18 arrangement -- or your situation with
19 Mr. ████ ?
20   A.   I've got -- he was living out at
21 Childhaven and he was a ward of the Cullman
22 County DHR and Childhaven. And they asked
23 me if I could take him in because he wanted

Page 266

1  to go to school over in Walker County. So
2  I told them yes.
3    Q.   And approximately when did you
4  take in Mr. ████ ?
5    A.   At 16.
6    Q.   He -- he was 16?
7    A.   He was 16.
8    Q.   Okay. How old is he now?
9    A.   35.
10   Q.   Was Mr. ████ living with you -
11 I'm trying to do the math in my head real
12 quick - while you were living at Hames
13 Marina?
14   A.   No.
15   Q.   Okay. He moved in after you
16 moved out of Hames Marina?
17   A.   No. This --
18   Q.   He was already not -- no longer
19 living with you at --
20   A.   He was grown and gone.
21   Q.   Okay. And you said the third one
22 was ████ ?
23   A.   ████ .

Page 267

1    Q.   ████ . Can you describe your
2  situation with ████████ ?
3    A.   She needed a place to stay, so I
4  let her move in. And now she's got her own
5  apartment and baby.
6    Q.   Okay. You didn't legally adopt
7  Ms. ████ ?
8    A.   No.
9    Q.   And at the time, you did not
10 legally adopt Mr. -- ████ is his --
11   A.   ████████
12   Q.   You didn't legally adopt
13 ████ . You were just working for DHR?
14   A.   Yes.
15   Q.   You were his placement?
16   A.   Yes.
17   Q.   Okay. You talked about your
18 employment history when -- when Greg asked
19 you about that. And you mentioned working
20 at ████████ (sic) twice?
21   A.   Yes.
22   Q.   I want to run back through that
23 to make sure I'm clear on -- everything is

Page 268

1  clear with that.
2         You worked at the bar in West
3  Jefferson. That was your first job after
4  moving out of Hames Marina?
5    A.   Yes.
6    Q.   And then your next employment was
7  at the ████ ?
8    A.   Yes.
9    Q.   And you worked there
10 approximately how long?
11   A.   Six months.
12   Q.   And then you went to ████████ .
13 ████ .
14   A.   Yes.
15   Q.   Where that was located?
16   A.   Jasper, Alabama.
17   Q.   Is there more than one location?
18   A.   Yes. There's one in Cullman.
19   Q.   Okay. And then you went to
20 ████████ ?
21   A.   Yes.
22   Q.   Okay. How long did you work at
23 ████████ the first time?

**Marie** ████████                                        **3/11/2020**

Pages 269 to 272

| Page 269 |
| --- |

1      A.    A little over a year.
2      Q.    Then where did you go after that?
3      A.    ████.
4      Q.    Okay.  How long did you stay at
5   ████?
6      A.    About -- a few months.  I'm not
7   exactly -- how long.
8      Q.    Where did you go after ████?
9      A.    Hanceville.
10     Q.    How long did you work at
11  Hanceville?
12     A.    Just a few months.  And I went
13  back to ████
14     Q.    Okay.  And is that your current
15  employment?
16     A.    No.
17     Q.    Okay.  How long were you at
18  ████?
19     A.    After I went back the second
20  time?  Just a few months.
21     Q.    Okay.  So I believe earlier you
22  testified that there were a lot of these
23  jobs within like a two-year period or

| Page 270 |
| --- |

1   something?
2      A.    Yes.
3      Q.    This would have starting in
4   approximately what year, this succession of
5   employment?
6      A.    I'm not sure.  2016 --
7      Q.    Okay.
8      A.    -- maybe.
9      Q.    And Mr. Greg asked you if you've
10  ever been convicted of anything and you
11  said no.  Are you aware that traffic
12  tickets or pleading guilty to that is
13  technically considered a traffic citation?
14     A.    I did not.
15     Q.    Okay.
16           MR. YAGHMAI:  Just for the
17  record, I didn't -- that wasn't my
18  intention to --
19           MS. DANLEY:  It wasn't your
20  intention?  Okay.  You meant convicted of a
21  felony?
22           MR. YAGHMAI:  No.  I just meant
23  convictions of anything.

