US Exhibit 12 b

## Page 1

```
1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE NORTHERN DISTRICT OF ALABAMA
3              SOUTHERN DIVISION
4
5    CIVIL ACTION NUMBER
6    5:18-cv-01055-CLS
7    2:18-cv-01096-CLS
8
9    UNITED STATES OF AMERICA,
10         Plaintiff,
11   vs
12   RANDY HAMES and HAMES MARINA, d/b/a HAMES
13   MARINA and MOBILE HOME PARK,
14         Defendants
15
16   TOMEKA BARTLETT and KAYLA CARREKER,
17         Plaintiff's
18   vs
19   RANDY ALLAN HAMES, HAMES MARINA, L L C ,
20   CHRISTIE HAMES DOLBEER, MARY CATHERINE
21   HAMES, JESSICA HAMES PENNER, ANGELA HAMES
22   SAHURIE and MIRANDA HAMES SELF,
23         Defendant's
```

## Page 2

```
1         DEPOSITION TESTIMONY OF:
2                  MARIE
3
4         March 11, 2020
5         9:17 a.m.
6
7    COURT REPORTER:
8    BRITTANY N. HANVEY, CCR
9    The reading and signing of this deposition
10   has not been waived.
```

## Page 3

```
1                  STIPULATIONS
2         IT IS STIPULATED AND AGREED
3    by and between the parties through their
4    respective counsel that the deposition of
5    MARIE            may be taken before BRITTANY
6    N. HANVEY, Certified Shorthand Reporter
7    and Notary Public, State at Large, at the
8    offices of NORMAN, WOOD, KENDRICK &
9    TURNER, BIRMINGHAM, ALABAMA, on
10   March 11, 2020, commencing at
11   approximately 9:17 a.m.
12        IT IS FURTHER STIPULATED AND
13   AGREED that the signature to and the
14   reading of the deposition by the witness
15   is not waived, the deposition to have the
16   same force and effect as if full
17   compliance had been had with all laws and
18   rules of Court relating to the taking of
19   depositions.
20        IT IS FURTHER STIPULATED AND
21   AGREED that it shall not be necessary for
22   any objections to be made by counsel to
23   any questions, except as to form or
```

## Page 4

```
1    leading questions, and that counsel for
2    the parties may make objections and assign
3    grounds at the time of trial or at the
4    time said deposition is offered in
5    evidence, or prior thereto.
6         In accordance with Rule 5(d)
7    of the Alabama Rules of Civil Procedure,
8    as amended, effective May 15, 1988, I,
9    BRITTANY N. HANVEY, am hereby delivering
10   to GREGORY YAGHMAI the original transcript
11   of the oral testimony taken
12   March 11, 2020, along with exhibits.
13        Please be advised that this
14   is the same and not retained by the Court
15   Reporter, nor filed with the Court.
```

Page 5

```
 1              I N D E X
 2
 3    WITNESS:
 4    Marie
 5
 6    EXAMINATION BY           PAGE
 7    BY MR. YAGHMAI . . . . . . . . . . .  13
 8    BY MS. SHORE . . . . . . . . . .  260
 9    BY MS. DANLEY . . . . . . . . . .  263
10    BY MR. YAGHMAI . . . . . . . . .  292
11    BY MS. DANLEY . . . . . . . . . .  306
12
13
14         DEFENDANT'S EXHIBITS
15    NO.     DESCRIPTION        PAGE
16    1 - Letter                  222
17    2 - Facebook Messages       245
18    3 - Complaint               302
```

Page 6

```
 1         A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFF:
 4       ELISE SANDRA SHORE
         Attorney at Law
 5       Housing and Civil Enforcement
         Section Civil Acts Division U.S.
 6       Department of Justice
         150 M Street NW, Room 8
 7       1124 Washington, DC 20530
 8       ERIN MEEHAN RICHMOND
         Attorney at Law
 9       Housing and Civil Enforcement
         Section Civil Acts Division U.S.
10       Department of Justice
         150 M Street NW, Room 8
11       1124 Washington, DC 20530
12    FOR THE PLAINTIFFS:
13       CANDIS A. MCGOWAN
         Attorney at Law
14       WIGGINS, CHILDS, PANTAZIS, FISHER
         & GOLDFARB, LLC
15       The Kress Building
         301 19th Street
16       Birmingham, Alabama 35203
17       LACEY K. DANLEY
         Attorney at Law
18       WIGGINS, CHILDS, PANTAZIS, FISHER &
         GOLDFARB, LLC
19       The Kress Building
         301 19th Street
20       Birmingham, Alabama 35203
```