| Page 271 |
| --- |

1           MS. DANLEY:  Any kind.
2           MR. YAGHMAI:  But not a traffic
3   ticket.  Like -- unless it was a DUI.
4   But --
5           MS. DANLEY:  Okay.  Just making
6   sure.
7      Q.    (By Ms. Danley:)  But you've had
8   some traffic citations?
9      A.    Maybe a couple.  I haven't had
10  many.
11     Q.    Mr. Greg asked you earlier if you
12  had talked to anyone about the deposition.
13  I'm -- did you talk to anyone about just
14  the procedure about being here.  Not like,
15  you know, the content of it, but just like
16  the logistics of getting here?
17     A.    Yes, my daughter.
18     Q.    Who is that?
19     A.    ████.
20     Q.    And what was the nature of that
21  conversation?
22     A.    She drove me here.
23     Q.    Okay.  When Greg asked you about

| Page 272 |
| --- |

1   your eviction from your residence prior to
2   moving into Hames Marina -- I'm just kind
3   of directing you to what we're talking
4   about.  How far behind were you on rent?
5      A.    When I lived in --
6      Q.    No.
7      A.    The -- it was one month that I
8   could not pay at the time it was due.
9      Q.    That was in August?
10     A.    Yes.
11     Q.    Did you attempt to negotiate or
12  talk to your landlord about this issue?
13     A.    I did.
14     Q.    And what was his response?
15     A.    He wanted his money then.
16     Q.    So you -- it was your
17  understanding that you had to be out
18  immediately?
19     A.    Correct.
20     Q.    You testified that when you first
21  met Randy Hames that you didn't see
22  anything improper about him or didn't have
23  any reason to be alarmed by his conduct; is

**Marie** ████████                                    **3/11/2020**

---

Page 273

1   that correct?
2       A.   That's correct.
3       Q.   In the first conversation that
4   you had with Mr. Hames, did you inform him
5   that you were being evicted?
6       A.   Yes.
7       Q.   Did you inform him how much you
8   would owe?
9       A.   Yes.
10      Q.   Did you inform him of how you
11  obtained money to pay rent?
12      A.   Yes.
13      Q.   What was his response?
14      A.   As long as I could have -- you
15  know, had my rent money every month, he was
16  fine with it.
17      Q.   You mentioned that you discussed
18  your children with Mr. Hames.  At any
19  point, did you discuss the status of -- I
20  don't want to say his last name wrong.
21      A.   ████████?
22      Q.   ████████.  Say his last name for
23  me.

---

Page 274

1       A.   ████████.
2       Q.   ████████.  Did you at any point
3   discuss your status with ████████?
4       A.   I did.
5       Q.   What was that?
6       A.   That --
7       Q.   What was the nature of that
8   discussion?
9       A.   That he come from Childhaven, but
10  he was through DHR of Cullman.
11      Q.   Was he living with you at that
12  point?
13      A.   When I got -- which one, DHR?
14      Q.   At the point in which you were
15  going to live at Hames Marina.
16      A.   No.
17      Q.   Okay.  Greg also asked you about
18  some casual conversations that you had with
19  Mr. Hames.  During any of these casual
20  conversations with Mr. Hames, did you ever
21  discuss with him his role or his
22  occupation?
23      A.   Only that he was an attorney and

---

Page 275

1   that he was an attorney with DHR.
2       Q.   When did he say that?
3       A.   Just when we was talking about
4   ████████ being through DHR.
5       Q.   What did he say?
6       A.   He said he represents DHR and the
7   children -- the children of DHR.
8       Q.   Did you ever have any
9   conversation -- let me back up.  And we've
10  talked about -- I'll call it the wine
11  incident.
12           Prior to the wine incident, did
13  you have any conversations with Mr. Hames
14  that you felt were alarming?
15      A.   No.
16      Q.   Did you feel that it was safe for
17  you to move in at Hames Marina?
18      A.   Yes.
19      Q.   Why was that?
20      A.   Well, him being an attorney, you
21  know.
22      Q.   What about him being an attorney
23  made you feel safe to move in there?

---

Page 276

1       A.   He was like an officer of the
2   law, you know.
3       Q.   So it's your understanding you
4   think attorneys are held to some kind of
5   higher standard or they're more likely to
6   behave than regular landlords?
7       A.   Correct.
8           MR. TURNER:  Thank you.
9       Q.   During the wine incident that
10  we've talked about, you testified that you
11  went to the restroom, you came back, and
12  you sat down on the couch?
13      A.   Correct.
14      Q.   And that Mr. Hames asked - and
15  I'm paraphrasing here - that he asked you
16  for a blow job?
17      A.   Correct.
18      Q.   And your response was essentially
19  no?
20      A.   No.
21      Q.   You testified that you said he
22  said, I'm a lawyer, I can do - paraphrasing
23  again - I'm a lawyer, I can do whatever I

---