Page 7

```
 1    FOR THE PLAINTIFFS:
 2       CHAMP CROCKER
         Attorney at Law
 3       207 2nd Avenue Southeast
         Cullman, Alabama 35055
 4
 5    FOR THE PLAINTIFFS:
 6       CARLA C. WARD
         Attorney at Law
 7       Northern District of Alabama
         1801 4th Avenue North
 8       Birmingham, Alabama 35203
 9    FOR THE DEFENDANTS:
10       GREGORY F. YAGHMAI
         Attorney at Law
11       YAGHMAI LAW, LLC
         2081 Columbiana Road
12       Birmingham, Alabama 35216
13    FOR THE DEFENDANTS:
14       KILE T. TURNER
         Attorney at Law
15       NORMAN, WOOD, KENDRICK & TURNER
         Ridge Park Place
16       1130 22nd Street South
         Birmingham, Alabama 35205
17
18    ALSO PRESENT:  Chiquita Robertson
```

Page 8

```
 1         I, BRITTANY N HANVEY, a
 2    Certified Shorthand Reporter of
 3    Birmingham, Alabama, and a Notary Public
 4    for the State of Alabama at Large, acting
 5    as Commissioner, certify that on this
 6    date, pursuant to the Alabama Rules of
 7    Civil Procedure and the foregoing
 8    stipulation of counsel, there came before
 9    me at the offices of NORMAN, WOOD,
10    KENDRICK & TURNER, BIRMINGHAM, ALABAMA,
11    commencing at approximately 9:17 a m on
12    March 11, 2020, MARIE             witness in
13    the above cause, for oral examination,
14    whereupon the following proceedings were
15    had:
16
17         THE VIDEOGRAPHER:  We're now on
18    the record  This is the video deposition
19    of Marie          Case numbers
20    2:18-CV-01055 and 01096-CLS in the United
21    States District Court for the Northern
22    District of Alabama, Southern Division
23    Today's date is March the 11th, 2020  The
```

Page 277

```
 1   want.  What was your response to that?
 2       A.   That I pay my rent -- I paid my
 3   rent, you know.  My house was clean.  He
 4   had no reason to.
 5       Q.   And what did he do or say in
 6   response to that?
 7       A.   What do you mean by that?
 8       Q.   So you said that you told
 9   Mr. Hames that you -- basically you
10   questioned why he would threaten to evict
11   you.
12       A.   Yes.
13       Q.   And you said that my -- I paid my
14   rent.  My house is clean.  And his response
15   was what?
16       A.   I can do whatever I want to.
17       Q.   Did you say anything in return to
18   that?
19       A.   I was just stunned.
20       Q.   Did you say anything else to him
21   before the act took place?
22       A.   I don't remember.
23       Q.   You were both seated at this
```

Page 278

```
 1   point, correct?
 2       A.   Correct.
 3       Q.   Mr. Hames then unbuttoned his --
 4   did he unzip his pants?
 5       A.   Yes.
 6       Q.   And pulled out his penis?
 7       A.   Yes.
 8       Q.   Did he touch himself?
 9       A.   Yes.
10       Q.   Was that -- then what happened?
11       A.   He --
12       Q.   Is that when he pushed -- and I
13   don't want to have to make you go back
14   through all that, but is that when he
15   touched your head?
16       A.   Yes.
17       Q.   Okay.  Did he stay seated the
18   whole time?
19       A.   No.
20       Q.   Describe what happened if -- when
21   he was -- I guess, he got up?
22       A.   He stood up.
23       Q.   Tell me about that.
```

Page 279

```
 1       A.   And stood in front of me and
 2   grabbed the back of my head.
 3       Q.   Did he hold on to your head the
 4   entire time that you were performing oral
 5   sex?
 6       A.   I don't remember.
 7       Q.   At least in the beginning he had
 8   pushed your --
 9       A.   Yes.
10       Q.   -- head down?  And then even when
11   he stood, he still held your -- the back of
12   your head?
13       A.   Yes.
14       Q.   Okay.  And I believe you had --
15   there was some question -- you said this
16   was for your birthday.  But this event did
17   not actually take place on your birthday?
18       A.   No.
19       Q.   How do you know that?
20       A.   Because my kids were gone and my
21   birthday was in the middle of the week.
22       Q.   So what is the significance of
23   your kids being gone?
```

Page 280

```
 1       A.   There was nobody at my house but
 2   me.
 3       Q.   Were your kids gone during the
 4   week?
 5       A.   Just to school.
 6       Q.   But I think you testified earlier
 7   they were at your -- their dad's house?
 8       A.   They were.
 9       Q.   When did they go visit their dad?
10       A.   Every other weekend if he picked
11   them up.
12       Q.   So is it fair to say that based
13   on that, you knew that this had to be
14   either the weekend before your birthday or
15   the weekend after?
16       A.   Yes.
17       Q.   Okay.  Prior to the wine
18   incident, would you ever allow Mr. Hames in
19   your house?
20       A.   Before?  Yes.
21       Q.   After?
22       A.   The only time he come in my house
23   after that was when I was in the tub.
```

Page 281

1  Q. And let's talk about that. When
2  he came in while you were in the tub, did
3  he call out to you?
4  A. No.
5  Q. Did he beat on the door?
6  A. I didn't hear it if he did.
7  Q. When he entered, he didn't call
8  out to you in any way?
9  A. No.
10 Q. Or make his presence known?
11 A. No.
12 Q. Had he put anything on your door
13 prior to letting you know that someone
14 would be coming in?
15 A. No.
16 Q. Okay. You were asked by opposing
17 counsel that you -- whether you started
18 making arrangements to move somewhere else.
19    Why did you not immediately make
20 arrangements to move some -- somewhere
21 else?
22 A. Because I didn't have the money
23 to move.

Page 282

1  Q. After the wine incident, did you
2  have any conversations with Mr. Hames
3  regarding another female named Laquitta
4  Caldwell?
5  A. I did.
6  Q. What was the nature of that
7  conversation?
8  A. She had called my cell phone one
9  day wanting to know what was going on
10 between me and Randy. And I told her I
11 didn't know what she was talking about.
12 And after she hung -- we hung up, I called
13 Randy.
14 Q. What did you say to Randy?
15 A. I said, why is Laquitta calling
16 me.
17 Q. His response?
18 A. He goes, I don't know.
19 Q. Do you -- did Laquitta say why
20 she was calling you?
21 A. No.
22 Q. At the time, did you know the
23 significance of Laquitta Caldwell calling

Page 283

1  you?
2  A. What do you mean? That --
3  Q. At the time, did you know if
4  there was any relationship between Randy
5  Hames and Laquitta Caldwell?
6  A. I -- I had heard from a neighbor
7  that --
8  Q. When she called you. Let me
9  clarify that.
10 A. -- that he was dating her.
11 Q. What neighbor was that?
12 A. Renee.
13 Q. And what else did Renee -- did
14 Renee tell you anything else about Laquitta
15 Caldwell?
16 A. Just that she worked for DHR.
17 Q. So when -- when Greg asked you
18 earlier that you didn't remember having any
19 conversations with Randy Hames about his
20 girlfriend, would you have considered
21 Ms. Caldwell Mr. Hames' girlfriend?
22 A. Yes.
23 Q. Okay. So if he asked you -- so

Page 284

1  if I'm asking you now would you have had
2  any conversation -- do you remember having
3  any conversations with Mr. Hames about any
4  girlfriends, what would your response be?
5  A. If I asked him?
6  Q. No. I'm asking you now.
7  Because --
8  A. Oh.
9  Q. Let me clarify. Greg asked you
10 earlier if you remembered having any
11 conversations with Mr. Hames about anybody
12 he was -- any of his girlfriends.
13 A. I didn't have that conversation
14 with him about it. Renee had told me. So
15 I took what Renee said.
16 Q. So you just assumed that --
17 A. Yes.
18 Q. That was after you had talked to
19 Mr. Hames?
20 A. Yes.
21 Q. Okay. So you would -- you would
22 not consider Laquitta Caldwell to have been
23 his girlfriend?

Page 285

1  A.  All I could go by is what she
2  said, that he was his girlfriend -- she was
3  his girlfriend.
4  Q.  Okay.
5     MS. DANLEY: Sorry. I'm trying
6  to read my own handwriting.
7  Q.  (By Ms. Danley:) When Wesley
8  moved in with you, is it fair to say that
9  the harassment by Mr. Hames slowed or
10 stopped?
11 A.  It definitely slowed down a whole
12 lot.
13 Q.  So your belief is that having
14 a male companion live with you slowed down
15 the harassment?
16 A.  Yes.
17 Q.  Greg asked you earlier if you had
18 had any conversations with your daughter
19 about this case -- I think he actually said
20 about -- anything about Randy Hames. And I
21 think it was in the context of maybe -- so
22 I want to split that out and make sure
23 we're clear on that.

Page 286

1     Had you had any conversations
2  with your daughter ▮ at the time this
3  stuff was going on about Randy Hames?
4  A.  When I lived at the trailer park?
5  Q.  Yes.
6  A.  No.
7  Q.  Have you had any conversations
8  about Randy Hames with your daughter ▮
9  recently?
10 A.  Just that I had to come up here
11 for a deposition and she -- I needed her to
12 drive me.
13 Q.  Did you have any conversations
14 with your daughter about Randy Hames
15 contacting her?
16 A.  Yes. He contacted her -- she
17 told me that he sent her two friends
18 request on Facebook. She denied both of
19 them and blocked him.
20 Q.  How did that make you feel?
21 A.  Mad, really, because why is he
22 contacting my children?
23 Q.  Did you -- did Randy Hames have

Page 287

1  any contact that you're aware of with any
2  of your other children?
3  A.  Yes.
4  Q.  Who?
5  A.  He had contact with my
6  ex-daughter-in-law, which is ▮ , ▮
7  ex-wife.
8  Q.  ▮ ?
9  A.  Yes.
10 Q.  Describe that conduct -- I mean,
11 that contact.
12 A.  That he went to her place of work
13 and needed to use -- that he needed a
14 sitter for his sister, that he wanted
15 ▮ . And ▮ told me that he was
16 trying to find out where I worked, where I
17 lived, and all of that. And she wouldn't
18 give him any information. But he was also
19 trying to get information on Crystal Bee,
20 her sister.
21 Q.  And how did that make you feel?
22 A.  Mad. I mean --
23 Q.  Why?

Page 288

1  A.  Scared. You know, why is he
2  wanting to find me?
3  Q.  Did Mr. Hames have any contact
4  with any of your other children --
5  A.  ▮ .
6  Q.  -- about you?
7  A.  ▮ .
8  Q.  Can you describe that conduct
9  (sic)?
10 A.  He was in Burger King one
11 afternoon with his son and Randy Hames come
12 up to him and wanted to know -- aren't you
13 -- said, aren't you Marie's son? I need to
14 get in touch with her. Can you tell me how
15 to get in touch to -- with her, where she
16 lived, phone number, because she owes me
17 money.
18 Q.  How did that make you feel?
19 A.  Mad.
20 Q.  Why?
21 A.  Because he has no business trying
22 to find me for one thing, but why is he
23 trying to go through my kids.

Page 289

1  MS. DANLEY: Can we go off the
2  record for a second? I just want to look
3  through my --
4  THE VIDEOGRAPHER: We're off the
5  record at 2:29 p.m.
6  (Discussion was held off the
7  record.)
8  THE VIDEOGRAPHER: We're back on
9  the record at 2:35 p.m.
10  Q. (By Ms. Danley:) Okay.
11  Mrs. ___, you testified earlier that
12  after the wine incident the bath robe tub
13  incident followed and Mr. Hames did not
14  come into your home anymore after that?
15  A. No.
16  Q. Is that correct?
17  A. That's correct.
18  Q. Did he -- was there any point
19  after the wine incident that he solicited
20  oral sex from you?
21  A. In his office, when I was outside
22  with my kids, and he would drive by. He
23  would stop and call me over to the car and

Page 290

1  he would bring it up about going to his
2  trailer and stuff.
3  Q. And you said sometimes he would
4  ask about going to the trailer but would
5  not mention oral sex?
6  A. Oh. No. He would mention it
7  sometime -- well, sometimes going to the
8  trailer and sometimes it was going there
9  for oral sex.
10  Q. So he would mention oral sex in
11  -- located, you know, at the trailer park?
12  A. Yes.
13  Q. Did he mention oral sex in his
14  office?
15  A. Yes.
16  Q. When he would ask you to go to
17  the trailer, what was your understanding of
18  what that meant?
19  A. For oral sex. I mean, that's all
20  he ever talked about.
21  Q. You also mentioned that he would
22  drive by your home. Was this prior to the
23  wine incident or after the wine incident or

Page 291

1  both?
2  A. Both.
3  Q. After the wine incident, would he
4  just sit in the car, not come in?
5  A. Yes.
6  Q. Prior to the wine incident, would
7  he come in?
8  A. Just -- I think he's only been in
9  my house like two or three times. And that
10  was when I first moved in, the wine
11  incident and the bathtub incident.
12  Q. You testified earlier that you
13  did not discuss this with anyone until
14  approximately 2017. Why was that?
15  A. Because I was ashamed and I just
16  didn't want anybody to know.
17  Q. What made you change your mind?
18  A. Well, if he'd do it -- he did it
19  to other people and I didn't want to see
20  anybody else get traumatized like he has
21  done me.
22  Q. So your understanding prior to
23  learning about other women was that he --

Page 292

1  this, you know, horrific act would may have
2  just been a one-time thing with you?
3  A. Yes.
4  Q. And you -- these messages that
5  we've gone through, that was prior to your
6  learning that he had done this to other
7  women?
8  A. Yes.
9  Q. Is it fair to say that that
10  changed your mind?
11  A. Yeah. It did most definitely.
12  Q. At the time of these incidents
13  when you, you know, were asking him, my
14  kids and I don't have any place to live,
15  and he unzips his pants anyway, what was
16  your understanding of that action?
17  A. That if I didn't, he would evict
18  me. And me and my kids had nowhere to go.
19  MS. DANLEY: I think that's all.
20  FURTHER EXAMINATION
21  BY MR. YAGHMAI:
22  Q. Just really quickly. I think you
23  were asked -- when we asked off the record

Page 293

1  -- and I think we clarified. When you met
2  with the police -- the Cullman County
3  Sheriff's Department, you kind of gave them
4  the information and they typed it up. You
5  didn't actually write something out
6  yourself, did you?
7     A.   No. I wrote something out.
8     Q.   Oh. You wrote something out?
9     A.   I did.
10    Q.   Okay. Did you read what the
11 police typed up? Had you ever seen that
12 report, what the police typed up?
13    A.   Not from them.
14    Q.   Not from them?
15    A.   No.
16    Q.   So you have never seen the typed
17 police report from the Cullman County
18 Sheriff's Department when you went down
19 there and talked to them?
20    A.   I didn't.
21         MS. SHORE: Can I just interject?
22 You're saying police. Is it a police
23 report or a sheriff report or --

Page 294

1          MR. YAGHMAI: That's the same
2  thing.
3          MS. SHORE: Okay. In Cullman,
4  it's the same thing?
5          MR. YAGHMAI: Yeah.
6          MS. SHORE: Okay. Thank you.
7     Q.   (By Mr. Yaghmai:) So the --
8     A.   I seen it at my lawyer's office.
9     Q.   You've seen it? Okay. And so
10 you reviewed what the police actually --
11 the sheriff's department actually typed up,
12 correct?
13    A.   Yes.
14    Q.   All right. And it was accurate,
15 correct?
16    A.   On the dates, some of it was not.
17    Q.   But other than the dates, it was
18 accurate?
19    A.   To my knowledge.
20    Q.   Yes, ma'am.
21    A.   I can't remember what was all in
22 it.
23    Q.   Well, if you had --

Page 295

1          MS. DANLEY: You might show it to
2  her and let her point it out.
3          MR. YAGHMAI: Well, I don't have
4  -- thank you for that.
5     Q.   (By Mr. Yaghmai:) But I just
6  want to make sure. But you've never
7  contacted the sheriff's department and told
8  them that they got something wrong on the
9  report, did you?
10    A.   No. Because I didn't see it
11 until, what, yesterday or --
12    Q.   Okay. And the thing that stuck
13 out in your mind whenever you saw it
14 yesterday or the day before was about the
15 dates, correct?
16    A.   My birthday.
17    Q.   Your birthday was the thing --
18    A.   Yeah.
19    Q.   -- you saw on there wrong,
20 correct?
21    A.   Well, I mean, I noticed that.
22    Q.   Yes, ma'am.
23    A.   But -- because it had on my

Page 296

1  birthday and it wasn't on my birthday.
2     Q.   Okay. Anything other than on
3  your birthday that was inaccurate in the
4  Cullman County sheriff's report?
5     A.   I don't remember what all was in
6  it.
7     Q.   Well, you looked at it, didn't
8  you?
9     A.   I looked at it, but I can't
10 remember what all is in it right now.
11    Q.   Yes, ma'am. And I'm not asking
12 you to quote it verbatim. I'm just asking
13 you whether there was anything else on the
14 report that stuck out in your mind other
15 than having that date of the --
16         MS. SHORE: Objection.
17    Q.   -- wine incident.
18         MS. SHORE: Objection. It's been
19 asked and answered.
20         MR. YAGHMAI: Okay.
21    Q.   You can answer. Because it
22 hasn't been answered. But --
23    A.   If I seen it, I could probably

Page 297

1  point out something.
2      Q.   Yes, ma'am. Okay. Well, I'm
3  just saying, was there anything else in
4  your mind that stuck out as it being wrong?
5         MS. SHORE: Objection.
6      A.   Not that I can acknowledge right
7  now.
8      Q.   Okay. Fair enough. And have you
9  seen your handwritten statement that you
10 say you gave to the police?
11     A.   No.
12     Q.   Have you ever seen it other than
13 when you wrote it?
14     A.   No.
15     Q.   When you talked about
16 ▮▮▮, you know, did you get any
17 money from the state when you took
18 ▮▮▮ into your house?
19     A.   Yes.
20     Q.   And how much was that?
21     A.   I don't remember how much.
22     Q.   Okay.
23     A.   Because each child was different.

Page 298

1      Q.   All right. And you were asked by
2  the government about the car wreck. How
3  much money did you get out of the car
4  wreck?
5         MS. DANLEY: Objection. I don't
6  know -- I don't know this, but I don't know
7  if she signed any type of confidentiality
8  agreement as far as her settlement. So I
9  would -- without knowing what the terms of
10 that agreement were, I don't know that she
11 can testify to the results.
12     Q.   Did you have a confidentiality
13 agreement? Do you know?
14     A.   I don't remember.
15     Q.   Okay. When did you -- regardless
16 of how much it was, when did you get the
17 money?
18     A.   A couple of years ago.
19     Q.   All right. And I can ask you how
20 much without violating the settlement
21 agreement, I think, because -- the terms of
22 how much was paid. Can you tell us how
23 much you got?

Page 299

1      A.   2,300.
2      Q.   Okay.
3         MR. YAGHMAI: We're just --
4  they're printing out a copy of the police
5  report. So we can --
6         MS. SHORE: Would it be possible
7  for us to get copies too?
8         MR. TURNER: It's possible.
9         MS. SHORE: Thank you.
10        MR. YAGHMAI: I'm just not sure
11 it's possible for me, but, you know --
12        MS. SHORE: I mean, we just want
13 to ask whatever you show her, if we could
14 get one, two or three --
15        MR. YAGHMAI: Sure.
16        MS. SHORE: -- copies to share
17 among ourselves.
18        MR. YAGHMAI: If they can print
19 it out, yeah. While they're waiting, let
20 me just ask a couple of more questions.
21     Q.   (By Mr. Yaghmai:) As far as your
22 handwritten statement that you gave to the
23 Cullman County Sheriff's Department, did

Page 300

1  you keep a copy of it?
2      A.   No.
3      Q.   And you've never seen a copy of
4  it except when you actually wrote it,
5  correct?
6      A.   Correct.
7      Q.   Where were you when you wrote it?
8      A.   In the Cullman County Sheriff's
9  Department detective's office.
10     Q.   And so you met with the
11 detective. He asked you to handwrite it
12 out?
13     A.   Yes.
14     Q.   And was it your understanding you
15 gave it to them and then they were going to
16 type it up for you?
17     A.   Yes.
18     Q.   And that's what they explained to
19 you?
20     A.   I don't remember to my knowledge
21 him saying he was going to type it up.
22     Q.   Okay.
23     A.   All he did was ask me to write my

Page 301

1  statement.
2     MS. DANLEY: And just for the
3  record, we have represented that counsel
4  for defendants do not have this statement
5  in their possession.
6     MR. YAGHMAI: That's correct.
7     MS. DANLEY: And it --
8     MS. SHORE: We're in the same
9  mess.
10    MR. YAGHMAI: Yeah.
11    MS. DANLEY: Her witness
12 statement.
13    MR. YAGHMAI: That's correct.
14 And to confirm that the plaintiff's don't
15 -- or the government does not have a copy.
16    MS. SHORE: We do not have a copy
17 of it.
18    MR. YAGHMAI: Yeah.
19    MS. SHORE: And we -- just for
20 the record, we subpoenaed the sheriff's
21 department --
22    MR. YAGHMAI: Yeah.
23    MS. SHORE: -- who would have the

Page 302

1  police report--
2     MR. TURNER: And it's --
3     MS. SHORE: -- of her handwritten
4  note.
5     MR. YAGHMAI: Well, they should.
6     MS. SHORE: We subpoenaed them
7  and we did not receive a copy of it.
8     MR. YAGHMAI: And for the
9  record --
10    MS. SHORE: And we shared our
11 subpoenaed documents with all of you.
12    MR. YAGHMAI: Sure. And just for
13 the record -- and not only do we not have a
14 copy of it, I've never seen it before
15 either. So --
16    MS. DANLEY: That makes two of
17 us.
18    (Defendant's Exhibit 3 was marked
19    for identification.)
20    Q.   (By Mr. Yaghmai:) Let me show
21 you what I've marked as Defendant's Exhibit
22 Number 3 and ask you to take a look at it.
23 On the front page, it has listed as the

Page 303

1  complainant as Doris Marie
2  correct?
3     A.   Yes.
4     Q.   Okay. So that would have been --
5  and I believe it says the date that you
6  would have gone there would have been
7  March 12th of 2018. Does that sound
8  correct?
9     A.   I don't remember the dates,
10 but --
11    Q.   Okay. Well, actually the next
12 page --
13    MS. SHORE: Counsel --
14    MR. YAGHMAI: Yes.
15    MS. SHORE: -- can you state
16 where -- where you're pointing to?
17    MR. YAGHMAI: Yeah.
18    Q.   (By Mr. Yaghmai:) If we go to
19 the next page, it says that you went to --
20 it actually has the complainant listed as
21 March 8th of 2018. Do you see that?
22    A.   Yes.
23    Q.   Okay. And then the third page is

Page 304

1  where it has what you reported to the
2  sheriff's department, correct?
3     A.   Correct.
4     Q.   Okay.
5     MS. SHORE: If I could just ask
6  if you could just give her a minute to read
7  the -- page three of the report, which is
8  Bates number 348.
9     MR. YAGHMAI: Well, if she needs
10 time, she will tell me.
11    MS. SHORE: Would you --
12 Mrs.        , would you like a few
13 minutes --
14    THE WITNESS: Yes, please.
15    MS. SHORE: -- to read the
16 document? Thank you.
17    THE WITNESS: Okay.
18    Q.   (By Mr. Yaghmai:) Have you had a
19 chance to look at page 3 of Defendant's
20 Exhibit Number 3?
21    A.   The supplement?
22    Q.   No, ma'am.
23    A.   Yeah.

Page 305

1   Q. The narrative.
2   A. Oh, yeah.
3   Q. All right. And is this what you
4   told -- an accurate reflection of what you
5   told the police back on March 8th of 2000
6   -- or excuse me, March 6th of 2018?
7   A. To the best of my knowledge, it
8   could have been different -- written
9   different.
10  Q. But was the gist of it the same?
11  A. Pretty much, yes.
12  Q. Was there anything that this
13  police report left out, page three of five,
14  Bates stamp Sheriff's -- Cullman Sheriff's
15  Office, 348, that the officer left out?
16      MS. DANLEY: Object to form.
17  A. I do not remember because I --
18      MS. SHORE: Objection. Form.
19  A. I don't remember everything I
20  wrote.
21  Q. Yes, ma'am. But was there
22  anything that actually happened that left
23  out that you told them happened?

Page 306

1       MS. SHORE: Objection. Form.
2   You can answer.
3   A. I don't remember what all I
4   written (sic) because it's been several
5   years.
6   Q. Yes, ma'am. Is there anything
7   inaccurate about this report?
8       MS. SHORE: Objection. Form.
9   You can answer.
10  A. No.
11  Q. Ma'am?
12  A. Not that I -- I see.
13  Q. Okay.
14      MR. YAGHMAI: I don't have
15  anything else. We just offer Defendant's
16  Exhibit Number 3 for the purpose of the
17  deposition.
18      THE VIDEOGRAPHER: We're off the
19  record at 2: --
20      MS. DANLEY: I was not done.
21      THE VIDEOGRAPHER: Okay. Sorry.
22      MS. DANLEY: Sorry.
23      FURTHER EXAMINATION

Page 307

1   BY MS. DANLEY:
2   Q. Can you get that back out and go
3   to page 348?
4   A. Okay.
5   Q. And I know, Mrs.        , you've
6   testified that you don't remember what all
7   they asked you and what you asked them.
8   A. Uh-huh.
9   Q. Looking at the second paragraph
10  about -- where it says -- let's see. One,
11  two, three, four, five, six, seven lines
12  down. The victim said she didn't have
13  anywhere for her and the kids to go, so she
14  performed oral sex on Mr. Hames.
15      Did you tell Mr. Hames that you
16  didn't have -- you and your kids didn't
17  have anywhere else to go?
18  A. Yes.
19  Q. Okay. This paragraph does not
20  mention Mr. Hames putting his hand on your
21  head.
22  A. Correct.
23  Q. Is it fair to say that it is not

Page 308

1   an accurate reflection of everything that
2   happened that day?
3   A. Yes.
4   Q. Do you remember if they asked you
5   if Mr. Hames put his hand on your head?
6   A. No, they did not. All they asked
7   me to do is write what I could remember.
8   Q. So they didn't ask you any
9   questions to the level of detail that Greg
10  and I have asked you today?
11  A. No.
12  Q. Okay. Let's go down to the third
13  paragraph. It says the victim said the
14  harassment by Mr. Hames got so bad she
15  started locking her door and would mute her
16  TV when she thought Mr. Hames was going to
17  be in Marina?
18  A. Yes.
19  Q. Tell us a little bit more about
20  that. This was -- was this after the wine
21  incident?
22  A. Yes. And the bathtub incident.
23  Q. What would you do specific --

**Page 309**

1   what would Mr. Hames do, first, that would
2   prompt this reaction?
3       A.   He would like pull up and sit in
4   my yard. And it made me uncomfortable.
5   And after him just walking into my house
6   that -- that day, I started to lock my
7   door, mute my TV, and act like I wasn't at
8   home.
9       Q.   So the victim said while she was
10  in Mr. Hames' law office he -- he asked her
11  for oral sex in front of his secretary?
12      A.   That's incorrect.
13      Q.   I know that you testified earlier
14  that some of the secretaries could have
15  been there. Can you describe the layout of
16  how it worked to get to Mr. Hames' office?
17      A.   Okay. When you walk into the
18  front door of -- that is the lobby. And
19  there was a glass desk behind -- you know,
20  in there. And if the secretary was in, she
21  would call. And I only seen them there,
22  you know, maybe a couple of times. You had
23  to pick up a phone and call an extension to

**Page 310**

1   get ahold of anybody.
2       Q.   So there was a door in between --
3       A.   Yes.
4       Q.   Okay. And when you called and
5   got the extension, would they let you in?
6       A.   Yes.
7       Q.   Okay. So you would come through
8   one door. Then what?
9       A.   Then you would walk down the hall
10  to his office.
11      Q.   And there was another door to his
12  office?
13      A.   Yeah. There was several doors.
14      Q.   But the secretary was sitting at
15  the front of the building?
16      A.   When I seen her.
17      Q.   When you --
18      A.   Yeah.
19      Q.   If the secretary had been there,
20  they were sitting --
21      A.   Yes.
22      Q.   -- in the front of the building?
23  And it's fair to say that there are at

**Page 311**

1   least two doors in between you, Mr. Hames'
2   office, and where the secretary were
3   sitting?
4       A.   There might have been a few more
5   as far as offices go. But just, you know,
6   it was the door you walk through and then
7   the one to his office.
8       Q.   Okay.
9           MS. DANLEY: That's it. That's
10  all.
11          THE VIDEOGRAPHER: We're off the
12  record at 2:56 p m.
13          (Concluded at 2:56 p.m.)

**Page 312**

1           C E R T I F I C A T E
2   State of Alabama
3   CALHOUN COUNTY
4       I hereby certify that the above and
5   foregoing deposition was taken down by me
6   in stenotype and the questions and answers
7   thereto were transcribed by means of
8   computer-aided transcription, and that the
9   foregoing represents a true and correct
10  transcript of the testimony given by said
11  witness upon said hearing.
12      I further certify that I am neither of
13  counsel, nor of kin to the parties to the
14  action, nor am I in any way interested in
15  the result of said cause named in said
16  caption.
17
18          /s/BRITTANY NICHOLE HANVEY
19          BRITTANY NICHOLE HANVEY, CCR
20          CCR#649, Expires 9/30/20
21          Commissioner for the State
22          Of Alabama at Large
23          My Commission Expires 05/14/2021